IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,153

HODES & NAUSER, MDS, P.A.;
HERBERT C. HODES, M.D.; and
TRACI LYNN NAUSER, M.D.,
*Appellees*,

v.

DEREK SCHMIDT,
in His Official Capacity as
Attorney General of the State of Kansas; and
STEPHEN M. HOWE,
in His Official Capacity as
District Attorney for Johnson County,
*Appellants*.

SYLLABUS BY THE COURT

1.

To obtain a temporary injunction, a plaintiff must show the court: (1) The plaintiff has a substantial likelihood of eventually prevailing on the merits; (2) a reasonable probability exists that the plaintiff will suffer irreparable injury without an injunction; (3) the plaintiff lacks an adequate legal remedy, such as damages; (4) the threat of injury to the plaintiff outweighs whatever harm the injunction may cause the opposing party; and (5) the injunction will not be against the public interest.

2.

When a party alleges a trial court erred in issuing a temporary injunction, an appellate court examines whether the court abused its discretion. A trial court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact.

1

3.

Kansas courts have the authority to interpret Kansas constitutional provisions independently of the manner in which federal courts interpret similar or corresponding provisions of the United States Constitution. This can result in the Kansas Constitution protecting the rights of Kansans more robustly than would the United States Constitution.

4.

Kansas courts look to the words of the Kansas Constitution to interpret its meaning. When the words do not make the drafters' and people's intent clear, courts look to the historical record, remembering the polestar is the intention of the makers and adopters of the relevant provisions.

5.

Appellate courts conduct de novo review of issues requiring the interpretation of constitutional provisions, which means appellate courts are not bound by the interpretation of a lower court.

6.

Section 1 of the Kansas Constitution Bill of Rights sets forth rights that are broader than and distinct from the rights in the Fourteenth Amendment to the United States Constitution.

7.

The rights acknowledged in section 1 of the Kansas Constitution Bill of Rights are judicially enforceable against governmental action that does not meet constitutional standards.

2

8.

Section 1 of the Kansas Constitution Bill of Rights affords protection of the right of personal autonomy, which includes the ability to control one's own body, to assert bodily integrity, and to exercise self-determination. This right allows a woman to make her own decisions regarding her body, health, family formation, and family life—decisions that can include whether to continue a pregnancy.

9.

The State may only infringe upon the right to decide whether to continue a pregnancy if the State has a compelling interest and has narrowly tailored its actions to that interest.

10.

When common-law terms are used in the Kansas Constitution Bill of Rights, courts should look to common-law definitions for their meaning.

11.

The recognition of inalienable natural rights in section 1 of the Kansas Constitution Bill of Rights is intended for all Kansans, including pregnant women.

12.

The Kansas Constitution does not begin with an enumeration of the powers of government; it instead begins with a Bill of Rights for all Kansans, which in turn begins with a statement of inalienable natural rights, among which are life, liberty, and the pursuit of happiness. By this ordering, demonstrating the supremacy placed on the rights of individuals, preservation of these natural rights is given precedence over the establishment of government.

13.

   This court, when considering claims brought under section 1 of the Kansas Constitution Bill of Rights has recognized and adopted three standards: (1) the rational basis standard, which requires only that the enactment bear some rational relationship to a legitimate state interest; (2) the heightened or intermediate scrutiny standard, which requires the enactment to substantially further an important state interest; and (3) the strict scrutiny standard, which requires the enactment serve some compelling state interest and be narrowly tailored to further that interest. The determination of which of the three standards applies depends on the nature of the right at stake.

14.

   The most searching of these standards—strict scrutiny—applies when a fundamental right is implicated.

15.

   The natural right of personal autonomy is fundamental and thus requires applying strict scrutiny.

16.

   Under strict scrutiny, the burden falls on the government to defend challenged legislation.

17.

   Before a court considers whether any governmental action survives strict scrutiny, it must be sure the action actually impairs the right.

4

18.

Generally, a statute comes before the court cloaked in a presumption of constitutionality, and it is the duty of the one attacking the statute to sustain the burden of proving unconstitutionality.

19.

When a statute is presumed constitutional, all doubts must be resolved in favor of its validity. If there is any reasonable way to construe that statute as constitutionally valid, the court has the authority and duty to do so.

20.

In a case involving a suspect classification or fundamental interest, the courts peel away the protective presumption of constitutionality and adopt an attitude of active and critical analysis, subjecting the classification to strict scrutiny. In that case, the burden of proof is shifted from plaintiff to defendant and the ordinary presumption of validity of the statute is reversed.

21.

No presumption of constitutionality applies to a statute subject to strict scrutiny under section 1 of the Kansas Constitution Bill of Rights.

Review of the judgment of the Court of Appeals in 52 Kan. App. 2d 274, 368 P.3d 667 (2016). Appeal from Shawnee District Court; LARRY D. HENDRICKS, judge. Opinion filed April 26, 2019. The judgment of the Court of Appeals affirming the district court is affirmed. The judgment of the district court is affirmed, and the case is remanded.

*Stephen R. McAllister*, solicitor general, argued the cause, and *Sarah E. Warner* and *Shon D. Qualseth*, of Thompson Ramsdell Qualseth & Warner, P.A., of Lawrence, *Jeffrey A. Chanay*, chief deputy attorney general, *Dennis D. Depew*, deputy attorney general, *Dwight R. Carswell*, assistant solicitor

general, *Bryan C. Clark*, assistant solicitor general, and *Derek Schmidt*, attorney general, were with him on the briefs for appellant.

*Janet Crepps*, of Center for Reproductive Rights, of New York, New York, argued the cause, and *Genevieve Scott* and *Zoe Levine*, of the same office, *Erin Thompson*, of Foland, Wickens, Eisfelder, Roper and Hofer, P.C., of Kansas City, Missouri, *Lee Thompson*, of Thompson Law Firm, LLC, of Wichita, *Robert V. Eye*, of Robert V. Eye Law Office, LLC, of Lawrence, and *Teresa A. Woody*, of The Woody Law Firm PC, of Kansas City, Missouri, were with her on the briefs for appellee.

*Mary Ellen Rose*, of Overland Park, *Kevin M. Smith*, of Law Offices of Kevin M. Smith, P.A., of Wichita, and *Paul Benjamin Linton*, of Thomas More Society, of Northbrook, Illinois, were on the briefs for amicus curiae Family Research Council.

*Stephen Douglas Bonney*, of ACLU Foundation of Kansas, of Overland Park, and *Brianne J. Gorod* and *David H. Gans*, of Constitutional Accountability Center, of Washington, D.C., were on the brief for amici curiae Constitutional Accountability Center and American Civil Liberties Union Foundation of Kansas.

*Frederick J. Patton, II*, of Patton and Patton Chartered, of Topeka, and *Teresa S. Collett*, of Saint Paul, Minnesota, were on the briefs for amicus curiae Kansans for Life.

*Mark P. Johnson*, of Dentons US LLP, of Kansas City, Missouri, was on the brief for amici curiae Kansas physicians.

*Don Saxton*, of Saxton Law Firm LLC, of Kansas City, Missouri, and *Kimberly A. Parker*, *Skye L. Perryman*, *Brittani Kirkpatrick Ivey*, and *Souvik Saha*, of Wilmer Cutler Pickering Hale and Dorr LLP, of Washington, D.C., were on the briefs for amicus curiae American College of Obstetricians and Gynecologists.

*Richard J. Peckham*, of Andover, and *Mathew D. Staver* and *Horatio G. Mihet*, of Liberty Counsel, of Orlando, Florida, were on the brief for amici curiae American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, and Catholic Medical Association.

PER CURIAM: Section 1 of the Kansas Constitution Bill of Rights provides: "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." We are now asked: Is this declaration of rights more than an idealized aspiration? And, if so, do the substantive rights include a woman's right to make decisions about her body, including the decision whether to continue her pregnancy? We answer these questions, "Yes."

We conclude that, through the language in section 1, the state's founders acknowledged that the people had rights that preexisted the formation of the Kansas government. There they listed several of these natural, inalienable rights—deliberately choosing language of the Declaration of Independence by a vote of 42 to 6.

Included in that limited category is the right of personal autonomy, which includes the ability to control one's own body, to assert bodily integrity, and to exercise self-determination. This right allows a woman to make her own decisions regarding her body, health, family formation, and family life—decisions that can include whether to continue a pregnancy. Although not absolute, this right is fundamental. Accordingly, the State is prohibited from restricting this right unless it is doing so to further a compelling government interest and in a way that is narrowly tailored to that interest. And we thus join many other states' supreme courts that recognize a similar right under their particular constitutions.

Finally, we conclude that the plaintiffs Herbert C. Hodes, M.D., Traci Lynn Nauser, M.D., and Hodes & Nauser, MDs, P.A. (Doctors) have shown they are substantially likely to ultimately prevail on their claim that Senate Bill 95 violates these principles by severely limiting access to the safest procedure for second-trimester abortions. As a result, we affirm the trial court's injunction temporarily enjoining the enforcement of S.B. 95 and remand to that court for full resolution on the merits.

7

THE LEGISLATION AND THIS CASE'S PROCEDURAL HISTORY

In 2015, the Kansas Legislature enacted S.B. 95, which is now codified at K.S.A. 65-6741 through 65-6749. S.B. 95 prohibits physicians from performing a specific abortion method referred to in medical terms as Dilation and Evacuation (D & E) except when "necessary to preserve the life of the pregnant woman" or to prevent a "substantial and irreversible physical impairment of a major bodily function of the pregnant woman." K.S.A. 65-6743(a).

In this case, the Doctors provide abortions, including D & E procedures, in Kansas. They filed this action challenging S.B. 95 on behalf of themselves and their patients on June 1, 2015. They argued S.B. 95 prevents them from using the safest method for most second-trimester abortions—the D & E method. These restrictions, according to the Doctors, violate sections 1 and 2 of the Kansas Constitution Bill of Rights because they infringe on inalienable natural rights, specifically, the right to liberty.

A graphic description of the D & E procedure referred to in S.B. 95 is not necessary to resolving the legal issues before us. Although the detailed nature of the procedure may factor into the lower court's later decision on the full merits, at this temporary injunction stage the United States Supreme Court's description suffices. That Court explained the procedure involves "(1) dilation of the cervix; (2) removal of at least some fetal tissue using nonvacuum instruments; and (3) (after the 15th week) the potential need for instrumental disarticulation or dismemberment of the fetus or the collapse of fetal parts to facilitate evacuation from the uterus." *Stenberg v. Carhart*, 530 U.S. 914, 925, 120 S. Ct. 2597, 147 L. Ed. 2d 743 (2000). The Doctors argued, and the trial court found, that 95% of second-trimester abortions in the United States are performed using the D & E procedure.

When the Doctors filed this action, they also filed a motion for temporary injunction to prevent S.B. 95 from taking effect while the case moved forward. The Doctors submitted documentation to support this motion, including two affidavits from board-certified physicians licensed to provide abortion care and one affidavit from an expert on medical ethics.

The defendants, the Kansas Attorney General and the District Attorney for Johnson County (the State), submitted a response opposing the temporary injunction, asserting that the Doctors had failed to show they were entitled to the relief they sought because there is no right to abortion protected by the Kansas Constitution. The State acknowledged that the United States Supreme Court decided in *Roe v. Wade*, 410 U.S. 113, 157-58, 164, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973), that a fetus is not a "person" entitled to protection under the Fourteenth Amendment to the United States Constitution and that, at least in the early stages of a pregnancy, the State could not interfere with a woman's right to decide whether to continue her pregnancy. But it argued those same rights do not exist under the Kansas Constitution.

Alternatively, the State argued that, if such state constitutional rights exist, S.B. 95 would not violate them. It first pointed to the test adopted by the United States Supreme Court in *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 874-78, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) (plurality opinion)—often referred to as the undue burden test or standard—for balancing the burdens imposed on a woman's rights and the State's interests. The State then concluded S.B. 95 does not impose an undue burden on a pregnant woman's right to obtain a lawful abortion, in part because other abortion procedures are available. Before the trial court, the State primarily presented three alternatives:  labor induction, induction of fetal demise using an injection, and induction of fetal demise using umbilical cord transection.

Following a hearing on the Doctors' motion, the trial court granted the temporary injunction. The court noted (1) this court has repeatedly stated that sections 1 and 2 of the Kansas Constitution Bill of Rights are given much the same effect as the Fourteenth Amendment to the United States Constitution; (2) the United States Supreme Court caselaw provides a framework for analyzing the constitutionality of the Kansas legislation; and (3) under that framework, the Doctors are substantially likely to prevail on the merits of their claim that the legislation is unconstitutional. Citing *Casey* and other United States Supreme Court decisions that applied its undue burden test advanced by the State, the trial court concluded S.B. 95 is likely to unduly burden access to abortions because it eliminates the most commonly used procedure for second-trimester abortions and the State's proposed alternatives are more dangerous. In rejecting the State's arguments about alternative procedures, the trial court made the following findings of fact regarding those procedures:

- "Labor induction is used in approximately 2% of second-trimester abortion procedures. It requires an inpatient labor process in a hospital that will last between 5-6 hours up to 2-3 days, includes increased risks of infection when compared to D & E, and is medically contraindicated for some women."

- "There is no established safety benefit to inducing demise prior to a D & E procedure."

- Regarding fetal demise by either transabdominal or transvaginal injection of digoxin, "[r]esearch studies have shown increased risks of nausea, vomiting, extramural delivery, and hospitalization."

10

- "Injections to induce demise using digoxin prior to D & E are not practiced prior to 18 weeks gestation, and the impact of subsequent doses of digoxin, required in cases where a first does is not effective, is virtually unstudied."

- "Umbilical cord transection prior to a D & E is not possible in every case" and, when used, "increases procedure time, makes the procedure more complex, and increases risks of pain, infection, uterine perforation, and bleeding."

- "The use of transection to induce fetal demise has only been discussed in a single retrospective study, the authors of which note that its main limitation is 'a potential lack of generalizability.'"

The State reminds us that it has not yet fully litigated the safety of the various procedures. Nevertheless, it does not suggest the trial court lacked a factual basis for making those findings based on the limited record made for purposes of the ruling on the temporary injunction.

Before us, the State discusses an alternative to the D & E procedure it had briefly mentioned to the trial court: the induction of fetal demise using potassium chloride, otherwise known as KCl. During the trial court proceedings, the Doctors, in apparent anticipation of this alternative being argued, presented affidavits that included facts about this procedure and its risks. Nevertheless, presumably because the State made only a passing reference to this procedure, the trial court did not make any factual finding about it. As a result, this alternative does not factor into our analysis. "[A]ppellate courts do not make factual findings but review those made by district courts." *State v. Berriozabal*, 291 Kan. 568, 591, 243 P.3d 352 (2010). And the State did nothing to insure adequate factual findings on the issue. See *State v. Rodriguez*, 302 Kan. 85, 91, 350 P.3d 1083 (2015) (party must object to inadequate findings of fact to preserve issue for appeal).

11

Consequently, the State has essentially waived this alternative—at least for the purposes of this appeal—and we have no basis to consider the State's fact-based argument regarding the comparative safety of the KCl procedure.

After making the findings about the safety risks associated with the three alternatives primarily argued by the State to the trial court, that court cited *Gonzales v. Carhart*, 550 U.S. 124, 127 S. Ct. 1610, 167 L. Ed. 2d 480 (2007); *Stenberg v. Carhart*, 530 U.S. 914; and *Planned Parenthood of Missouri v. Danforth*, 428 U.S. 52, 96 S. Ct. 2831, 49 L. Ed. 2d 788 (1976). *Gonzales* and *Stenberg* both dealt with legislation restricting access to D & E procedures. Based on that authority, the trial court concluded: "[T]he Supreme Court has already balanced the State interests asserted here against a ban on the most common method of second-trimester abortion and determined that it is unconstitutional." Finding this indicated a likelihood that the Doctors ultimately would succeed on the merits of their petition, the trial court granted a temporary injunction.

The State immediately appealed from this temporary injunction to the Court of Appeals. That court, sitting en banc, split 6-1-7. *Hodes & Nauser, MDs v. Schmidt*, 52 Kan. App. 2d 274, 368 P.3d 667 (2016). Seven of the judges concluded that the Kansas Constitution protects a woman's access to abortion services and held that the injunction should be affirmed, but they split 6-1 on the reasons to reach that result. In a plurality opinion, six of the judges adopted the reasoning of the trial court—i.e., that sections 1 and 2 of the Kansas Constitution Bill of Rights are given much the same effect as the Fourteenth Amendment to the United States Constitution. 52 Kan. App. 2d at 275. One judge wrote separately, concurring in the plurality's result only and reasoning that our state Constitution provides protection of interests separate and distinct from the United States Constitution. 52 Kan. App. 2d at 297. The seven remaining judges dissented, concluding that the injunction was not warranted because a woman has no right protected by the Kansas Constitution to obtain an abortion. 52 Kan. App. 2d at 330. Because the

12

panel split evenly on the result, the trial court's temporary injunction remained in place. 52 Kan. App. 2d at 295.

We granted the State's petition for review, providing our jurisdiction under K.S.A. 60-2101(b).

ANALYSIS

The ultimate question presented in this appeal is whether the trial court erred in granting a temporary injunction. A temporary injunction merely preserves the relative positions of the parties until a full decision on the merits can be made. *Steffes v. City of Lawrence*, 284 Kan. 380, 394, 160 P.3d 843 (2007). Even so, in order to obtain such an injunction, a plaintiff must show the court: (1) The plaintiff has a substantial likelihood of eventually prevailing on the merits; (2) a reasonable probability exists that the plaintiff will suffer irreparable injury without an injunction; (3) the plaintiff lacks an adequate legal remedy, such as damages; (4) the threat of injury to the plaintiff outweighs whatever harm the injunction may cause the opposing party; and (5) the injunction will not be against the public interest. *Downtown Bar and Grill v. State*, 294 Kan. 188, 191, 273 P.3d 709 (2012).

When a party alleges a trial court erred in issuing a temporary injunction, an appellate court examines whether the court abused its discretion. 294 Kan. at 191. A trial court abuses its discretion if its decision is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011).

The State primarily contests the trial court's conclusions regarding only one of the five requirements for issuing a temporary injunction—specifically, the first element that

13

requires a plaintiff to establish a substantial likelihood of eventually prevailing on the merits. According to the State, the trial court abused its discretion when it held the Kansas Constitution Bill of Rights protects a woman's right to access abortion. Alternatively, the State argues S.B. 95 does not violate any such rights. In both instances, the State argues the court's decisions were based on an error of law.

These arguments address the two elements the Doctors must establish in order to prevail on the temporary injunction. First, having alleged a violation of the Kansas Constitution Bill of Rights, they must establish this right exists and that our Constitution protects it. Second, the Doctors must establish S.B. 95 unconstitutionally infringes on this right. See *State v. Limon*, 280 Kan. 275, 284, 122 P.3d 22 (2005).

## 1. The Doctors' First Burden: Establishing a Constitutional Right

As to the first of the Doctors' burdens, as previously discussed, the trial court applied United States Supreme Court decisions interpreting the Fourteenth Amendment to reach the conclusion that sections 1 and 2 of the Kansas Constitution Bill of Rights, like the Fourteenth Amendment, protect a fundamental right to abortion. In doing so, the trial court followed the guidance that has been provided by this court over the years.

As pointed out by the trial court and the members of the Court of Appeals plurality, this court has often said that sections 1 and 2 have "much the same effect" as the Due Process and Equal Protection Clauses found in the Fourteenth Amendment to the United States Constitution. Generally, this statement has been made in cases where a party asserts violations of both Constitutions without making unique arguments about sections 1 and 2. See, e.g., *Limon*, 280 Kan. at 283; *State ex rel. Stephan v. Parrish*, 257 Kan. 294, Syl. ¶ 5, 891 P.2d 445 (1995); *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. 404, 426, 636 P.2d 760 (1981); *Manzanares v. Bell*, 214 Kan.

14

589, 602, 522 P.2d 1291 (1974); *Henry v. Bauder*, 213 Kan. 751, 752-53, 518 P.2d 362 (1974); *Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748, Syl. ¶ 1, 408 P.2d 877 (1965); *The State v. Wilson*, 101 Kan. 789, 795-96, 168 P. 679 (1917). In yet another case, *Alpha Med. Clinic v. Anderson*, 280 Kan. 903, 920, 128 P.3d 364 (2006), this court did not depart from that line of cases when asked to determine if the Kansas Constitution protects a woman's right to decide whether to continue a pregnancy.

In *Alpha Med. Clinic*, this court discussed the "federal constitutional rights to privacy [that] are potentially implicated" by an inquisition seeking abortion records. 280 Kan. 903, Syl. ¶ 10. These include "the fundamental right of a pregnant woman to obtain a lawful abortion without government imposition of an undue burden on that right." 280 Kan. at 920 (citing *Casey*, 505 U.S. at 874-78 [plurality opinion]). In referencing the potential that such a right arose under the Kansas Constitution, this court stated: "We have not previously recognized—and need not recognize in this case despite petitioners' invitation to do so—that such rights also exist under the Kansas Constitution." 280 Kan. at 920.

Thus, the question asserted by the Doctors—whether the Kansas Constitution Bill of Rights independently protects a woman's right to decide whether to continue a pregnancy—was not answered in *Alpha Med. Clinic*. And it has not been determined in any other case before this court. Moreover, since the ratification of the Fourteenth Amendment in 1868, this court has rarely been asked to focus solely on sections 1 or 2. Litigants typically present sections 1 and 2 in tandem with the Fourteenth Amendment, and Kansas courts have rarely contrasted the Kansas constitutional provisions with the Fourteenth Amendment.

In other contexts, however, this court has acknowledged that "allowing the federal courts to interpret the Kansas Constitution seems inconsistent with the notion of state

sovereignty." *State v. Lawson*, 296 Kan. 1084, 1091-92, 297 P.3d 1164 (2013). Indeed, this court has the authority to interpret Kansas constitutional provisions independently of the manner in which federal courts interpret corresponding provisions of the United States Constitution. This can result in the Kansas Constitution protecting the rights of Kansans more robustly than would the United States Constitution. 296 Kan. at 1090-91.

This court has put these principles into practice on occasion and, after doing so, has interpreted a provision of the Kansas Constitution in a manner different from the United States Supreme Court's interpretation of a parallel provision of the United States Constitution. E.g., *State v. McDaniel & Owens*, 228 Kan. 172, 184-85, 612 P.2d 1231 (1980) (independently interpreting section 9 of the Kansas Constitution Bill of Rights in manner different from the Eighth Amendment to the United States Constitution). Significantly, in *Farley v. Engelken*, 241 Kan. 663, 740 P.2d 1058 (1987), this court recognized section 1 of the Kansas Constitution Bill of Rights describes rights that are broader than and distinct from those in the Fourteenth Amendment.

*Farley* addressed the constitutionality of a statute that abolished the collateral source rule in medical malpractice cases. The parties had raised issues relating to the Fourteenth Amendment and sections 1 and 18 of the Kansas Constitution Bill of Rights. This court chose to analyze the issues under the Kansas Constitution, holding it "affords separate, adequate, and greater rights than the federal Constitution. Therefore, [it held] we clearly and expressly decide this case upon sections 1 and 18 of the Kansas Bill of Rights." 241 Kan. at 671.

Consistent with *Farley*'s holding, the Doctors argue the Kansas Constitution Bill of Rights describes stronger rights than the United States Constitution. In contrast, the State argues the Kansas Bill of Rights does not recognize the same rights as have been found to exist under the United States Constitution. The parties have not cited, nor have

16

we found, a decision fully analyzing the divergent positions they pose. Although *Farley* supports the Doctors' position, the court did not explain its holding that section 1 affords greater rights than the United States Constitution. In addition, *Farley* did not deal with the personal rights at issue in the present case.

Accordingly, the parties' arguments and Doctors' exclusive reliance on the Kansas Constitution Bill of Rights require us to now delve deeper into the differences between it and the Fourteenth Amendment.

Doing so raises questions of constitutional interpretation. The standard applied by Kansas courts when interpreting the Kansas Constitution was enunciated by this court in 1876. There, it rejected a man's argument that a woman who received more votes than he nevertheless was barred by her gender from holding the office of superintendent of public instruction then described in article 6 of the Kansas Constitution because the same Constitution denied her the right to vote in that race. The court stated:

> "'[T]he best and only safe rule for ascertaining the intention of the makers of any written law, is to abide by the language they have used; and this is especially true of written constitutions, for in preparing such instruments it is but reasonable to presume that every word has been carefully weighed, and that none are inserted, and none omitted without a design for so doing.'" *Wright v. Noell*, 16 Kan. 601, 607, 1876 WL 1081 (1876).

This court has repeatedly quoted *Wright* as stating the standard governing this court's constitutional interpretation. See, e.g., *State v. Spencer Gifts,* 304 Kan. 755, 761, 374 P.3d 680 (2016); *In re Estate of Strader,* 301 Kan. 50, 55, 339 P.3d 769 (2014); *Gannon v. State*, 298 Kan. 1107, 1143, 319 P.3d 1196 (2014). When the words themselves do not make the drafters' intent clear, courts look to the historical record, remembering "'the polestar . . . is the *intention* of the *makers* and *adopters*.' [Citation

17

omitted.]" *Hunt v. Eddy*, 150 Kan. 1, 5, 90 P.2d 747 (1939); see *State ex rel. Stephan v. Finney*, 254 Kan. 632, 655, 867 P.2d 1034 (1994).

Appellate courts conduct de novo review of issues requiring the interpretation of constitutional provisions, which means appellate courts are not bound by the interpretation of a lower court. See *Limon*, 280 Kan. at 283.

We begin our analysis of the issue of whether the Kansas Constitution Bill of Rights protects a woman's right to decide whether to continue a pregnancy by comparing the text of section 1 and the Fourteenth Amendment. This comparison highlights that Kansans chose to protect their "inalienable natural rights," including their liberty.

Second, we examine whether there is any support for the State's argument that the framers of section 1 did not intend to grant individual rights that could be judicially protected. The historical record overwhelmingly shows an intent to broadly and robustly protect natural rights and to impose limitations on governmental intrusion into an individual's rights.

Third, we explore the meaning of a "natural right." We do so by examining the philosophical underpinnings of natural rights, legal recognition of natural rights, the history of state courts recognizing an enforceable natural right of bodily integrity, and the recognition of the concepts of liberty and the pursuit of happiness as including the right to make decisions about parenting and procreation.

Fourth, we consider whether these rights extend to women, as well as men. This leads, fifth, to our examination of whether protections extend to a pregnant woman's right to control her body and to her right to decide whether to continue a pregnancy. And,

18

sixth, we consider the relevance of Kansas territorial and state statutes that criminalized abortion.

Our analysis leads us to the conclusion that section 1 of the Kansas Constitution Bill of Rights acknowledges rights that are distinct from and broader than the United States Constitution and that our framers intended these rights to be judicially protected against governmental action that does not meet constitutional standards. Among the rights is the right of personal autonomy. This right allows a woman to make her own decisions regarding her body, health, family formation, and family life—decisions that can include whether to continue a pregnancy. Although the Doctors, the lower courts here, and various decisions from this court have tended to lump sections 1 and 2 together, we base our decision on section 1 alone because we find it sufficiently protects the rights at stake.

1.1 *Section 1 Identifies Rights Distinct from and Broader than Those Listed in the Fourteenth Amendment; It Provides a Nonexhaustive List of Natural Rights.*

A comparison of the text of section 1 of the Kansas Bill of Rights, which was part of the Kansas Constitution ratified by the territorial voters in October 1859, and the Fourteenth Amendment to the United States Constitution, which was ratified in 1868, reveals several differences in wording. Again, section 1 states: "All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness." And the Fourteenth Amendment states, in relevant part, that no State can "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

As this side-by-side comparison reveals, section 1 contains the following words not found in the Fourteenth Amendment: "All men are possessed of equal and

19

inalienable natural rights." In fact, no provision of the United States Constitution uses the term "natural rights"—i.e., "[a] right that is conceived as part of natural law and that is therefore thought to exist independently of rights created by government or society." Black's Law Dictionary 1519 (10th ed. 2014); see *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 319, 6 L. Ed. 606 (1827) (Trimble, J., opinion); 25 U.S. at 345 (Marshall, C.J., opinion). This silence created an ambiguity as to whether rights other than those listed are protected by the United States Constitution. In contrast, the Kansas provision lists certain rights—life, liberty, and the pursuit of happiness—but indicates these are just among the natural rights Kansans possess.

The framers of the Kansas Constitution in 1859 were not alone in adopting a natural rights provision. William Hutchinson, who chaired the "Preamble and Bill of Rights" Committee of the Wyandotte Constitutional Convention that initially developed section 1, explained the history of natural rights declarations to the other Convention delegates when he submitted his committee's report, stating:

> "It is a historical fact, that ever since the days of King John, when the magna charta in favor of British freedom was obtained by the English yeomanry, some declaration of rights similar to the one presented by us, has been common with the people of all countries; but it was not until 1776, when that memorable Declaration of ours came into existence, that the people cut loose from a narrow conception of humanity, and entered upon that broad field of human liberty. All the States [State Constitutions] since that day down to [that of] the prospective State of Kansas, have contained a similar instrument, that becomes as it were the timbers of the building—the superstructure upon which the edifice of State must be erected." Proceedings and Debates of the Kansas Constitutional Convention (Drapier ed., 1859), *reprinted in* Kansas Constitutional Convention 184-85 (1920) (hereinafter Convention).

By the time the Fourteenth Amendment to the United States Constitution was ratified in "1868, twenty-four of the thirty-seven state constitutions existing at that time,

nearly a two-thirds majority, contained provisions guaranteeing inalienable, natural, or inherent rights of an unenumerated rights type. Thus, in 1868, approximately 67% of all Americans then living resided in states that constitutionally protected unenumerated individual liberty rights." Calabresi & Vickery, *On Liberty and the Fourteenth Amendment:  The Original Understanding of the Lockean Natural Rights Guarantees*, 93 Tex. L. Rev. 1299, 1303 (2015) (*Lockean Natural Rights Guarantees*).

These provisions in state constitutions, which are often referred to as "Lockean Natural Rights Guarantees," originated with the Virginia Declaration of Rights of 1776. The Virginia Declaration, principally drafted by George Mason, relies heavily on the philosophy of John Locke. In particular, Mason "endorsed the Lockean ideal that all men retain some of their natural rights after subscribing to the social compact, in contrast to the idea put forth by Thomas Hobbes and Jean-Jacques Rousseau that men surrender all their natural rights to the sovereign in exchange for security and public order." 93 Tex. L. Rev. at 1314, 1316-17.

Mason's draft served not only as the model for many state constitutions but also for portions of the Declaration of Independence. 93 Tex. L. Rev. at 1318. As we will discuss in more detail when looking at the history of the Kansas Constitution, Kansas' section 1 was patterned after the Declaration of Independence. Convention, at 283. Therefore, we may, by this path, trace our section 1 to the Lockean natural rights guarantees.

Returning to the language of section 1, after using the phrase "inalienable natural rights," it delineates three rights:  life, liberty, and the pursuit of happiness. The framers made clear the list was not intended to be exhaustive—rather, the listed rights are "among" the inalienable natural rights recognized by the provision. See Webster's New World College Dictionary 47 (5th ed. 2014) (defining "among" to mean "in the company

of; surrounded by; included with a group of"). Two of the three nonexclusive listed rights—life and liberty—are mirrored in the Fourteenth Amendment, while section 1's explicit inclusion of "pursuit of happiness" is absent from the Fourteenth Amendment. Section 1, however, does not list "property," while the Fourteenth Amendment does. Whatever implications arise from that omission need not be plumbed today, because section 1's broad declaration that all men are entitled to a nonexhaustive list of inalienable natural rights clearly reveals that section 1 recognizes a distinct and broader category of rights than does the Fourteenth Amendment.

A final and notable language distinction between section 1 and the Fourteenth Amendment arises from another phrase found in the Amendment but not in section 1: "without due process of law." In other words, the text of section 1 demonstrates an emphasis on substantive rights—not procedural rights. In contrast, the Fourteenth Amendment's use of "the term 'due process' seem[s] to speak of procedural regularity." Currie, The Constitution in the Supreme Court: The First Hundred Years, 1789-1888, at 272 (1985). Thus, section 1's focus on substantive rights removes from our calculus one of the criticisms of *Roe* and other decisions of the United States Supreme Court relying on substantive due process rights under the Fourteenth Amendment. See *Roe*, 410 U.S. at 173 (Rehnquist, J., dissenting).

### 1.2 *The Historical Record of the Kansas Bill of Rights Indicates Section 1 Describes Judicially Enforceable Rights.*

The State focuses on the omission of a due process clause from section 1 to argue the rights listed there are aspirational or hortatory and not enforceable or self-executing. Although the State recognizes that the 1859 Wyandotte Constitutional Convention delegates could not have considered the Fourteenth Amendment's inclusion of the due process provision because it was not ratified until nine years after voters ratified the Kansas Constitution, it argues they could have considered the Fifth Amendment to the

United States Constitution, which was ratified in 1791. The Fifth Amendment, which applies only to the federal government, provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law." Because those attending the Wyandotte Convention could have adopted a similar due process clause but did not, the rights described in section 1 cannot be judicially enforced, according to the State.

The Kansas Constitution does include a due process provision, however: section 18 of the Bill of Rights. It states: "All persons, for injuries suffered in person, reputation or property, shall have remedy by due course of law . . . ." But the Wyandotte Convention delegates simply chose to separate the provisions acknowledging rights—for example, section 1—from the due process provision in section 18.

Arguably, the failure to combine sections 1 and 18 creates an ambiguity that underlies the State's argument that section 1 does not provide for judicially enforceable rights. To resolve this potential ambiguity, we next examine the historical record regarding the debates at the Wyandotte Convention as well as the early caselaw interpreting section 1.

Section 1 was incorporated into and adopted as part of the Kansas Constitution that emerged from the Wyandotte Convention and was subsequently ratified by the voters in October 1859. The section has not been amended since that time.

The Wyandotte Convention followed three other conventions: the 1855 Topeka convention at which free-state proponents repudiated the positions on slavery by the 1855 proslavery territorial legislature, the 1857 Lecompton convention convened by the proslavery legislature in order to make slavery an "inviolable" right of property, and the 1858 Leavenworth convention that decried the Lecompton constitution. Congress rejected the constitution produced at the Topeka convention, and Kansas territorial voters

rejected the constitution produced at the Lecompton convention. The constitution from the Leavenworth convention was abandoned when the Lecompton constitution was defeated. Thacher, Address at the Quarter-Centennial Celebration:  The Rejected Constitutions, *in* 3 Kansas Historical Collections 436-48 (1886).

In 1859, the Kansas Territorial Legislature called for another constitutional convention, this one to be held in Wyandotte for the purpose of producing a constitution that would be acceptable both to the citizens of the prospective state and to Congress. Elected delegates—all men—included eighteen lawyers, sixteen farmers, eight merchants, three manufacturers, three physicians, a mechanic, a land agent, a printer, and a surveyor. See generally Simpson, *The Wyandotte Constitutional Convention*, *in* 2 Kansas Historical Collections 236, 236-38 (1881).

A majority of the delegates who voted chose to use the Ohio Constitution as the foundation for the one they would craft. Perdue, Address Before the Kansas State Historical Society:  The Sources of the Constitutions of Kansas, *in* 7 Kansas Historical Collections 130, 131-32 (1902). At the end of the convention, sections 2 through 20 of the Bill of Rights mirrored those same sections in the Ohio Constitution. Perdue, at 133-34.

Section 1, however, followed a different path, and it "was the only one that led to an extended debate." Perdue, at 134. The first proposed text of section 1 derived from the previous constitutions drafted at the Topeka and Leavenworth conventions and was presented by the Preamble and Bill of Rights Committee. It stated:

> "All men are by nature equally free and independent, and have certain inalienable rights, among which are those of enjoying and defending their lives and liberties, acquiring, possessing, and protecting property, and of seeking and obtaining happiness and safety,

24

and the right of all men to the control of their persons, exists prior to law and is inalienable." Convention, at 187.

During the Wyandotte Convention debates regarding section 1, the chairman of that committee, William Hutchinson, commented on the reasons for having an expansive section 1 that protects natural rights:

"This is the first section of our bill of rights. What is a bill of rights? It is a mere declaration of the natural rights of man. And in summing up these rights, it is not to be supposed that we will come down to any narrow, contracted conception of them—that we will use the pocket compass of legislation—but it is to be supposed that we will look on the bright side—will take a fair and independent view of the rights of man, aside from the restrictions of law and civil government of any character. . . . It is but a declaration of those natural rights of man that have been acknowledged from the foundation of this government." Convention, at 281-82.

These concepts remained a focal point of all the proposals for section 1. In short, the drafters made no attempt to list all rights; they incorporated the broad concept of natural rights (by using that term or substitute descriptions), and they expressed a desire to protect those rights from government infringement.

Despite the apparent consensus on these concepts, reaching agreement on the specific wording proved problematic.

The Topeka constitution had used nearly the same language as proposed by the Hutchinson committee through the word "safety" where the provision ended. The proslavery Lecompton constitution was quite different, allowing rights for only "freemen." The Leavenworth convention returned to the Topeka constitution language but added the words, "and the right of all men to the control of their persons exists prior

25

to law and is inalienable." These "changes in the phraseology [were] made by the Leavenworth committee, with the definite purpose of antagonizing the proslavery sentiment." Perdue, at 134. The antagonism carried over to the Wyandotte Convention.

One proslavery delegate to the Wyandotte Convention expressed the opinion that section 1 "was brought forward here for the express purpose of setting the fugitive slave law of the United States at defiance." The delegate went on to explain that section 1 would operate as a "'liberty bill'" for any fugitive slave who entered the state. Convention, at 274; see Waters, Address Before the Kansas State Historical Society: Fifty Years of the Wyandotte Constitution, *in* 11 Kansas Historical Collections 47, 49 (1910). Other delegates concurred with this view, and several debated whether including the wording would cause Congress to reject the constitution because of a potential conflict with the federal fugitive slave law. Convention, at 274-81. Delegates also expressed concern that giving inalienable control of a man's person would mean the state "cannot make a man amenable to any criminal law." Convention, at 272.

While other delegates countered that these concerns were unfounded, the "extended" and "violent" debate continued. Several amendments or outright substitutions were proposed. Convention, at 272-82; Perdue, at 134. "To pour oil upon the troubled waters, the first section of the Ohio bill of rights was twice introduced. The first time it was voted down, and the second declared out of order." Perdue, at 134. It read: "'All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety.'" Convention, at 272.

Eventually, the chair of the convention's Judiciary Committee, a lawyer from Hiawatha named Samuel A. Kingman, who two years later became a justice of this court and who eventually served as its Chief Justice from 1867 to 1876, proposed the current

26

wording of section 1: "'All men are possessed of equal and inalienable natural rights, among which are those of life, liberty and the pursuit of happiness.'" Convention, at 282-83.

Kingman indicated he could support earlier proposals that granted all men inalienable rights but he preferred his variation based on the Declaration of Independence, which states: "[A]ll men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness." Convention, at 282-83. Kingman explained the reasons for using similar language when proposing section 1: "We all cling to old truths, . . . and our national Declaration of Independence is of this class of truth. . . . I think the amendment I have read, in these old terms, is broad enough. It will show no man's prejudices, and it is broad enough for all to stand upon." Convention, at 283. Kingman's proposal was adopted by a vote of 42 to 6. Convention, at 285.

The Constitution containing Kingman's section 1 language was subsequently approved by Kansas Territory citizens by a vote of 10,421 to 5,530. Following the election of Abraham Lincoln as our sixteenth President and the secession of several southern states in 1861, Congress voted to admit Kansas to the Union as a free state, and President James Buchanan signed the admission bill during his last weeks as our fifteenth president on January 29, 1861. Sutton, Stark Mad Abolitionists 123-25 (2017).

This broad wording of Kansas' section 1, with its unenumerated natural rights guarantee, was not unlike the natural rights guarantees in at least 14 other states' constitutions in place at the time of the Wyandotte Convention. Although the wording of each state's constitutional natural rights guarantee varied, the provisions shared three characteristics. They (1) "affirmed the freedom or equality of men (or both)"; (2) "guaranteed inalienable, inherent, or natural rights"; and (3) "guaranteed a right to

27

enjoy life, liberty," property, the pursuit of happiness, or some combination of these words. *Lockean Natural Rights Guarantees*, 93 Tex. L. Rev. at 1305-06, 1444-48.

Applying these provisions in cases decided before Kansas convened the 1859 Wyandotte Convention, the courts in many of these 14 states had enforced unenumerated rights through judicial orders. 93 Tex. L. Rev. at 1311-12, 1444-48 (surveying natural rights guarantees in 24 state constitutions—16 of which predated Kansas'—ratified before the adoption of the Fourteenth Amendment and surveying court decisions in these states). These cases provided a context for how these natural rights guarantees would have been viewed at the time of the Wyandotte Convention, and several conclusions that can be drawn from these cases inform our interpretation of section 1.

First, these cases "make[] it crystal clear that the Lockean Natural Rights Guarantees did mean *something*. They did not function as simply vague, preambular language but were instead applied with varying degrees of judicial vigor to decide some of the most challenging and controversial issues of the day." 93 Tex. L. Rev. at 1440. Professor Steven G. Calabresi and Sofia M. Vickery addressed the question posed by the State in this case:  Are these guarantees merely hortatory and not enforceable? They answered the guarantees were neither, "after exhaustively studying the case law applying the Lockean Natural Rights Guarantees from the founding of the Republic until 1868" and concluding that "the Guarantees protected rights grounded in natural law . . . ." 93 Tex. L. Rev. at 1304.

Second, the "state supreme courts applied the Lockean Natural Rights Guarantees to an enormous variety of topics, suggesting an understanding during this time that the Lockean Natural Rights Guarantees protected a vast range of unenumerated rights." 93 Tex. L. Rev. at 1442. For example, state supreme courts had invoked the rights guarantees in cases dealing with a number of civil and political rights, including:  "(1)

freedom of religion; (2) the right of marriage; (3) the involuntary confinement and transportation of the poor; (4) retroactive legislation; (5) the constitutionality of statutes imposing or exempting tort liability"; and (6) a variety of other issues that "show the far-reaching nature of the state court's consideration of liberty and natural or unalienable rights for a very broad range of fact patterns." 93 Tex. L. Rev. at 1364-82.

So, contrary to the State's argument, at the time the Kansas Bill of Rights was written and ratified in 1859, provisions like section 1 were widely accepted as guaranteeing natural rights enforceable via court proceedings.

Kingman, Hutchinson, and the other delegates to the 1859 Wyandotte Convention had this background information when they chose the wording for section 1. We know from the statements of Hutchinson, chair of the Preamble and Bill of Rights Committee, and Kingman, chair of the Judiciary Committee, that section 1's language was intended to be "broad enough for all to stand upon" and that it not be "any narrow, contracted conception" of rights but "a fair and independent view of the rights of man, aside from the restrictions of law and civil government of any character." Convention, at 281-83. This intent has been repeatedly recognized in the caselaw of this court.

In 1876, David Brewer, who at that time was a justice of this court but who became a justice of the United States Supreme Court in 1889, explained that the Kansas Constitution had retained a wide range of individual rights. Writing for a unanimous court that included Chief Justice Kingman, Justice Brewer stated:

> "'All political power is inherent in the people,' and all powers not delegated by the constitution remain with them. These truths, which lie at the foundation of all republican governments, are distinctly asserted in our own bill of rights, §§ 2 and 20. By the constitution the people have granted certain powers, and to that extent have restricted and limited their own action. But beyond those restrictions, and except as to matters guarded

29

by absolute justice, and the inherent rights of the individual, the power of the people is unlimited." *Wright*, 16 Kan. at 603.

Justice Brewer also explained in several decisions he authored while on this court that the rights in section 1 were judicially enforceable. In one case, counsel argued that "the bill of rights is not to be considered as containing precise limitations upon power, but rather only comprehensive statements of general truths; that it is more in the nature of a guide to the legislature, than a test for the courts." *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.*, 31 Kan. 660, 664, 3 P. 284 (1884). In rejecting this argument about the Bill of Rights, Justice Brewer wrote:

> "The bill of rights is something more than a mere collection of glittering generalities: some of its sections are clear, precise and definite limitations on the powers of the legislature and all other officers and agencies of the state; and while others are largely in the nature of general affirmations of political truths, *yet all are binding on legislatures and courts*, and no act of the legislature can be upheld which conflicts with their provisions, or trenches upon the political truths which they affirm." (Emphasis added.) 31 Kan. 660, Syl. ¶ 1.

Consistent with these declarations, this court later recognized a natural right to contract in 1899. See *The State v. Wilson*, 61 Kan. 32, 36, 58 P. 981 (1899); see also *Ogden,* 25 U.S. at 345 (Marshall, C.J., opinion) (recognizing right to contract as a "natural right[]"). A few years after *Wilson*, citing section 1 along with its discussion of the Fourteenth Amendment, this court recognized the right of "[e]very citizen . . . to work where and for whom he will" and a natural right prohibiting one person from being compelled to provide personal services to another. *Brick Co. v. Perry*, 69 Kan. 297, 298-300, 76 P. 848 (1904).

30

Then, in a case relied on by the State and the Court of Appeals' dissenting opinion (*Hodes*, 52 Kan. App. 2d at 339), this court in *Schaake v. Dolley*, 85 Kan. 598, 118 P. 80 (1911), seemed to distance itself from these prior decisions. Referring to Justice Brewer's words in *Atchison Street Rly. Co.*, the *Schaake* court first noted that section 1 of the Kansas Constitution Bill of Rights "is a political maxim addressed to the wisdom of the legislature and not a limitation upon its power. It is not a mere 'glittering generality' and can not be entirely disregarded in any valid enactment." 85 Kan. at 601. But, according to *Schaake*, "it lacks the definiteness, certainty and precision of a rule . . . and consequently can not . . . furnish a basis for the judicial determination of specific controversies." 85 Kan. at 601.

Certainly, this statement from *Schaake* supports the State's position here. Nevertheless, it stands in sharp contrast to the court's previous decisions. In addition, it stands apart from later ones. Just three years after *Schaake*, this court again embraced the rationale that the Bill of Rights provided enforceable rights, this time in the context of section 2. *Winters v. Myers*, 92 Kan. 414, 140 P. 1033 (1914).

In *Winters*, the court noted the "glittering generalities" discussions in *Atchison Street Rly. Co.* and *Schaake* and assessed how those discussions applied to section 2, which states, in part:  "All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit." Discussing that language, the *Winters* court looked to decisions from Wisconsin and Ohio, including one that dealt with a provision much like section 1. In that Wisconsin decision, the court stated:

> "This may be said to be somewhat vague and general,—somewhat in the nature of rhetorical flourish; but when it is said that all men equally free have the inherent rights of life, liberty, and the pursuit of happiness, it is certain that it is not meant that some

have or may have greater privileges before the law than others. The phrase must mean equality before the law, if it means anything." *Black v. State*, 113 Wis. 205, 219, 89 N.W. 522 (1902), *quoted in Winters*, 92 Kan. at 422.

The *Winters* court found this "vigorous language" persuasive, concluding that section 2 of the Kansas Constitution Bill of Rights, "while declaring a political truth, does not permit legislation which trenches upon the truth thus affirmed. To this extent at least it must, like other constitutional provisions, be interpreted with sufficient liberality to carry into effect the principles of government which it embodies." 92 Kan. at 422, 428.

Soon thereafter, this court made clear that section 1 also could be enforced in the courts as a protection against legislation that impeded the exercise of individual rights. In *Wilson*, 101 Kan. 789, this court recognized that an act suppressing the use of trading stamps would violate the right to contract guaranteed in section 1 if it was an improper use of the State's police power. In resolving the question, the *Wilson* court looked to caselaw in which the United States Supreme Court had upheld similar legislation, holding it did not violate the Fourteenth Amendment to the United States Constitution. The *Wilson* court noted: "These decisions are of course conclusive so far as concerns any of the guaranties of the constitution of the United States, and are highly persuasive with respect" to sections 1 and 2 of the Kansas Constitution Bill of Rights. 101 Kan. at 795.

In that discussion, the court, for the first time, used the phrase that has often been repeated in Kansas cases for more than 100 years when it stated that sections 1 and 2 "are given much the same effect as the clauses of the fourteenth amendment relating to due process of law and equal protection." 101 Kan. at 796. The liberty interest found in the Fourteenth Amendment included

"'the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any

32

lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned.'" 101 Kan. at 796 (quoting *Allgeyer v. Louisiana*, 165 U.S. 578, 589, 17 S. Ct. 427, 41 L. Ed. 832 [1897]).

More recently, this court recognized the importance of protecting the people's inalienable rights to life, liberty, and the pursuit of happiness:

"So there could be no mistake about its object and purpose, the American Republic officially and with the first breath of its new life declared, 'that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness. That to secure these rights, Governments are instituted among Men, deriving their just powers from the consent of the governed.' (The Declaration of Independence.) This is the American proclamation of freedom and equality, and the individual worth of a single human being." *Harris v. Shanahan*, 192 Kan. 183, 204, 387 P.2d 771 (1963).

Quoting from that passage, this court has held that "[t]he [Kansas] Bill of Rights protects the basic liberties which inure to each person at birth"—i.e., natural rights. *Kansas Malpractice Victims Coalition v. Bell*, 243 Kan. 333, 341, 757 P.2d 251 (1988), *disapproved on other grounds by Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991). Furthermore, as we previously noted, in *Farley*, 241 Kan. at 671, this court held:  "[T]he Kansas Constitution affords separate, adequate, and greater rights than the federal Constitution."

As this discussion illustrates, this court has determined, as have other courts, that section 1 or similar provisions describe a wide range of judicially enforceable rights, even if the provisions do not contain a due process clause and are stated in generalities. See *Lockean Natural Rights Guarantees*, 93 Tex. L. Rev. at 1305 (recognizing "the Lockean

Natural Rights Guarantees [found in state constitutions] might support the holdings" of the United States Supreme Court).

The dissent has opined that section 1 simply was to guarantee

"Kansans their first rights of republican self-rule. Namely, the right to participatory consent to government for the benefit of the common welfare, on the one hand, and the right to otherwise be free from arbitrary, irrational, or discriminatory regulation that bears no reasonable relationship to that same common welfare, on the other." Slip op. at 169.

Abraham Lincoln, whom the dissent cites freely (slip op. at 146-51), would not be quite so dismissive—particularly on the existence of equal "natural rights." In Lincoln's speech at Springfield, Illinois, on June 26, 1857—just two years before the Wyandotte Convention—he "briefly expressed [his] view of the *meaning* and *objects* of that part of the Declaration of Independence which declares that 'all men are created equal.'" Hirsch and Van Haften, Abraham Lincoln and the Structure of Reason, app. A, at 262 (2010).

In expressing his view of this phrase, Lincoln declared that United States Senator Stephen A. Douglas and United States Supreme Court Chief Justice Roger Taney, author of *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 15 L. Ed. 691 (1857) (denying equality to black men), were doing "obvious violence to the plain unmistakable language of the Declaration. . . . [T]he authors of that notable instrument intended to include *all* men, but they did not intend to declare all men equal *in all respects*." Hirsch and Van Haften, app. A, at 262.

Lincoln made clear that in articulating equality the Declaration's authors "did not mean to say all were equal in color, size, intellect, moral developments, or social capacity"—but equal in certain inalienable rights: "They defined with tolerable distinctness, in what respects they did consider all men created equal—equal in 'certain

34

inalienable rights, among which are life, liberty, and the pursuit of happiness.' This they said, and this meant." Hirsch and Van Haften, app. A, at 262.

> "They did not mean to assert the obvious untruth, that all were then actually enjoying that equality, nor yet, that they were about to confer it immediately upon them. In fact they had no power to confer such a boon. They meant simply to declare the *right*, so that the *enforcement* of it might follow as fast as circumstances should permit." Hirsch and Van Haften, app. A, at 262.

As for his view of the object, i.e., purpose, of their statement of equality, Lincoln reasoned:

> "They meant to set up a standard maxim for free society, which should be familiar to all, and revered by all; constantly looked to, constantly labored for, and even though never perfectly attained, constantly approximated, and thereby constantly spreading and deepening its influence, and augmenting the happiness and value of life to all people of all colors everywhere. *The assertion that 'all men are created equal' was of no practical use in effecting our separation from Great Britain; and it was placed in the Declaration, not for that, but for future use*." (Emphasis added.) Hirsch and Van Haften, app. A, at 262.

Lincoln most certainly was not suggesting the breadth of the State's police power that the dissent advocates. We do not disagree with the dissent's position that the people have given the State the power to act only when it does so reasonably and for the common welfare. But based on our Constitution, we fervently object to the dissent's assertion that the State can use this power to do anything it desires so long as it passes that test. The State's police power is limited by the language borrowed from the Declaration of Independence and purposely included in our Bill of Rights—the language explicitly acknowledging that "[a]ll men are possessed of equal and inalienable natural rights." It is clear that Lincoln and an overwhelming majority of the delegates at the

35

Wyandotte Convention saw these words as more than rhetorical flourishes. The language recognized rights that to be meaningful—as they were certainly meant to be—had to be enforced and protected by courts. So when the State attempts to use its police power to unconstitutionally encroach on these *inalienable* rights, we have an obligation to ensure it does not. As this court stated more than 50 years ago, "the judiciary . . . has imposed upon it the obligation of interpreting the Constitution and of safeguarding the basic rights reserved thereby to the people." *Harris*, 192 Kan. at 206.

Based on this review of section 1, the Fourteenth Amendment, the differences between them, and the statements of intent by delegates at the Wyandotte Constitutional Convention, we conclude section 1 establishes the judicial enforceability of rights that are broader than and distinct from the rights described in the Fourteenth Amendment.

1.3     *Natural Rights Include a Right to Personal Autonomy that Allows Us to Make Decisions Regarding Our Bodies, Our Health Care, Family Formation, and Family Life.*

We turn now to the specific questions of what a natural right entails and whether it includes a woman's right to decide whether to continue a pregnancy.

When common-law terms are used in the Kansas Constitution Bill of Rights, courts should look to common-law definitions for their meaning. *Addington v. State*, 199 Kan. 554, 561, 431 P.2d 532 (1967); *The State v. Criqui*, 105 Kan. 716, 719-20, 185 P. 1063 (1919).

> "'It is also a very reasonable rule that a state constitution shall be understood and construed in the light and by the assistance of the common law, and with the fact in view that its rules are still left in force. By this we do not mean that the common law is to control the constitution, . . . but only that for its definitions we are to draw from that great fountain, and that in judging what it means we are to keep in mind that it is not the

beginning of law for the state, but that it assumes the existence of a well-understood system which is still to remain in force and be administered, but under such limitations and restrictions as that instrument imposes.'" *Criqui*, 105 Kan. at 719-20 (quoting Cooley Const. Lim., 7th ed. p. 94).

Because section 1 recognizes "natural rights," we must investigate the historical—the common-law—basis for determining whether an asserted right can be labeled a "natural right." Consequently, we turn to that question.

Certainly, as our prior discussion of the early caselaw of this court reveals, we have been willing to identify "natural rights." Further, the historical record of the Wyandotte Convention reveals the framers of section 1 looked to and adopted the language of the Declaration of Independence. In writing that document, Thomas Jefferson looked to the Virginia Declaration of Rights of 1776, written by George Mason, who, in turn, looked to the writings of Locke. *Lockean Natural Rights Guarantees*, 93 Tex. L. Rev. at 1316, 1318; Convention, at 283. In light of this foundation of section 1, Locke's views on natural rights are significant.

Locke identified the law of nature as the source of inalienable individual rights. He wrote that man is born "with a Title to perfect Freedom, and an uncontrouled enjoyment of all the Rights and Priviledges of the Law of Nature, equally with any other Man, or Number of Men in the World" and thus possesses "a Power . . . to preserve his Property, that is, his Life, Liberty and Estate, against the Injuries and Attempts of other Men." Locke, Two Treatises of Government, Bk. II, § 87 (Gryphon special ed. 1994) (1698).

In the present case, the Doctors assert that the following natural rights underlie the right of a woman to decide whether to continue a pregnancy:  personal autonomy and decision-making about issues that affect one's physical health, family formation, and

family life. To test these assertions, we look to the historical and philosophical basis for considering those rights as "natural."

### 1.3.1 *The Philosophy of Locke and Others Recognized Personal Autonomy and Bodily Integrity as Natural Rights.*

Locke observed that "every Man has a *Property* in his own *Person*." Two Treatises, Bk. II, § 27. He also wrote about the components of autonomy, bodily integrity, and self-determination, noting that "so far as a man has power to think, or not to think: to move or not to move, according to the preference or direction of his own mind; so far is a man free." Locke, An Essay Concerning Human Understanding, Bk. II, ch. 21, § 8 (27th ed. 1836).

Other political philosophers and legal writers uniformly maintained that one's control over one's own person stands at the heart of the concept of liberty, one of the enumerated natural rights in section 1.

Already in 1642, in his Second Institute, Commentary on Magna Carta, Sir Edward Coke observed that an ordinance setting requirements on the clothes that certain merchants could wear was against the law of the land, "because it was against the liberty of the subject, for every subject hath freedom to put his clothes to be dressed by whom he will." See Pound, The Development of Constitutional Guarantees of Liberty 47-48, 150 (1975).

William Blackstone in his Commentaries identified the private rights to life, liberty, and property as the three "absolute" rights—so called because they "appertain[ed] and belong[ed] to particular men, merely as individuals," not "to them as members of society [or] standing in various relations to each other"—that is, not dependent upon the will of the government. 1 Blackstone, Commentaries on the Laws of England *123,

*129-38 (1765). American courts reaffirmed these observations in applying the common law in this country. See, e.g., *State v. Moore*, 42 N.J.L. 208, 13 Vroom 208 (1880) (quoting 1 Blackstone, at *134: "[T]he law . . . regards, asserts and preserves the personal liberty of individuals.").

In his Letter to the Sheriffs of Bristol in 1777, the conservative philosopher Edmund Burke, writing about the American Revolution, reflected the spirit of his times when he declared:

> "[I]t ought to be the constant aim of every wise public counsel to find out by cautious experiments, and rational, cool endeavors, with how little, not how much, . . . restraint [on liberty] the community can subsist: for liberty is a good to be improved, and not an evil to be lessened. It is not only a private blessing of the first order, but the vital spring and energy of the state itself, which has just so much life and vigor as there is liberty in it." Burke, Selected Works 211 (Bate ed., 1960).

James Madison wrote that a person has an inviolable interest in the "safety and liberty" of one's person. Madison, *Essay on Property for the National Gazette* (Mar. 27, 1792), *in* 14 The Papers of James Madison 266 (Rutland & Mason et al. eds., 1983).

Chancellor James Kent, in his Commentaries on American Law, Volume 2, Lecture 24, at 1 (1827), spoke of the right of personal liberty as one of the "absolute rights of individuals." See *McMasters v. West Chester State Normal School*, 13 Pa. C.C. 481, 2 Pa. D. 753, 757 (1893); see also *United States v. Verdugo-Urquidez*, 856 F.2d 1214, 1220 (9th Cir. 1988) (quoting 2 Kent, at 1; right of personal liberty in the United States considered "'natural, inherent, and unalienable'"), *rev'd on other grounds* 494 U.S. 259, 110 S. Ct. 1056, 108 L. Ed. 2d 222 (1990).

1.3.2  *The United States Supreme Court Has Recognized the Natural Right of Personal Autonomy.*

The natural right to personal autonomy has been recognized by the United States Supreme Court for more than 120 years.

In 1891, the Supreme Court recognized that "[n]o right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person." *Union Pacific Railway Co. v. Botsford*, 141 U.S. 250, 251, 11 S. Ct. 1000, 35 L. Ed. 734 (1891).

At about that same time, future United States Supreme Court Justice Louis Brandeis wrote of the "general right of the individual to be let alone," which is a component of the "inviolate personality" of human beings. Warren & Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 205 (1890). And he elaborated on this concept nearly 40 years later in *Olmstead v. United States*, 277 U.S. 438, 478, 48 S. Ct. 564, 72 L. Ed. 944 (1928) (Brandeis, J., dissenting):

> "The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government, *the right to be let alone—the most comprehensive of rights and the right most valued by civilized men*." (Emphasis added.)

Even when the State regulates health care, demands some medical action such as an immunization, or eliminates treatment options in the interests of public health, safety, and welfare, the government still cannot intrude on a person's control of his or her own body when doing so will cause harm to the individual. See *Jacobson v. Massachusetts*,

40

197 U.S. 11, 39, 25 S. Ct. 358, 49 L. Ed. 643 (1905) (upholding mandatory vaccination regulation and its authorizing state statute only because of presumption that legislature intended exceptions where individual could establish he or she "is not at the time a fit subject of vaccination or that vaccination, by reason of his [or her] then condition, would seriously impair his health or probably cause his [or her] death").

### 1.3.3  *State Courts, Including This Court, Have Recognized an Enforceable Natural Right to Bodily Integrity.*

Various state courts have reached the same conclusion as the United States Supreme Court. In Illinois, "under a free government at least, the free citizen's first and greatest right, which underlies all others—the right to the inviolability of his person, in other words, his right to himself—is the subject of universal acquiescence." *Pratt v. Davis*, 118 Ill. App. 161, 166 (1905), *aff'd* 224 Ill. 300, 79 N.E. 562 (1906). New York's highest court has held:  "Every human being of adult years and sound mind has a right to determine what shall be done with his own body . . . ." *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 129-30, 105 N.E. 92 (1914), *abrogated on other grounds by Bing v. Thunig*, 2 N.Y.2d 656, 163 N.Y.S.2d 3, 143 N.E.2d 3 (1957). And the Florida Supreme Court has stated that "everyone has a fundamental right to the sole control of his or her person." *In re Guardianship of Browning*, 568 So. 2d 4, 10 (Fla. 1990).

In interpreting a provision in the Pennsylvania Constitution providing for the rights of enjoying and defending life and liberty, the acquisition and protection of property, and the pursuit of happiness, the Pennsylvania Supreme Court stated:

> "The greatest joy that can be experienced by mortal man is to feel himself master of his fate,—this in small as well as in big things. Of all the precious privileges and prerogatives in the crown of happiness which every American citizen has the right to wear, none shines with greater luster and imparts more innate satisfaction and soulful

contentment to the wearer than the golden, diamond-studded right to be let alone. Everything else in comparison is dross and sawdust." *Commonwealth v. Murray*, 423 Pa. 37, 51, 223 A.2d 102 (1966) (plurality opinion).

The Alaska Supreme Court has concluded that exercising control over one's body "involves the kind of decision-making that is 'necessary for . . . civilized life and ordered liberty.'" *Valley Hosp. Ass'n v. Mat-Su Coalition*, 948 P.2d 963, 968 (Alaska 1997) (quoting *Baker v. City of Fairbanks*, 471 P.2d 386, 401-02 [Alaska 1970]). And Mississippi's highest court has held:  "Each of us has a right to the inviolability and integrity of our persons, a freedom to choose or a right of bodily self-determination, if you will." *In re Brown*, 478 So. 2d 1033, 1039 (Miss. 1985).

This court has recognized the same principles, stating:  "Anglo-American law starts with the premise of thorough-going self determination. It follows that each man is considered to be master of his own body, and he may, if he be of sound mind, expressly prohibit the performance of life-saving surgery, or other medical treatment." *Natanson v. Kline*, 186 Kan. 393, 406-07, 350 P.2d 1093, *decision clarified on denial of reh'g* 187 Kan. 186, 354 P.2d 670 (1960).

Each of these court-recognized principles acknowledging the natural-law right to control one's own body and to exercise self-determination stands firmly on the shoulders of the Lockean philosophies embraced in section 1's natural rights, which include liberty and the pursuit of happiness. And these concepts of control over one's body and of self-determination have roots in common law, as the United States Supreme Court noted in *Union Pacific Railway Co. v. Botsford*, 141 U.S. at 251, and as this court noted in *Natanson v. Kline*, 186 Kan. at 406-07.

The State argues, however, that the men at the Wyandotte Convention rejected control over one's body as a constitutionally protected right. This argument is based on failure of the convention delegates to adopt the version of section 1 that would have protected property, happiness, and "the right of all men to the control of their persons." Convention, at 271.

The State is wrong to attribute such significance to this rejection. The historical record shows this provision was a taunt to the proslavery delegates at the Leavenworth convention, and the animosity and distrust from that experience obviously tainted the debate in Wyandotte. Convention, at 271-85; see Waters, at 49. Ultimately, the language of section 1 is better understood as continuing a guarantee of natural rights, which include control over one's own body, by using the familiar and revered wording of the Declaration of Independence.

1.3.4 *Concepts of Liberty and the Pursuit of Happiness Include a Right to Make Decisions About Parenting and Procreation.*

Lockean principles also underlie a recognition that section 1 encompasses a natural right to make decisions about parenting and procreation.

Locke described the rights related to the relationship between a man and a woman as it impacts procreation as follows:

"Conjugal Society is made by a voluntary Compact between Man and Woman, and tho' it consist chiefly in such a Communion and Right in one anothers [*sic*] Bodies, as is necessary to its chief End, Procreation; yet it draws with it mutual Support and Assistance; and a Communion of Interest too, as necessary not only to unite their Care and Affection, but also necessary to their common Off-spring, who have a Right to be nourished and maintained by them, till they are able to provide for themselves." Two Treatises, Bk. II, § 78.

43

Expressing similar views, the United States Supreme Court has acknowledged that the rights "to marry, establish a home and bring up children" were "long recognized at common law as essential to the orderly pursuit of happiness by free men." *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923). In *Eisenstadt v. Baird*, 405 U.S. 438, 453, 92 S. Ct. 1029, 31 L. Ed. 2d 349 (1972), the Court made additional statements similar to Locke's, noting that a "couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup." The Court recognized the right "to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child" applied to each "individual, married or single." 405 U.S. at 453.

And significantly, in *Chapsky v. Wood*, 26 Kan. 650, 652, 1881 WL 1006 (1881), this court recognized that the parent-child relationship is rooted in the "law of nature."

### 1.3.5 *Summary*

At the heart of a natural rights philosophy is the principle that individuals should be free to make choices about how to conduct their own lives, or, in other words, to exercise personal autonomy. Few decisions impact our lives more than those about issues that affect one's physical health, family formation, and family life. We conclude that this right to personal autonomy is firmly embedded within section 1's natural rights guarantee and its included concepts of liberty and the pursuit of happiness.

1.4     *Section 1 Guarantees Women, as well as Men, the Right of Personal Autonomy.*

Given that women were not allowed as delegates to the Wyandotte Convention or as voters on the resultant Constitution's ratification, one might question whether the Convention delegates intended to acknowledge in section 1 that women possessed these natural rights. But the record reveals they did. The dissent more fully discusses the historical context, and Kingman clearly explained as much in his report to the convention. He directly stated that "[s]uch rights as are natural are now enjoyed as fully by women as men." Convention, at 169.

At first glance, the sincerity of Kingman's comment seems questionable. After all, he chaired the Judiciary Committee that had considered and denied a petition asking for female suffrage. But the Convention record explains that Kingman and the other delegates distinguished between natural and political rights. After noting that women should have natural rights, Kingman continued by saying on behalf of the committee that "[s]uch rights and duties as are merely political in their character, they should be relieved from, that they have more time to attend to those 'greater and more complicated responsibilities' which, petitioners claim and your committee admits, devolve upon women." Convention, at 169. The comments by Kingman and his committee reflect that society's attitude regarding women at the time was not in step with the natural rights guarantee in section 1. We discuss what impact this has on our analysis in section 1.6.

At the core of the natural rights of liberty and the pursuit of happiness is the right of personal autonomy, which includes the ability to control one's own body, to assert bodily integrity, and to exercise self-determination. This ability enables decision-making about issues that affect one's physical health, family formation, and family life. Each of us has the right to make self-defining and self-governing decisions about these matters.

45

1.5     *Section 1's Protections Extend to a Pregnant Woman's Right to Control Her Own Body.*

Denying a pregnant woman the ability to determine whether to continue a pregnancy would severely limit her right of personal autonomy. And abortion laws do not merely restrict a particular action; they can impose an obligation on an unwilling woman to carry out a long-term course of conduct that will impact her health and alter her life. Pregnancy often brings discomfort and pain and, for some, can bring serious illness and even death. The New Mexico Supreme Court described some of these health concerns:

> "[T]here is undisputed evidence in the record that carrying a pregnancy to term may aggravate pre-existing conditions such as heart disease, epilepsy, diabetes, hypertension, anemia, cancer, and various psychiatric disorders. According to these sources, pregnancy also can hamper the diagnosis or treatment of a serious medical condition, as when a pregnant woman cannot receive chemotherapy to treat her cancer, or cannot take psychotropic medication to control symptoms of her mental illness, because such treatment will damage the fetus." *New Mexico Right to Choose/NARAL v. Johnson*, 126 N.M. 788, 855, 975 P.2d 841 (1998).

The list of ways the government's restriction on abortion can have an impact on a woman's ability to control her own body and the course of her life could continue at length. In summary, "[t]he decision whether to obtain an abortion is fraught with specific physical, psychological, and economic implications of a uniquely personal nature for each woman." *In re T.W.*, 551 So. 2d 1186, 1193 (Fla. 1989). Other courts with natural rights constitutional guarantees similar to Kansas' have reached the same conclusion. Some have done so based on privacy, but others have reached the conclusion because of constitutional protections of inalienable natural rights such as liberty—guarantees like that in the Kansas Constitution Bill of Rights.

46

Although the Wyandotte Convention delegates rejected article I, section 1 of the Ohio Constitution in favor of Kingman's proposal, its language is very similar. It stated that men "by nature" have "certain inalienable rights," including "enjoying and defending life and liberty" and "seeking and obtaining happiness and safety." Applying that provision, the Ohio Court of Appeals recognized it was broader than any provision in the United States Constitution because it recognized natural rights while the United States Constitution did not. "In that sense, the Ohio Constitution confers greater rights than are conferred by the United States Constitution, although that Constitution has been construed very broadly so as to maximize the nature of the individual rights guaranteed by it." *Preterm Cleveland v. Voinovich*, 89 Ohio App. 3d 684, 691, 627 N.E.2d 570 (1993).

Given the broad scope of the Ohio natural rights provision, the Ohio court determined "it would seem almost axiomatic that the right of a woman to choose whether to bear a child is a liberty within the constitutional protection," including the right to have an abortion. 89 Ohio App. 3d at 691-92.

The Supreme Judicial Court of Massachusetts had arrived at the same conclusion in 1981 after noting that its state constitutional guarantees had "sometimes impelled us to go further than the United States Supreme Court." *Moe v. Secretary of Administration & Finance*, 382 Mass. 629, 649, 417 N.E.2d 387 (1981). The Massachusetts Constitution, part 1, article I, recognizes individuals have "certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness." See also Mass. Const. pt. 1, art. XII (due process provision).

47

As to a "woman's right to make the abortion decision privately," the Massachusetts court observed it was "but one aspect of a far broader constitutional guarantee" related to "'[t]he existence of a "private realm of family life which the state cannot enter,"'" the "'sanctity of individual free choice and self-determination,'" the "'strong interest in being free from nonconsensual invasion of . . . bodily integrity, and a constitutional right of privacy that may be asserted to prevent unwanted infringements of bodily integrity.' [Citations omitted.]" *Moe*, 382 Mass. at 648-49. Likewise, the court concluded, "'decisions whether to accomplish or to prevent conception are among the most private and sensitive.'" 382 Mass. at 649 (quoting *Carey v. Population Services International*, 431 U.S. 678, 685, 97 S. Ct. 2010, 52 L. Ed. 2d 675 [1977]).

A little over a decade later, the highest court in West Virginia, its Supreme Court of Appeals, relied in part on its state constitution to invalidate an abortion funding regulation in *Women's Health Center v. Panepinto*, 191 W. Va. 436, 446 S.E.2d 658 (1993). The relevant West Virginia constitutional provision declares that the "'[g]overnment is instituted for the common benefit'" of the people. 191 W. Va. at 441. Because the West Virginia Constitution provides guarantees that are not present in the United States Constitution, the court deemed it appropriate to "interpret those guarantees independent from federal precedent," and held that denying funding for certain abortions violated the constitutionally protected right to an abortion. 191 W. Va. at 442, 445.

A woman's right to decide whether to continue a pregnancy has also been recognized under the Mississippi Constitution, which provides: "The enumeration of rights in this constitution shall not be construed to deny and impair others retained by, and inherent in, the people." Miss. Const. art. 3, § 32. In *Pro-Choice Mississippi v. Fordice*, 716 So. 2d 645 (Miss. 1998), the Mississippi Supreme Court rejected an argument that this provision could not provide for a woman's right to decide whether to continue a pregnancy because abortion was not mentioned in the state constitution. "While we do not interpret our Constitution as recognizing an explicit right to an

48

abortion, we believe that autonomous bodily integrity is protected under the right to privacy as stated in [our previous decision]. Protected within the right of autonomous bodily integrity is an implicit right to have an abortion." 716 So. 2d at 653. The Mississippi court observed that "'no aspects of life [are] more personal and private than those having to do with one's . . . reproductive system.'" 716 So. 2d at 653 (quoting *Young v. Jackson*, 572 So. 2d 378, 382 [Miss. 1990]).

Recently the Iowa Supreme Court also has held that the Iowa Constitution's guarantee that "'no person shall be deprived of life, liberty, or property, without due process of law,'" protects a woman's right to decide whether to continue a pregnancy. *Planned Parenthood v. Reynolds ex rel.*, 915 N.W.2d 206, 232, 237 (Iowa 2018). The court wrote that "[a]utonomy and dominion over one's body go to the very heart of what it means to be free." 915 N.W.2d at 237. It characterized the right to decide whether to continue a pregnancy as "the right to shape, for oneself, without unwarranted governmental intrusion, one's own identity, destiny, and place in the world" and noted that "[n]othing could be more fundamental to the notion of liberty." 915 N.W.2d at 237. It concluded that "under the Iowa Constitution, . . . implicit in the concept of ordered liberty is the ability to decide whether to continue or terminate a pregnancy." 915 N.W.2d at 237.

The natural right of personal autonomy recognized in these states' constitutions allows individuals to control their own bodies, to make health care decisions, and to make decisions about whether to bear or beget a child. Some of these courts chose the terminology of *Roe*, 410 U.S. at 153, and spoke in terms of a state constitutional right to "privacy." See Wharton, *Roe at Thirty-Six and Beyond:  Enhancing Protection for Abortion Rights Through State Constitutions*, 15 Wm. & Mary J. Women & L. 469, 521-26 (2009) (discussing state abortion decisions post-*Roe*). And this court has recognized privacy as a natural right. See *Kunz v. Allen*, 102 Kan. 883, 884, 172 P. 532 (1918) ("'The

49

right of privacy has its foundation in the instincts of nature. It is recognized intuitively, consciousness being the witness that can be called to establish its existence. . . . A right of privacy in matters purely private is therefore derived from natural law.'"); see also *Munsell v. Ideal Food Stores*, 208 Kan. 909, 922-23, 494 P.2d 1063 (1972); *Johnson v. Boeing Airplane Co*., 175 Kan. 275, 262 P.2d 808 (1953). But we agree with the Ohio court that concluded "it is not necessary to find a constitutional right of privacy in order to reach the conclusion that the choice of a woman whether to bear a child is *one of the liberties guaranteed by Section 1* [of the] Ohio Constitution." (Emphasis added.) *Voinovich*, 89 Ohio App. 3d at 692.

Consistent with these and other states, today we hold our Kansas Constitution's drafters' and ratifiers' proclamation of natural rights applies to pregnant women. This proclamation protects the right to decide whether to continue a pregnancy.

We are struck by the ease with which the dissent ignores the importance of this natural right and the consequences women would face if we did not recognize the founders' intent to protect it from an overreaching government. The dissent mentions pregnant women only when discussing the graphic details of the D & E and other medical procedures. By avoiding any other aspect of the lives of pregnant women, the dissent appears to maintain that upon becoming pregnant, women relinquish virtually all rights of personal sovereignty in favor of the Legislature's determination of what is in the common good. Essentially, the dissent exploits the vivid medical details of abortion procedures by turning them into a constitutional prerogative to invade the autonomy of pregnant women and exclude them from our state Constitution's Bill of Rights.

1.6     *Territorial and Early State Statutes that Criminalized Abortion Cannot Be the Basis for Ignoring Constitutional Rights.*

The State argues we cannot conclude the framers of our Constitution envisioned a right of a woman to decide whether to continue her pregnancy. For support, it cites the Statutes of the Territory of Kansas, 1855, ch. 48, secs. 10 and 39, which made performing any abortion a misdemeanor and performing an abortion on a quickened child manslaughter in the second degree. It points out these laws were carried forward into the first state statutes. See G.L. 1862, ch. 33, secs. 10 and 37.

The State's reliance on the existence of 19th century criminal abortion statutes is wholly unpersuasive. There are three reasons we reject this argument:  (1) the history of enactment provides no evidence that the legislation reflected the will of the people; (2) these statutes were never tested for constitutionality; and (3) the historical record reflects that those at the Wyandotte Convention, while willing to recognize some rights for women, refused to recognize women as having all the rights that men had.

As to the first reason, we have only sketchy legislative history regarding the statutes adopted by the 1855 territorial legislature. But we do know that in slightly more than 30 days this proslavery legislature enacted a complete code of laws consisting of 147 chapters and 1,058 printed pages, the overwhelming majority of which were statutes from the slave state of Missouri. This body became known as the "'bogus legislature'" because 5,000 Missouri voters took over the polls in the Kansas Territory to elect the members of the legislature. Wilson, *How the Law Came to Kansas*, 63 J.K.B.A. 26, 29 (January 1994); Wilder, The Annals of Kansas 72 (1886). The bogus legislature's criminal statutes on abortion were virtually verbatim statements of Missouri statutes. Compare Mo. Rev. Stat., Crimes and Punishments, art. II, §§ 9, 10, 36 (1835), with Kan. Terr. Stat. 1855, ch. 48, §§ 9, 10, 39.

51

What we know about the Missouri laws and the manner in which those laws were passed in Kansas convinces us these early statutes provide little evidence of what a majority of Kansans felt about abortion in 1855. Dr. James Mohr, a historian who focuses his academic work on the history of social policy in America, wrote about the shift in abortion policy in America in his work, Abortion in America: The Origins and Evolution of National Policy, 1800-1900 (1978). His research has been widely cited, including by the United States Supreme Court, see *Casey*, 505 U.S. at 952 (Rehnquist, C.J., concurring in part and dissenting in part), and it provides some background on Missouri's abortion statutes, which can be traced back to the first abortion law passed in the United States in 1821.

To first provide some perspective, Dr. Mohr documents that, until the first statute was adopted, abortion in the United States was governed by the traditional British common law. Mohr, at 3. He explains "the practice of aborting unwanted pregnancies was, if not common, almost certainly not rare in the United States during the first decades of the nineteenth century." Mohr, at 16. In fact, women could obtain abortifacient information "from home medical guides, from health books for women, from midwives and irregular practitioners [that is, individuals who were not properly trained], and from trained physicians." Mohr, at 16. "[M]any American women sought abortions, tried the standard techniques of the day, and no doubt succeeded some proportion of the time in terminating unwanted pregnancies. Moreover, this practice was neither morally nor legally wrong in the eyes of the vast majority of Americans, provided it was accomplished before quickening." Mohr, at 16.

In 1821, Connecticut passed the first statute limiting abortion in the United States. It prohibited the use of "'any deadly poison, or other noxious and destructive substance, with an intention . . . to murder, or thereby to cause or procure the miscarriage of any

woman, then being quick with child.'" Mohr, at 21 (quoting Conn. Stat. tit. 22, § 14 [1821]). Mohr explains this law "might best be characterized as a poison control measure." Mohr, at 21. It "did not proscribe abortion per se; it declared illegal one particular method of attempting to induce an abortion because that method was considered prohibitively unsafe owing to the threat of death by poisoning." Mohr, at 22.

After Connecticut's legislation, "three other states—Missouri in 1825, Illinois in 1827, and New York in 1828—also passed laws that dealt specifically with abortion. Both the Missouri law and the Illinois law followed Connecticut's 1821 statute closely and, like the Connecticut law, they were as much poison control measures as anti-abortion measures." Mohr, at 25-26. Unlike the Connecticut statute, the Missouri law deleted any reference to quickening, but "in practice, indictments could not be brought under these laws before quickening because intent had to be proved and the only way that intent could be proved was to demonstrate that the person who administered the poison could have known beyond any doubt the woman was pregnant." Mohr, at 26.

The New York statute instead "addressed abortion in three separate clauses." Mohr, at 26. It influenced subsequently adopted provisions in other states, and it seems this influence extended to the Missouri Legislature. In 1835, Missouri amended its poison-control abortion laws and the new law, although not identical to New York's law, was very similar. Compare 2 N.Y. Rev. Stat. pt. IV, ch. I, tit. 2, §§ 8, 9, and tit. 6, § 21 (1828), with Mo. Rev. Stat., Crimes and Punishments, art. II, §§ 9, 10, 36 (1835). The similarity makes the history of the 1828 New York legislation relevant.

Mohr explains that the passage of the 1828 New York legislation, while including physiological and moral arguments about abortion, "was inextricably bound up with the history of medicine and medical practice in America," specifically in the movement to regulate the medical profession. Mohr, at 31, 36. Historically, there had been little

53

regulation of the credentials required to hold oneself out as a medical practitioner. "As early as 1800, for example, two-thirds of the people who made their livings as physicians in the city of Philadelphia were neither members of the local College of Physicians nor graduates of any medical school of any kind." Mohr, at 32. Outside the cities, "regular" physicians—"those physicians dedicated to the principles of what later became scientific medicine"—were very rare. Mohr, at 32-33. Instead, in rural areas like Missouri or the Kansas Territory, "irregulars" or "self-taught lay healers and part-time folk doctors dispensed medicines of all kinds and performed simple surgery." Mohr, at 33.

The proliferation of the "irregulars" created "an intense competition for paying patients that hurt the regulars badly." Mohr, at 34. The regulars turned to state legislatures, and in New York, "by controlling through the speaker of the assembly all appointments to the standing committee on medical practice, [they] had pushed through the legislature in 1827 the toughest medical regulation law the state had ever had." Mohr, at 37-38.

The following year, the New York Legislature's revisers reported they listened to the "'old and experienced surgeons'" in drafting additional, medically related sections of the state code, including the abortion provisions. Mohr, at 38. These new requirements included a mandate that no therapeutic abortion could occur unless two physicians, who by operation of the 1827 provisions meant two "regulars," had been consulted. Mohr, at 38. In the Missouri version of the statute, only one physician had to be consulted. Mo. Rev. Stat., Crimes and Punishments, art. II, § 36 (1835). In New York, the wide-ranging regulation of the medical field led to "[i]rregulars organiz[ing] protests and launch[ing] a counteroffensive of major proportions in favor of what might be termed laissez-faire medicine." Mohr, at 38. As a result, New York's abortion law "lay buried in the code, unenforced." Mohr, at 39.

Mohr concludes the "first wave of abortion legislation in American history," which included Missouri's provisions, "emerged from the struggles of both legislators and physicians to control medical practice rather than from public pressures to deal with abortions per se" and "were aimed . . . at regulating the activities of apothecaries and physicians, not at dissuading women from seeking abortions." Mohr, at 43. Moreover, "not a single one of these early abortion provisions was passed by itself. They were all contained in large revisions of the criminal codes in their jurisdictions or in omnibus 'crimes and punishments' bills." Mohr, at 42.

Mohr found this significant, noting: "[T]here was no substantial popular outcry for anti-abortion activity; or, conversely, no evidence of public disapproval of the nation's traditional common law attitudes." Mohr, at 42. According to Mohr, "[n]o legislator took a political stand" or cast a recorded vote on stand-alone abortion legislation. "The popular press neither called for nor remarked upon the passage of the acts; the religious press was equally detached." Mohr, at 42. Instead, Mohr attributes the statutory language to "the regular physicians to whom . . . legal scholars would look for guidance in drafting their codes." Mohr, at 42. "But as far as the vast majority of the population was concerned, the country's first laws on abortion remained deeply buried in the ponderous prose of criminal codes and were evidently little noticed and rarely enforced by anybody." Mohr, at 43; see Siegel, *Reasoning from the Body: A Historical Perspective on Abortion Regulation and Questions of Equal Protection*, 44 Stan. L. Rev. 261, 282 (1992) (In the early 1800s, "America's politicians, clergy, and press were silent on the question of abortion."). Most organized religions in America, including Catholic, Protestant, and Jewish denominations, did not condemn early-term abortions until after criminal abortion laws were already on the books. See *Roe*, 410 U.S. at 160-61; Reagan, When Abortion Was a Crime 6-14 (1997).

This history does not reflect the type of antiabortion sentiment the State wishes to ascribe to the genesis of Kansas' early abortion statutes. And the legislative record suggests Kansas territorial legislators gave no consideration to the appropriateness of the abortion statutes. Given that the 1855 bogus legislature's criminal statutes on abortion were virtually verbatim recitations of Missouri statutes, and buried in the approximately 300 sections of Missouri's criminal statutes that Kansas adopted, little, if any, weight can be accorded these statutes as expressing the will of the people of the Kansas Territory at the time of the Wyandotte Convention four years later.

Without much ado, the 1859 Territorial Legislature simply reenacted most, if not all, of the criminal code from the bogus legislature. See House J. 1859, p. 42. Since proslavery legislators were now outnumbered, the deleted statutes involved crimes related to slaves, e.g., assisting in their escape or specifically criminalizing conduct related to "negroes or mulattoes." Compare Kan. Terr. Stat. 1855, ch. 151, with Kan. Terr. G.L. 1859.

Once Kansas became a state, the procedure was much the same. The bill admitting Kansas to the Union was signed by President James Buchanan on January 29, 1861. Charles Robinson took the oath as governor on February 9, and he asked the Legislature to meet on March 26. That first Legislature, as one member would later recall, spent its time "passing just such laws as were necessary to put the state government in motion." Ballard, Address Before the Kansas State Historical Society:  The First State Legislature, *in* 10 Kansas Historical Collections 232, 232-33, 237 (1908). Indeed, the "General Laws of the State of Kansas, passed at the First Session of the Legislature" (i.e., 1861 session laws) show the only criminal law change during these early months of the Civil War was to add treason and disloyalty crimes on May 21, 1861. G.L. 1861, ch. 27.

During the second legislative session in 1862, a committee was appointed to "'ascertain what laws are in force at this time, and what laws have become obsolete or repealed by implication.'" Baker, Address Before the Kansas State Historical Society: The Kansas Legislature in 1862, *in* 3 Kansas Historical Collections 101, 107-08 (1885) (quoting resolution on January 27, 1862). The committee was not tasked with looking at the merits of any legislation.

Even given the committee's limited task of determining what statutes were in effect, its members obviously felt rushed. The committee reported:

> "'Owing to want of time, the committee have not been able to give the work that care and attention which it should have had . . . . It would indeed be difficult, in the time allowed us to perform this work, to select from the mass of legislation now upon our statute books, all the laws and parts of laws in force, and omit all which have been repealed, suspended, and become obsolete, without fault or mistake . . . . We have inserted all laws about which we have any doubt, preferring that the error, if there was any, should be on the safe side.'" Baker, at 108.

The Legislature acted as a committee of the whole to hear the report on the night before adjournment. In a speech before the Kansas Historical Society, the President of the Society described the Legislature's handling of the report:

> "The chairman stood for three hours reading the report, making motions to amend, strike out, &c., &c., and receiving the paper balls which were hurled at him. Every motion he made was carried with a whoop, and he might have inserted an appropriation to himself for any amount, without its being discovered." Baker, at 108.

Given the way in which these bills were passed, we cannot know what a majority of the legislators—much less the people in the Kansas Territory or the new state— thought about abortion. For this reason, we give them little weight. Indeed, the "General

Laws of the State of Kansas in force at the close of the session of the Legislature [e]nding March 6th, 1862," reveal the crimes and punishments statutory sources are the "Acts of 1859" of the Territorial Legislature plus the treason-based acts of the 1861 Legislature. G.L. 1862, chs. 33 and 34.

The second reason the statutes do not warrant deference in our constitutional analysis is that, obviously, the Kansas Constitution and section 1 of its Bill of Rights did not apply to the territorial laws that predated the Wyandotte Convention and those territorial laws were never tested for constitutionality. Constitutions are supreme over statutes—whether territorial or state. *Atkinson v. Woodmansee*, 68 Kan. 71, 90-91, 74 P. 640 (1903) (citing *Fairbank v. United States,* 181 U.S. 283, 285-86, 21 S. Ct. 648, 45 L. Ed. 862 [1901] [Brewer, J.]). Additionally, no Kansas reported court decision discusses whether the state abortion statutes were constitutional. And nothing in the history of the Wyandotte Convention or the text of the Kansas Constitution indicates the framers intended to create any exceptions to the natural right of personal autonomy. Finally, "the fact that an unconstitutional statute has been enacted and has remained in the statute books for a long period of time in no sense imparts legality. . . . Age does not invest a statute with constitutional validity, neither does it rob it of such validity." *State v. Hill*, 189 Kan. 403, 410, 369 P.2d 365 (1962).

The third reason we reject the State's reliance on the territorial and early state statutes arises from the gender-differentiated rights recognized at that time. The biases reflected in these differences, which we now recognize as discriminatory, manifested in a majority of legislators serving in Missouri and Kansas during the 1800s who failed to actually recognize all the natural and political rights of women, regardless of whether the Constitution recognized them. To appreciate the bias, one need only note the conduct barring women from the Wyandotte Convention and from voting on the resultant Constitution's ratification.

58

The Kansas Constitution initially denied women the right to vote in most elections, to serve on juries, and to exercise other rights that we now consider fundamental to all citizens of our state. See Kan. Const. art. 5, § 1 and art. 15, § 6 (1861). These types of limitations had a long history in England and the United States, as the following examples demonstrate.

The venerable Magna Carta, in its charter of rights, stated: "'No one shall be arrested or imprisoned upon the appeal of a woman, for the death of any other than her husband.'" Pound, at 125 (quoting McKechnie's translation of Magna Carta, ¶ 54). In 1765, Blackstone explained, in his Commentaries on the Laws of England, Volume 1, at *442-45, that a married woman had no separate legal existence from her husband and she could "bring no action for redress without her husband's concurrence, and in his name, as well as her own: neither can she be sued, without making the husband a defendant." Blackstone noted the law permitted a husband "to restrain a wife of her liberty." 1 Blackstone, at *445.

The English common-law deprivation of rights for women was transported to the new world. In 1845, Edward Mansfield wrote:

"[T]he husband's control over the person of his wife is so complete that he may claim her society altogether; that he may reclaim her if she goes away or is detained by others; that he may use gentle constraint upon her liberty to prevent her going away, or to prevent improper conduct; that he may maintain suits for injuries to her person; that he may defend her with force; that she cannot sue alone; and that she cannot execute a deed or valid conveyance, without the concurrence of her husband. In most respects she loses the power of personal independence, and altogether that of separate action in legal matters." Mansfield, The Legal Rights, Liabilities and Duties of Women 272-73.

Under the common law, a "feme-covert" could not contract, even with the assent of her husband, for the sale of her real estate. See, e.g., *Butler v. Buckingham*, 5 Day 492 (Conn. 1813). The common law recognized a right of a husband to punish his wife by beating her with "a rod no larger than the diameter of his thumb." See, e.g., *Feltmeier v. Feltmeier*, 333 Ill. App. 3d 1167, 1169 n.1, 777 N.E.2d 1032 (2002); *State v. Oliver*, 70 N.C. 60, 61 (1874). The common-law spousal exception to rape continued in this country for nearly 200 years. See *Shunn v. State*, 742 P.2d 775, 777 (Wyo. 1987).

In *Bradwell v. The State*, 83 U.S. 130, 21 L. Ed. 442 (1872), the Supreme Court upheld a state's rejection of a woman's application for admittance to practice law. A concurring opinion of three of the court's justices pointed out that, under the common law, only men were admitted to the bar. 83 U.S. at 140. The concurrence explained the legal status of women at the time:

> "The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. The constitution of the family organization, which is founded in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood. The harmony, not to say identity, of interests and views which belong, or should belong, to the family institution is repugnant to the idea of a woman adopting a distinct and independent career from that of her husband. So firmly fixed was this sentiment in the founders of the common law that it became a maxim of that system of jurisprudence that a woman had no legal existence separate from her husband, who was regarded as her head and representative in the social state; and, notwithstanding some recent modifications of this civil status, many of the special rules of law flowing from and dependent upon this cardinal principle still exist in full force in most States." 83 U.S. at 141.

By 1879, in *Strauder v. West Virginia*, 100 U.S. 303, 310, 25 L. Ed. 664, the Supreme Court held that the Constitution protected the right of males of color to sit on juries but not the right of women to do so.

And, as late as in 1910, in *Thompson v. Thompson*, 218 U.S. 611, 31 S. Ct. 111, 54 L. Ed. 1180, the Supreme Court upheld the common-law rule that a wife could not recover damages from her husband for assault and battery committed by him against her person. Abrogating this common-law relationship might unleash "evils" upon society and would "open the doors of the courts to accusations of all sorts of one spouse against the other." Rejecting the common law in this regard would constitute "radical and far-reaching changes in the policy of the common law." 218 U.S. at 617-19.

We recognize that many do not view abortion through a lens of gender bias. But we cannot ignore the prevailing views justifying widespread legal differentiation between the sexes during territorial times and the reality that these views were reflected in policies impacting women's ability to exercise their rights of personal autonomy, including their right to decide whether to continue a pregnancy. See Siegel, 44 Stan. L. Rev. 261. In essence, the history of women's rights contemporaneous to the Wyandotte Convention reflects a paternalistic attitude and—despite what the Constitution said—a practical lack of recognition that women, as individuals distinct from men, possessed natural rights. We no longer live in a world of separate spheres for men and women. True equality of opportunity in the full range of human endeavor is a Kansas constitutional value, and it cannot be met if the ability to seize and maximize opportunity is tethered to prejudices from two centuries ago. Therefore, rather than rely on historical prejudices in our analysis, we look to natural rights and apply them equally to protect all individuals. Territorial and early state statutes do not compel another result or rationale.

1.7     *Conclusion:  Section 1 Protects a Right to Determine Whether to Continue a Pregnancy.*

As discussed, we reach our conclusion that section 1 of the Kansas Constitution Bill of Rights protects a woman's right to make decisions about whether she will continue a pregnancy based on several factors. These include an analysis of natural rights, Lockean principles, the caselaw of Kansas, the rationale and holdings of court decisions from other jurisdictions reviewing broad constitutional natural rights provisions or other provisions similar to ours, and the history of early statutes limiting abortion in Kansas. These factors lead us to conclude that section 1's declaration of natural rights, which specifically includes the rights to liberty and the pursuit of happiness, protects the core right of personal autonomy—which includes the ability to control one's own body, to assert bodily integrity, and to exercise self-determination. This right allows Kansans to make their own decisions regarding their bodies, their health, their family formation, and their family life. Pregnant women, like men, possess these rights.

## 2.  *The Doctors' Second Burden:  Establishing an Unconstitutional Infringement*

Now that the Doctors have established a protected right, they must show an unconstitutional infringement of that right. One may question whether the Legislature may adopt any restrictions that implicate a natural right, declared in section 1 to be inalienable.

In answering this question, we start by observing that the Kansas Constitution does not begin with an enumeration of the powers of government. It instead begins with a Bill of Rights for Kansans, which in turn begins with a statement of acknowledged inalienable natural rights, among which are life, liberty, and the pursuit of happiness. By this ordering, demonstrating the supremacy placed on the rights of individuals, preservation of these natural rights is given precedence over the establishment of

government. Cf. *State ex rel. Zillmer v. Kreutzberg*, 114 Wis. 530, 532, 90 N.W. 1098 (1902).

Further, a state constitution's bill of rights "is inserted in the constitution for the express purpose of operating as a restriction upon legislative power." Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union 176 (1868). Even though those in the Kansas Territory recognized the advisability of establishing a government that would protect the common welfare, by starting the Kansas Constitution with the Bill of Rights, the founders, like those in other territories, set the limit beyond which "no human legislation should be suffered to conflict with the rights declared to be *inherent and inalienable*." Bateman, Political and Constitutional Law of the United States of America 17 n.1 (1876). Bills of rights in state constitutions acted as "*admonitions to the legislature which aimed at preventing the abuse of private rights.*" Elliott, *The Constitution as the American Social Myth*, *in* The Constitution Reconsidered 217 (Read ed., 1938).

Does all of this mean no governmental action may infringe to any degree on such rights? We turn to that question.

2.1     *The Historical Record Demonstrates a Recognition and Acceptance that Governmental Regulations Could Encroach on Rights.*

The debates about the wording of section 1 at the Wyandotte Convention suggest the framers did not intend to prohibit all government encroachment of natural rights. Kingman told his fellow delegates that "the word 'inalienable' has a fixed meaning in law." Convention, at 282. He gave an example:  "[W]hen in the common use of the word we say, that a man cannot alienate his property, none would suppose we mean to say, he cannot forfeit his property." Convention, at 282-83. Referring to the constitution's homestead provision, "which shall be inalienable," he indicated his committee did "not

propose to ordain that it shall not be forfeited for debts due to the State, and so on."
Convention, at 283.

Nor did Locke himself view inalienable rights as being totally outside the purview of regulation in an organized society. He viewed some regulation of natural rights as essential to civil society because there is no privilege to violate the rights of others. Two Treatises, Bk. II, §§ 87, 95. But that regulation cannot be so extensive or invasive that these natural rights are surrendered completely. Two Treatises, Bk. II, § 131 (a person forgoes natural rights "only with an intention . . . to preserve himself his Liberty and Property"); see Barnett, *The Proper Scope of the Police Power*, 79 Notre Dame L. Rev. 429, 450-56, 479-86 (2004) (discussing Locke's theories and their understanding during the time period of the Wyandotte Convention).

This means that, as long as an individual remains within her (or his) private domain, she may do as she pleases, provided her "conduct does not encroach upon the rightful domain of others. As long as [her] actions remain within this rightful domain, other persons—including persons calling themselves government officials—should not interfere without *a compelling justification*." (Emphasis added.) 79 Notre Dame L. Rev. at 446.

2.2     *Courts Review Whether a Compelling Justification Exists Under a Strict Scrutiny Standard.*

What then constitutes a compelling justification? The United States Supreme Court and this court have adopted a standard for courts to apply when determining if the government has met its burden of establishing a compelling justification for enactments. The standard is referred to as "strict scrutiny." See *Farley*, 241 Kan. at 669-70; Fallon, *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267 (2007) (providing a comprehensive history of strict scrutiny review and tracing its development); see also Siegel, *The Origin*

*of the Compelling State Interest Test and Strict Scrutiny*, 48 Am. J. Legal Hist. 355 (2006) (same). The strict scrutiny standard, also called the strict scrutiny test, is part of a three-tiered set of standards generally applied to claims under the Fourteenth Amendment to the United States Constitution. Initially, these standards were applied in equal protection cases, but the United States Supreme Court has expanded the application of strict scrutiny review to include government violations of fundamental rights under the Due Process Clause. Fallon, 54 UCLA L. Rev. at 1281-84. A robust body of United States Supreme Court caselaw sets out the parameters of the strict scrutiny standard and how courts should apply it.

This court, when considering claims brought concurrently under section 1 of the Kansas Constitution Bill of Rights and the Fourteenth Amendment to the United States Constitution, has recognized and adopted these three standards. *Farley*, 241 Kan. at 669. They are: (1) the rational basis standard, which requires only that the legislative enactment bear some rational relationship to a legitimate state interest; (2) the heightened or intermediate scrutiny standard, which requires the enactment to substantially further an important state interest; and (3) the strict scrutiny standard, which requires the enactment serve some compelling state interest and be narrowly tailored to further that interest. *Grutter v. Bollinger*, 539 U.S. 306, 326, 123 S. Ct. 2325, 156 L. Ed. 2d 304 (2003) (strict scrutiny); *Romer v. Evans*, 517 U.S. 620, 631, 116 S. Ct. 1620, 134 L. Ed. 2d 855 (1996) (rational basis); *Craig v. Boren*, 429 U.S. 190, 197, 97 S. Ct. 451, 50 L. Ed. 2d 397 (1976) (intermediate scrutiny). The determination of which of the three standards applies depends on the nature of the right at stake. *Farley*, 241 Kan. at 669.

The most searching of these standards—strict scrutiny—applies when a fundamental right is implicated. *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1017, 850 P.2d 773 (1993); see *State v. Ryce*, 303 Kan. 899, 957, 368 P.3d 342 (2016). As we have already noted, the natural right of personal autonomy is fundamental and thus requires

65

applying strict scrutiny. As such, to justify S.B. 95, the State must establish a compelling interest—one that is "not only extremely weighty, possibly urgent, but also rare—much rarer than merely legitimate interests and rarer too than important interests." Fallon, 54 UCLA L. Rev. at 1273.

The strict scrutiny standard has been applied in cases where the government has imposed restrictions on abortions. Initially, the United States Supreme Court applied the strict scrutiny standard in *Roe*, 410 U.S. at 154-55, and its companion case, *Doe v. Bolton*, 410 U.S. 179, 93 S. Ct. 739, 35 L. Ed. 2d 201 (1973), to state statutes restricting access to medical procedures used to end a pregnancy.

The Court adopted a different standard in *Casey*—a case that addressed restrictions on women's access to abortion. In doing so, the Court observed that the *Roe* Court had adopted a trimester-based framework when deciding the point during a pregnancy at which the State's interest in regulating abortion was significant enough to impose restrictions on the procedure. *Casey*, 505 U.S. at 872 (plurality opinion). During the first trimester, the State had no compelling interest and could not restrict abortion; during the second trimester, it could restrict abortion to ensure the woman's safety; and during the third trimester—when science then considered a fetus viable—its interest was compelling enough to completely prohibit the procedure unless it put the woman's life or health in danger. *Casey*, 505 U.S. at 872 (plurality opinion).

The *Casey* Court noted that medical advances had made it safe for women to have abortions later in pregnancy and had advanced viability to an earlier time in the pregnancy. But it concluded "these facts go only to the scheme of time limits on the realization of competing interests" and have "no bearing on the validity of *Roe*'s central holding" regarding a woman's right to terminate her pregnancy. 505 U.S. at 860. After reaffirming *Roe*'s conclusions on a woman's right to choose an abortion, the three

66

authoring justices in *Casey* realigned the "other side of the equation[, which] is the interest of the State in the protection of potential life." *Casey*, 505 U.S. at 871 (plurality opinion). Rather than the traditional strict scrutiny standard, the three justices adopted an "undue burden" standard for the State to meet. 505 U.S. at 876 (plurality opinion). As we will discuss, this standard is less rigorous than strict scrutiny.

Under the undue burden standard, the three justices divided pregnancy into two stages, with different rules applying to each stage. Before viability of the fetus, states could adopt measures designed "to persuade the woman to choose childbirth over abortion" as long as those measures were "reasonably related to that goal" and did not impose an "undue burden" on the woman's ability to obtain an abortion. 505 U.S. at 878 (plurality opinion). The decision defined "undue burden" as a law whose "purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." 505 U.S. at 878 (plurality opinion). After viability, states could "'regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.'" 505 U.S. at 879 (plurality opinion) (quoting *Roe*, 410 U.S. at 164-65).

This court has never adopted the undue burden standard. But it has, as acknowledged above, tended to employ a Fourteenth Amendment based approach to challenges invoking both that amendment and section 1 of the Kansas Constitution Bill of Rights. Thus, the trial court and the six members comprising the Court of Appeals plurality predicted this court would adopt the undue burden standard. Several worthy reasons lead us to do otherwise and apply the strict scrutiny standard.

First, the undue burden standard has proven difficult to understand and apply. See Chemerinsky & Goodwin, *Abortion:  A Woman's Private Choice*, 95 Tex. L. Rev. 1189, 1219-20 (2017) (discussing the ambiguities in the Court's articulation of the standard and

the internal "tension" of the undue burden test, which "says both that the state cannot act with the purpose of creating obstacles to abortion and that it can act with the purpose of discouraging abortion and encouraging childbirth"). One troubling ambiguity has arisen regarding the level of judicial scrutiny the standard requires. At least one author has referred to the *Casey* standard as "[a] form of intermediate scrutiny." Fallon, 54 UCLA L. Rev. at 1299. Under this standard, the State must show only an "important" interest in order to successfully defend the challenged legislation. 54 UCLA L. Rev. at 1298. Meanwhile, the Fifth Circuit has interpreted the undue burden test as a form of the rational basis test—i.e., a standard of review even less demanding than intermediate scrutiny. See Greenhouse & Siegel*, Casey and the Clinic Closings: When "Protecting Health" Obstructs Choice*, 125 Yale L.J. 1428, 1466-67 (2016) (discussing Fifth Circuit cases).

The United States Supreme Court's decision in *Whole Woman's Health v. Hellerstedt,* 579 U.S.___, 136 S. Ct. 2292, 2309, 195 L. Ed. 2d 665 (2016), did not equate the undue burden test to the rational basis test, and some have argued that *Hellerstedt* requires courts to apply "close scrutiny." Greenhouse & Siegel, *The Difference a Whole Woman Makes: Protection for the Abortion Right After* Whole Woman's Health, 126 Yale L.J. Forum 149, 163 (2016). But "close scrutiny" is not a defined term. It presumably means something very stringent, and Justice Thomas, in his *Hellerstedt* dissent, apparently believed that the majority had "transform[ed] the undue-burden test to something much more akin to strict scrutiny." 136 S. Ct. at 2324.

These shifting and conflicting pronouncements leave the exact contours of the undue burden test murky. In part, the lack of clarity comes from the fact that neither *Casey*, in stating the undue burden test, nor any of the cases applying it, including *Hellerstedt*, have set out the test in, or in relation to, the traditional language used for the three tiers of scrutiny.

68

Further, the undue burden standard has been criticized by some of our sister courts for leaving judges to subjectively gauge what is an undue burden—something that varies based on a judge's own views and experiences as well as on the circumstances of each pregnant woman. See, e.g., *Planned Parenthood*, 915 N.W.2d at 239 ("'[A] regulation held to be an undue burden by one judge could just as easily be found to be reasonable by another judge because the gauge for what is an undue burden necessarily varies from person to person.'"); 915 N.W.2d at 232 ("Abortion regulations impact different women in many different ways. . . . There are few hurdles that are of level height for women of different races, classes, and abilities."). There, the Iowa Supreme Court also observed— in our view, correctly:

"When a state regulates abortion in furtherance of its interest in potential life, the undue burden standard solely measures the impact the regulation has on women's ability to receive the procedure. . . . More, however, can be at stake. A standard that only reviews the burdens of the regulation fails to guarantee that the objective of the regulation is, in fact, being served and is inconsistent with the protections afforded to fundamental rights." 915 N.W.2d at 240.

Another reason not to default to the federal undue burden standard is that this court's precedent indicates application of strict scrutiny is appropriate. Traditionally this court has reviewed ordinances and statutes for violations of section 1 of the Kansas Constitution Bill of Rights using the three tests applied to equal protection challenges under the Fourteenth Amendment by the United States Supreme Court:  rational basis, intermediate scrutiny, and strict scrutiny. See, e.g., *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 618, 576 P.2d 221 (1978) (practice of medicine not a fundamental interest under Constitution; therefore, traditional rational relationship test applied); *Henry v. Bauder*, 213 Kan. 751, 762, 518 P.2d 362 (1974) (Kansas automobile guest statute

imposing legal liability on driver only if guilty of some act constituting recklessness or willful or wanton misconduct fails rational basis test).

Significantly, in *Farley*, 241 Kan. at 670-71, a case in which this court expressly decided the issue of a statute's constitutionality based on section 1's guarantee of equal protection rather than the Fourteenth Amendment's, we considered the possibility of applying strict scrutiny. Under the facts of the case, which did not involve a natural right, the court decided to apply the intermediate scrutiny standard to declare unconstitutional a statute that abolished the collateral source rule in medical malpractice litigation. 241 Kan. at 672, 678.

In short, although there are no Kansas cases applying strict scrutiny to natural rights, *Farley* and other cases suggest the standard is available. See *Limon*, 280 Kan. at 283-84, 287 (although applying rational basis analysis, recognizing tiers of scrutiny in an equal protection analysis under section 1).

The State urges us to distinguish these cases as dealing with equal protection rather than substantive rights and to refuse to expand the tiered scrutiny approach to include the latter. But the State does not explain why section 1 should be applied in two different ways—one way for an equal protection analysis and another for violation of a substantive right. We can perceive no doctrinal basis for doing so. And certainly nothing in the language of section 1 suggests a textual reason for doing so. In our view the same judicial standard of review should apply to this case arising under section 1. And strict scrutiny has been applied outside of equal protection—and due process. See, e.g., *R.A.V. v. St. Paul*, 505 U.S. 377, 382, 395, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992) (under First Amendment to the United States Constitution, content-based laws—those that target speech based on its communicative content—are subject to strict scrutiny). It serves as an appropriate test when fundamental rights are at issue.

As further support for our adopting the strict scrutiny standard, we note it has been applied by a majority of other courts that have determined their state constitutions provide a right to decide whether to continue a pregnancy. See, e.g., *Valley Hosp. Ass'n v. Mat-Su Coalition*, 948 P.2d 963, 969 (Alaska 1997) (constitution allows constraint of abortion rights only when it serves a "compelling state interest" and "no less restrictive means could advance that interest"); *Committee to Defend Reprod. Rights v. Myers*, 29 Cal. 3d 252, 262, 276, 172 Cal. Rptr. 866, 625 P.2d 779 (1981) ("only the most compelling of state interests" could possibly justify impairment of "fundamental constitutional right to choose whether or not to bear a child"); *In re T.W.*, 551 So. 2d 1186, 1192-93 (Fla. 1989) (statute interfering with a woman's decision to continue a pregnancy violates her constitutional rights unless the regulation "'serves a compelling state interest and accomplishes its goal through the use of the least intrusive means'"); *Hope Clinic for Women, Ltd. v. Flores*, 991 N.E.2d 745, 765-67 (Ill. 2013) (abortion regulations must withstand strict scrutiny); *Planned Parenthood*, 915 N.W.2d 206, 237-41 (because decision whether to end a pregnancy is a fundamental liberty, strict scrutiny applies); *Women v. Gomez*, 542 N.W.2d 17, 31 (Minn. 1995) (state statutes affecting a woman's fundamental right to choose whether to continue a pregnancy are subject to strict scrutiny); *Armstrong v. State*, 296 Mont. 361, 374-76, 989 P.2d 364 (1999) (infringement on women's right to obtain pre-viability abortion unconstitutional unless provision is narrowly tailored to effectuate compelling interest); *Planned Parenthood v. Sundquist*, 38 S.W.3d 1, 15 (Tenn. 2000) (because abortion regulations interfere with fundamental right, such regulations must withstand strict scrutiny), *superseded by amendment* Tenn. Const. art. I, § 36 (2014). But see *Moe*, 382 Mass. at 655-58 (impairment of fundamental right of choice assessed by balancing state interest against pregnant woman's interest); *Fordice*, 716 So. 2d at 655 (assessing statutes impairing access to abortion under undue burden standard instead of usual compelling interest standard applied to violations of right to privacy; privacy right to abortion "much more

71

complex"); *Voinovich*, 89 Ohio App. 3d at 702-03 (adopting *Casey* undue burden analysis for restrictions that interfere with liberty right to choose abortion; holding equal protection analysis requires abortion restrictions to be "'tailored to further an important government interest'"; state must demonstrate "'exceedingly persuasive justification'").

Finally, and perhaps most importantly, we adopt the strict scrutiny standard because it is our obligation to protect (1) the intent of the Wyandotte Convention delegation and voters who ratified the Constitution and (2) the inalienable natural rights of all Kansans today. And the strict scrutiny test best protects those natural rights that we today hold to be fundamental.

We agree with the concurring opinion that both the undue burden and strict scrutiny tests start with determining how governmental action burdens or infringes on a right. But significant differences between the two standards makes the undue burden standard less rigorous for the State to meet. We mention some of the most consequential ones.

First, under the strict scrutiny standard, the State faces a higher burden. As we will discuss in more detail in section 2.4 below, once a plaintiff proves an infringement—regardless of degree—the government's action is presumed unconstitutional. Then, the burden shifts to the government to establish the requisite compelling interest and narrow tailoring of the law to serve it. See, e.g., *Reed v. Town of Gilbert*, 576 U.S. ___, 135 S. Ct. 2218, 2226, 192 L. Ed. 2d 236 (2015) (in free speech context, holding "[c]ontent-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests"); *Fisher v. University of Texas at Austin*, 570 U.S. 297, 310, 133 S. Ct. 2411, 186 L. Ed. 2d 474 (2013) ("[s]trict

scrutiny is a searching examination, and it is the government that bears the burden");
*Liggett*, 223 Kan. at 617 (when strict scrutiny applies state has burden of proof).

On the other hand, *Hellerstedt*—with the undue burden test—"essentially engages in ad hoc balancing of the individual and state interests involved, seemingly *distributing the burden of proof roughly evenly* between the plaintiff and state in a given case." (Emphasis added.) McDonald*, A* Hellerstedt *Tale: There and Back Again*?, 85 U. Cin. L. Rev. 979, 1012 (2018). This balancing test relieves the State of some of the burden of proof and from having to narrowly tailor an infringement to the interest it seeks to protect. As long as that infringement—the burden on abortion access—is less than the benefit, it is constitutional. See *Hellerstedt*, 136 S. Ct. at 2309.

Second, the undue burden test requires only that the governmental interest be "'legitimate'" or "'valid.'" 136 S. Ct. at 2309. Thus, a weak but legitimate or valid interest—one that is less than compelling—may justify an infringement on a right if the burden is not substantial. In contrast, when the State has to show a compelling interest under strict scrutiny, it must show something that is "not only extremely weighty, possibly urgent, but also rare—much rarer than merely legitimate interests and rarer too than important interests." Fallon, 54 UCLA L. Rev. at 1273. In essence, the undue burden test emphasizes the governmental interest by simply balancing it against the individual rights of Kansans. This is instead of starting with an emphasis on the individual's rights and requiring the government to establish its compelling interest and to prove its action is narrowly tailored to serve that interest—even if the infringement is slight. And by placing their acknowledgment of these individual rights in the first section of Kansans' Bill of Rights, the drafters and adopters of our Constitution made clear the rights are foremost.

Simply put, the undue burden standard—both as set out in *Hellerstedt*, 136 S. Ct. at 2309, and in the concurring opinion, lacks the rigor demanded by the Kansas Constitution for protecting the right of personal autonomy at issue in this case. Further, great uncertainty exists about when—and how—to apply the standard to different abortion restrictions in the future. See McDonald, 85 U. Cin. L. Rev. at 1005-06 (arguing *Hellerstedt* applies only to maternal health regulations and not to persuasion regulations, which arguably continue to be subject to *Casey*'s more deferential approach). The standard also lacks the predictability the concurring opinion seeks to attach to it by criticizing the varied outcomes of strict scrutiny caselaw. As one legal commentator has noted: "As framed by *Whole Woman's Health* [*v. Hellerstedt*], the outcome of undue-burden analysis depends heavily on the facts of an individual case. Fact-intensive litigation rarely yields generalizable rules or consistent results." Ziegler, *Rethinking an Undue Burden*: Whole Woman's Health's *New Approach to Fundamental Rights*, 85 Tenn. L. Rev. 461, 512 (2018).

For similar reasons we also reject the dissent's position that a governmental regulation, such as S.B. 95, is constitutional as long as it is not arbitrary, irrational, or discriminatory and is reasonably related to the common welfare. Slip op. at 186, 188. Like the United States Supreme Court, this court has held that an exercise of the police power does not ensure constitutionality. Rather, "[w]hile the legislature is vested with a wide discretion . . . , it cannot, under the guise of the police power, enact unequal, unreasonable or oppressive legislation or *that which violates the Constitution*." (Emphasis added.) *Londerholm*, 195 Kan. at 760. Simply adopting the dissent's test sets too low a bar when protecting a natural right from unconstitutional governmental encroachment.

At issue here is the inalienable natural right of personal autonomy, which is the heart of human dignity. It encompasses our ability to control our own bodies, to assert bodily integrity, and to exercise self-determination. It allows each of us to make decisions

74

about medical treatment and family formation, including whether to bear or beget a child. For women, these decisions can include whether to continue a pregnancy. Imposing a lower standard than strict scrutiny, especially mere reasonableness, or the dissent's "rational basis with bite"—when the factual circumstances implicate these rights because a woman decides to end her pregnancy—risks allowing the State to then intrude into all decisions about childbearing, our families, and our medical decision-making. It cheapens the rights at stake. The strict scrutiny test better protects these rights. See, e.g., *Farley*, 241 Kan. at 669-70.

All of these reasons persuade us that any government infringement of the inalienable natural right of personal autonomy requires the State to establish a compelling state interest and to show that S.B. 95 is narrowly tailored to promote it.

2.3 *The Doctors Established They are Substantially Likely to Show that S.B. 95 Impairs Natural Rights.*

Of course, before a court considers whether a governmental action survives this test, it must be sure the action actually impairs the right. In some cases, it will be obvious that an action has such effect. Imprisonment, for example, obviously impairs the right to liberty. In other cases, the court may need to assess preliminarily whether the action only appears to contravene a protected right without creating any actual impairment. See *Casey*, 505 U.S. at 873 (plurality opinion) (noting that "not every law which makes a right more difficult to exercise is, *ipso facto*, an infringement of that right"). See generally *Limon*, 280 Kan. at 284 (noting multi-step process, first of which is deciding whether legislation actually creates discriminatory classification before deciding whether the classification impermissibly infringes constitutional rights).

The trial court, although applying a different standard, made factual findings establishing the broad brush of S.B. 95. It found that criminalizing the performance of the

75

D & E procedure limits second-trimester abortion options to procedures that carry increased risks, are untested in some circumstances, require extra steps and time, and may be impossible in some cases—all with no established health and safety benefit for the woman. The increased risks and lack of medical research associated with the remaining options will force a woman to gamble with other aspects of her health if she chooses to end her pregnancy. Finally, S.B. 95's requirement that doctors perform procedures for which there are no known health advantages and subject their patients to the aforementioned risks, uncertainty, and hardship—especially when safe, effective, and less intrusive means exist—will undoubtedly test the boundaries of medical ethics and threaten the already small number of providers willing to perform second-trimester abortions. These implications make the procedures more dangerous and, for some, will delay or completely prevent the exercise of an inalienable natural right.

### 2.4 *The Trial Court Did Not Err by Failing to Apply a Presumption of Constitutionality.*

The State also argues the trial court was required to presume that S.B. 95 was constitutional when deciding whether the Doctors had shown a substantial likelihood of prevailing on the merits. Instead, the State contends, the trial court ignored this presumption, effectively shifting the burden of proof to the State and forcing it to prove that S.B. 95 is constitutional. It argues this improper shift colored the court's findings of facts and impermissibly tipped the scale in the Doctors' favor.

The Doctors respond that the right to abortion is a fundamental right and, consequently, a presumption of constitutionality would be contrary to Kansas caselaw. Alternatively, the Doctors contend that even if the trial court should have applied a presumption of constitutionality, they overcame this presumption.

This is a legal issue and therefore our review is de novo. *Apodaca v. Willmore*, 306 Kan. 103, 106, 392 P.3d 529 (2017).

The State is correct in its assertion that, generally, "[a] statute comes before the court cloaked in a presumption of constitutionality and it is the duty of the one attacking the statute to sustain the burden of proof." *Liggett*, 223 Kan. at 616. When a statute is presumed constitutional, "all doubts must be resolved in favor of its validity. If there is any reasonable way to construe that statute as constitutionally valid, this court has the authority and duty to do so." *Miller v. Johnson*, 295 Kan. 636, 646-47, 289 P.3d 1098 (2012).

"A more stringent test has emerged, however, in cases involving 'suspect classifications' or 'fundamental interests.' Here the courts peel away the protective presumption of constitutionality and adopt an attitude of active and critical analysis, subjecting the classification to strict scrutiny." *Liggett*, 223 Kan. at 617. In such a case, "the burden of proof is shifted from plaintiff to defendant and the ordinary presumption of validity of the statute is reversed." *Farley*, 241 Kan. at 670. This burden shift stems from the recognition that government infringement of a fundamental right is inherently suspect. When considering government-instituted racial classifications, the United States Supreme Court has explained that such suspicion demands a "'searching judicial inquiry'" as a way to "''smoke out' illegitimate'" governmental action by "'assuring that [the government] is pursuing a goal important enough to warrant use of a highly suspect tool.'" *Johnson v. California*, 543 U.S. 499, 506, 125 S. Ct. 1141, 160 L. Ed. 2d 949 (2005) (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493, 109 S. Ct. 706, 102 L. Ed. 2d 854 [1989] [plurality opinion]).

Section 1 protects an inalienable natural right of personal autonomy, which today we hold to be fundamental. Presuming that any state action alleged to infringe that right is

77

constitutional dilutes the protections established by our Constitution. Thus, to the extent that the trial court actually refused to apply a presumption, it did so correctly.

Furthermore, we question the State's legal theory that the failure to apply a presumption colors a court's findings of fact. The State produces no support for this assertion. And, even if there is some legitimacy to its argument, it is of no consequence here because none of the State's factual assertions directly contradict the trial court's findings. Thus, even if the failure to apply a presumption would have altered the way the court assessed the facts, any error in not applying that presumption was harmless and gives us no reason to disturb the trial court's findings. See K.S.A. 2018 Supp. 60-261 ("Unless justice requires otherwise, no error in admitting or excluding evidence, or any other error by the court or a party, is ground for granting a new trial, for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."); *State v. McCullough*, 293 Kan. 970, 983, 270 P.3d 1142 (2012) (An error is harmless when there is no reasonable probability that the error affected the trial's outcome in light of the entire record).

2.5     *The Trial Court Abused Its Discretion by Applying the Wrong Legal Standard, but the Result Would Be the Same.*

Accepting the trial court's factual findings, we now ask the ultimate question before us in this appeal:  Did the trial court abuse its discretion when it concluded that the Doctors were substantially likely to prevail on the merits of their claim? See *Downtown Bar and Grill*, 294 Kan. at 191 (on first prong of temporary injunction test, plaintiffs need show only that they are substantially likely to win, not that they absolutely will). The trial court did not apply a strict scrutiny standard when answering this question. Nor did 13 of the 14 Court of Appeals judges. Although the concurring judge did not label his standard "strict scrutiny," it had some similarities. See *Hodes*, 52 Kan. App. 2d at 328 (Atcheson,

J., concurring) ("[E]ven a fundamental right may be regulated to advance an essential governmental interest, so long as the regulation is carefully circumscribed and does no more than required to advance that interest."). Applying the wrong legal standard constitutes an abuse of discretion. See *Ward*, 292 Kan. at 550 (A trial court abuses its discretion if its decision is [1] arbitrary, fanciful, or unreasonable; [2] based on an error of law; or [3] based on an error of fact.).

Nevertheless, when a trial court applies the wrong standard, remand for it to apply the correct standard is not always necessary. Cf. *Stueckemann v. City of Basehor*, 301 Kan. 718, 750-51, 756, 348 P.3d 526 (2015) (affirming district court's inquiry that met expansive concept of reasonableness in test later articulated by Supreme Court); *State v. Prado*, 299 Kan. 1251, 1260, 329 P.3d 473 (2014) (declining to remand for additional findings where record was sufficiently developed for appellate court to conclude attorney conflict of interest existed). As in those cases, we conclude a remand is not necessary here because the result would be the same.

Although the State only argued in the trial court that, if the Kansas Constitution protects a right to end a pregnancy, S.B. 95 is constitutional under the undue burden standard, we conclude that remand to consider whether the Doctors have shown they are substantially likely to prevail on the merits in light of the strict scrutiny standard we set out today is not necessary. See *Downtown Bar and Grill*, 294 Kan. at 191. The trial court and the Court of Appeals plurality held there was a substantial likelihood S.B. 95 could not survive *Casey*'s undue burden test, which in our view is a lesser standard. *Stenberg*, 530 U.S. 914, and *Gonzales*, 550 U.S. 124—the two cases that guided the trial court and the Court of Appeals plurality—illustrate this point.

In *Stenberg*, the United States Supreme Court considered a Nebraska law that banned two types of abortions it labeled as "'partial birth'" procedures, including the

79

D & E procedure at issue in the instant case and an "intact" D & E procedure. Intact D & E procedures occur in one of two ways, depending on whether the fetus presents head first or feet first. The feet-first method is known as "dilation and extraction" or "D & X." 530 U.S. at 927.

The *Stenberg* Court found two reasons the statute violated women's constitutional right to access abortion. First, the statute did not include a health exception allowing use of the targeted procedures when the mother's health was endangered. 530 U.S. at 929-30. Second, the Court concluded the Nebraska law placed an undue burden on a woman's right because it subjected physicians who performed the most common type of second-trimester abortion (the D & E procedure) to criminal prosecution. 530 U.S. at 945-46. In so holding, the Supreme Court stated that the Constitution protects against abortion regulations imposing "significant health risks," whether those risks "happen[] to arise from regulating a particular method of abortion, or from barring abortion entirely." 530 U.S at 931.

In combination, these holdings indicate a woman has a federal constitutional right to access an abortion, including whenever it is necessary to protect her health. A regulation that prevents her from accessing the safest method of abortion for her places an undue burden on that right. These holdings have particular significance in this case, where the trial court found that S.B. 95 has removed access to the method for performing a second-trimester abortion that is the safest in most cases.

Seven years later, in *Gonzales*, 550 U.S. at 141, 168, again applying the undue burden test, the Court rejected a constitutional challenge to the federal Partial-Birth Abortion Ban Act (PBABA) of 2003, which restricted D & X abortions "'in or affecting interstate or foreign commerce.'" The Court's conclusion rested, in part, on the fact that abortion by D & E would still be available. 550 U.S. at 164.

In light of these decisions, the Kansas Court of Appeals plurality, applying the undue burden standard, discussed the impact of these cases on the present case and explained why they persuasively showed that the Doctors are substantially likely to succeed here:

"Kansas has banned the intact D & E abortion procedure since 1998. See K.S.A. 2014 Supp. 65-6721; L. 1998, ch. 142, sec. 18; L. 2011, ch. 91, sec. 30. By combining that ban with a new one on the D & E abortion procedure, Kansas has simply attempted to do in two statutes what the United States Supreme Court [in *Stenberg*] held Nebraska could not do in one—ban both D & E and intact D & E abortions.

"The State contends, based on *Gonzales*, that the new Kansas statute is permissible because reasonable alternative procedures remain available. But the circumstances here are quite unlike *Gonzales*. There, the Court considered a ban on an uncommon procedure and noted that the most common and generally safest abortion method remained available. Here, the State has done the opposite, banning the most common, safest procedure and leaving only uncommon and often unstudied options available." *Hodes*, 52 Kan. App. 2d at 291-92 (plurality opinion).

We agree with this reading of *Stenberg* and *Gonzales* and the Court of Appeals plurality's analysis of their impact on this case. We would add that, after the Court of Appeals' decision in this case, the United States Supreme Court reiterated, quoting *Roe*, that the "'State has a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient.'" *Hellerstedt*, 136 S. Ct. at 2309 (quoting *Roe*, 410 U.S. at 150). Here, according to the findings of the trial court, through S.B. 95 the State actually thwarts its legitimate interest by taking away a method that is safer for the woman than the alternatives it proposes. See also *Danforth*, 428 U.S. at 79 (holding unconstitutional a ban on a method of abortion after finding the ban "force[d] a woman . . . to terminate her pregnancy by

81

methods more dangerous to her health"); *Gonzales*, 550 U.S. at 172 (Ginsburg, J., dissenting) ("[A] State must avoid subjecting women to health risks not only where the pregnancy itself creates danger, but also where state regulation forces women to resort to less safe methods of abortion.").

As previously noted, the undue burden standard applied in *Stenberg* and *Gonzales* and by the Court of Appeals plurality is often viewed as a more lenient standard than strict scrutiny or, at most, something akin to strict scrutiny. Accordingly, even though we would apply what we view as the more demanding strict scrutiny standard for the State to meet, doing so would not change the conclusions reached by the trial court.

     2.6    *Conclusion:  We Affirm the Trial Court's Decision to Impose the Temporary Injunction.*

Thus, neither the State's arguments about the application of a presumption nor our determination that strict scrutiny is the most appropriate test of constitutionality makes it necessary to remand this case to the trial court for new findings or additional legal analysis related to the temporary injunction phase. However, we do remand to the trial court for full consideration of the merits of the remainder of the case.

At oral argument, the State posited that if full resolution of the merits is ultimately required in the lower court, then there it might assert state interests in promoting potential life, protecting the dignity of life, protecting medical ethics, and protecting patient safety. We acknowledge some of these interests were argued in the line of cases relied on by the trial court. See *Gonzales*, 550 U.S. at 157 (recognizing "'State's interest in potential life'" and stating, "[t]here can be no doubt the government 'has an interest in protecting the integrity and ethics of the medical profession'"); *Danforth*, 428 U.S. at 79, 81 (discussing state's interest in patient health and holding unconstitutional a ban on a method of abortion after finding the ban "force[d] a woman . . . to terminate her pregnancy by

methods more dangerous to her health"). And some of these interests, particularly those of promoting or protecting fetal life and patient safety, have been court-recognized as interests that may be compelling. E.g., *Planned Parenthood*, 915 N.W.2d at 239. On remand for full consideration of the merits, the State may certainly raise to the trial court any interests it claims are compelling, including those it mentioned at oral argument before this court, and show why S.B. 95 is narrowly tailored to those interests. See *Grutter*, 539 U.S. at 326.

3. *The Dissent Weakens Section 1 in a Manner the Framers and Ratifiers of the Constitution Did Not Intend.*

Although we have responded to some points made by the dissent, we pause here to point out key distinctions between it and the majority opinion. The overriding difference between the opinions is the degree of importance and substance that each attaches to individual liberty. The majority holds that individuals enjoy constitutional protection against unwarranted government intrusion in their personal business, whereas the dissent leaves the individual nearly naked and defenseless, especially in the realm of individual sovereignty.

The dissent is at its strongest when it is in agreement with the majority, that is, when it drives home the historical and legal emphasis on rights accruing to the individual at birth. In particular, the dissent insightfully cites to numerous sources supporting the majority position that government may interfere with essential personal rights only when "necessary," which can be characterized as saying that the government may interfere with essential personal rights only when its actions pass a test of strict scrutiny. The dissent cogently argues that it is up to the courts to protect the individual from "unchecked" police power exercised by the State.

But the dissent is at its weakest when it takes the majority's reliance on individual rights and distorts that argument into one that favors a government-first reasoning. The dissent finds itself in a painful dilemma: It feels obligated to hold that government may intrude with impunity on the most fundamental of natural human rights, the right of personal autonomy—in particular, the right to make medical decisions about oneself; but it also wants to hold itself out as favoring constitutionally limited government power.

In order to resolve this conflict, the dissent engages in a fantastic acrobatic midair twist. It contends that government should come from rights first, but then maintains that government should be largely unrestrained in exercising its power over the personal sovereignty of pregnant women. The dissent achieves this astonishing reversal by fervently arguing that the Kansas Constitution Bill of Rights was intended to protect the pre-political rights of Kansans. But that argument eventually leads, of course, to the same conclusion that the majority reaches.

As a consequence, the dissent is forced to mischaracterize the majority opinion. It attempts to portray the majority as paternalistic and authoritarian, endorsing government power at the expense of citizens' rights, e.g., personal autonomy. But it is the dissent who argues for a government largely unfettered by constitutional constraints, with the State deciding for the individual what is best for that individual.

The dissent concedes that some state action may violate the protections of section 1 but only if such exercise of police power is completely arbitrary, irrational, or discriminatory. The dissent ultimately favors limited state powers that in reality have no practical limits. Presumably, if the Legislature were to mandate that all males receive vasectomies at the age of 18 in order to limit population density and therefore enhance respect for human dignity, the dissent would find no constitutional conflicts. The dissent's vision of government and rights is one of regal government powers, powers that sweep

away individual liberty in favor of a majoritarian dictate. In the dissent's view, the Kansas Constitution Bill of Rights is akin to a gentle reminder not to disturb liberty very much but with no legal consequences if government ignores that reminder.

CONCLUSION

We hold today that section 1 of the Kansas Constitution Bill of Rights protects all Kansans' natural right of personal autonomy, which includes the right to control one's own body, to assert bodily integrity, and to exercise self-determination. This right allows a woman to make her own decisions regarding her body, health, family formation, and family life—decisions that can include whether to continue a pregnancy.

Under our strict scrutiny standard, the State is prohibited from restricting that right unless it can show it is doing so to further a compelling government interest and in a way that is narrowly tailored to that interest. The Doctors have shown they are substantially likely to prevail on their claim that S.B. 95 does not meet this standard. So the trial court's temporary injunction enjoining the enforcement of S.B. 95 is appropriate.

On remand to the trial court for a full resolution of the issues on the merits, the State is certainly free to assert any interests it believes compelling and show how S.B. 95 is narrowly tailored to those interests. We are aware that the evidentiary record is sparsely developed because of the narrow issue previously before that court:  simply whether a temporary injunction should be granted. We, thus, decline the concurring opinion's invitation to guess at what the arguments and evidence might be in order to provide guidance on remand.

To this point, despite the criticism of the concurring opinion, we will not accept the challenge to become a trial court ourselves. The conclusions the concurring opinion

asks us to draw should rest on the evidence actually or eventually presented, not on hypotheticals and theories. It may be that the trial court will make holdings that are similar or even identical to those made by the Iowa Supreme Court in *Planned Parenthood*, 915 N.W.2d 206—a decision the concurring opinion lauds. But it is premature for us to do so. The Iowa Supreme Court's decision came after trial—after evidence was available for review and after a trial court had made findings of fact. See also *Gannon v. State*, 298 Kan. 1107, 1171, 319 P.3d 1196 (2014) (setting out new legal test and remanding case for trial court to apply test to evidence already or eventually to be produced). Ironically, the concurring opinion even recognizes this, noting that the Iowa decision was "based on credible trial evidence" and was based "on evidence showing waiting periods do not change women's decisions whether to have an abortion." Slip op. at 103.

The trial court undoubtedly has a heavy task ahead of it. Not only must it grapple with one of the most divisive issues of our time, it must also take into account advances in science that have blurred the sharp trimester-based lines used in *Roe*'s strict scrutiny analysis. And it must do this with a deep awareness that the outcome of this case could generate a profound and personal consequence for many women. But we have great confidence in the trial court's ability to meet this challenge while applying strict scrutiny and the understandings developed over many years in various United States jurisdictions of what constitutes compelling interests and a narrow tailoring to those interests. The term "strict scrutiny" was first articulated by the United States Supreme Court in 1942, and courts have utilized the test in various contexts for over half a century. See *Shapiro v. Thompson*, 394 U.S. 618, 658-60, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969) (Harlan, J., dissenting) (explicitly describing two prongs of test and citing older cases for analogous support), *overruled in part for other reasons by Edelman v. Jordan*, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974); see also Siegel, *The Origin of the Compelling State Interest Test and Strict Scrutiny*, 48 Am. J. Legal Hist. 355, 355-56 (2006). We note that

86

the strict scrutiny standard provides considerable guidance to a trial court—more so than the undue burden standard urged by the concurrence, a standard that has never been applied by this court in any context.

In its merits resolution, the trial court will "adopt an attitude of active and critical analysis," as it performs its "'searching judicial inquiry.'" *Liggett*, 223 Kan. at 617; *Johnson*, 543 U.S. at 506 (quoting *Richmond*, 488 U.S. at 493). As it does so, it should remain mindful of the words of former Kansas Attorney General and Supreme Court Justice Harold Fatzer. "[C]ourts have no power to overturn a law enacted by the legislature within constitutional limitations, even though the law may be unwise, impolitic or unjust. The remedy in such a case lies with the people." *Harris*, 192 Kan. at 206-07. On the other hand, "[t]he judiciary . . . has imposed upon it the obligation of interpreting the Constitution and of safeguarding the basic rights reserved thereby to the people." *Harris,* 192 Kan. at 206. So "when legislative action exceeds the boundaries of authority limited by our Constitution, *and transgresses a sacred right guaranteed or reserved to a citizen*, final decision as to invalidity of such action must rest exclusively with the courts." (Emphasis added.) 192 Kan. at 207.

The decision of the Court of Appeals is affirmed; the trial court's ruling on the Doctors' motion for temporary injunction is affirmed; and this case is remanded to the trial court for further proceedings consistent with this decision.

\* \* \*

BILES, J., concurring:  I concur in the result. I do so because the majority decision provides little guidance for applying strict scrutiny—very rarely used in Kansas—as a meaningful constitutional measure for this legislation. And what guidance it does provide confuses rather than clarifies. For all practical purposes, the majority leaves the trial court

to fend for itself. In my view, an issue as troubling as this one requires us to be more instructive. Toward that end, I suggest what our state test should look like using an evidence-based analytical model taken from *Whole Woman's Health v. Hellerstedt*, 579 U.S. ___, 136 S. Ct. 2292, 195 L. Ed. 2d 665 (2016).

But to be clear from the outset, I join the other members of this court who unanimously agree section 1 of the Kansas Constitution Bill of Rights provides all Kansans, including pregnant women, with state-based, judicially enforceable protections against unwarranted government intrusion. Some cast this as a right to abortion, others as a limitation on state police powers, but the bottom line is the same: those challenging government conduct as an unlawful restriction on their protected section 1 interests may do so in a Kansas courtroom. The difference in our approaches is the standard used to measure where our state Constitution draws the line. See majority slip op. at 64-75 ("traditional" strict scrutiny); slip op. at 94, 107-09 (Biles, J., concurring) (evidence-based analytical model taken from *Hellerstedt*); slip op. at 185-86 (Stegall, J., dissenting) (rational basis "with bite"). This unanimity puts an end to suggestions that section 1 furnishes no basis for judicial relief when government treads on individual rights. See, e.g., *Hodes & Nauser, MDs v. Schmidt*, 52 Kan. App. 2d 274, 342, 368 P.3d 667 (2016) (Malone, C.J., dissenting); *State ex rel. Kline v. Sebelius*, No. 05-C-1050, 2006 WL 237113, at *11-12 (Kan. 3d Jud. Dist. Ct. Jan. 24, 2006); Appellants' Supp. Brief, at 12; Appellants' Brief, at 23; Amicus Curiae Brief, The Family Research Council, at 2-9.

It is also worth mentioning our court has not gone rogue today. By my count, appellate courts in 17 states have addressed whether their state constitutions independently protect a pregnant woman's decisions regarding her pregnancy from unjustifiable government interference. Of those, 13 have plainly held they do. *Valley Hosp. Ass'n v. Mat-Su Coalition*, 948 P.2d 963, 969 (Alaska 1997); *Committee to Defend Reprod. Rights v. Myers*, 29 Cal. 3d 252, 262, 274, 172 Cal. Rptr. 866, 625 P.2d 779

(1981); *In re T.W.*, 551 So. 2d 1186, 1193 (Fla. 1989); *Hope Clinic for Women, Ltd. v. Flores*, 991 N.E.2d 745, 765-67 (Ill. 2013); *Planned Parenthood v. Reynolds ex rel.,* 915 N.W.2d 206, 237 (Iowa 2018); *Moe v. Secretary of Administration & Finance*, 382 Mass. 629, 649, 417 N.E.2d 387 (1981); *Women v. Gomez*, 542 N.W.2d 17, 31 (Minn. 1995); *Pro-Choice Mississippi v. Fordice*, 716 So. 2d 645, 653 (Miss. 1998); *Armstrong v. State*, 296 Mont. 361, 376, 989 P.2d 364 (1999); *Planned Parenthood v. Farmer*, 165 N.J. 609, 613, 762 A.2d 620 (2000); *Preterm Cleveland v. Voinovich*, 89 Ohio App. 3d 684, 691, 627 N.E.2d 570 (1993); *Planned Parenthood v. Sundquist*, 38 S.W.3d 1, 11, 15 (Tenn. 2000), *superseded by amendment* Tenn. Const. art. I, § 36 (2014); *State v. Koome*, 84 Wash. 2d 901, 904, 530 P.2d 260 (1975).

Three others have implicitly held their state constitutions contain this protection. *Reproductive Health Services v. Nixon*, 185 S.W.3d 685, 692 (Mo. 2006) (implying a state constitution right to abortion by explicitly holding state constitutional language is not broader than the corresponding federal language); *Hope v. Perales*, 83 N.Y.2d 563, 575-77, 634 N.E.2d 183 (1994) (stating whether the state constitution protects a woman's "fundamental right of reproductive choice" is "undisputed," and holding the challenged statute constitutional because it did not implicate "her fundamental right of choice"); *Wood v. University of Utah Medical Center*, 67 P.3d 436, 447-48 (Utah 2002) (implying state constitutional protection when noting the state constitution does not "give any further protection to plaintiffs than does the federal constitution"); cf. *Planned Parenthood v. Bd. of Medicine*, 865 N.W.2d 252, 262 (Iowa 2015) (listing *Nixon* and *Hope* as holding independent state right existed). Only one—an intermediate Michigan appellate court—has held its state constitution does not contain this guarantee. *Mahaffey v. Attorney General*, 222 Mich. App. 325, 338-39, 564 N.W.2d 104 (1997).

That said, I need to more fully explain my concurrence. I agree with the majority that section 1 substantially restrains the government's ability to encroach into intimate,

personal matters deeply affecting a person's "inalienable natural rights," such as a woman's decision whether to bear a child. If it means anything, section 1 must mean that. See *Planned Parenthood*, 915 N.W.2d at 237 ("Autonomy and dominion over one's body go to the very heart of what it means to be free. At stake in this case is the right to shape, for oneself, without unwarranted governmental intrusion, one's own identity, destiny, and place in the world. Nothing could be more fundamental to the notion of liberty."); *Women*, 542 N.W.2d. at 27 ("We can think of few decisions more intimate, personal, and profound than a woman's decision between childbirth and abortion.").

The Iowa Supreme Court recently articulated the intensely personal and demanding crossroads a pregnant woman can face at this constitutionally protected moment in her life:

> "Many reasons have been identified to explain why women choose to have an abortion. Sixty percent of abortion patients already have at least one child and many feel they cannot adequately care for another child. Other women feel they are currently unable to be the type of parent they feel a child deserves. Patients frequently identify financial, physical, psychological, or situational reasons for deciding to terminate an unplanned pregnancy. Some patients are victims of rape or incest, and others are victims of domestic violence. Women also present with health conditions that prevent a safe pregnancy or childbirth. Sometimes, women discover fetal anomalies later in their pregnancies and make the choice to terminate." *Planned Parenthood*, 915 N.W.2d at 214-15.

This Kansas litigation concerns S.B. 95, which injects the State into a pregnant woman's second trimester decision-making. Again, the Iowa court's description about the personal situations that can arise during this timeframe is equally well-stated:

> "There are many reasons women have second trimester or otherwise late-in-window procedures. Most women are not aware of a pregnancy until at least five weeks since their last menstrual period. Some forms of contraception can mask the symptoms of

90

pregnancy, which delays women from discovering a pregnancy by days or weeks. Some patients' life circumstances change drastically between discovery and the decision to terminate. A patient may have lost her job, ended the relationship with her partner, or lost a support system. Significantly, almost no fetal anomalies can be diagnosed until the second trimester when prenatal screening is conducted. Usually, an anatomical ultrasound is not performed until the eighteenth or twentieth week of pregnancy. Thus, some women may not be alerted to a problem until the second trimester, and by the time they have spoken with physicians and made the difficult choice to terminate, they may be very close to, or beyond, the twenty-week cutoff [for an abortion in Iowa]." 915 N.W.2d at 218.

See also The American College of Obstetricians and Gynecologists, Practice Bulletin No. 135: Second Trimester Abortion, 121 Obstetrics & Gynecology 1394, 1394 (2013).

Pregnant women, like the rest of us, have protected liberty interests fully rooted in our Kansas Constitution. No one can reasonably deny that. Yet the record so far indisputably shows S.B. 95 does more than significantly constrain a woman's access to abortion. It is a governmental edict denying pregnant women the safest and most routine medical procedure available for its purpose in the second trimester—a procedure elected by approximately 600 women in Kansas annually. And the justification for this prohibition is that the government professes to prefer less routine, more physically invasive medical options without offering actual evidence at the temporary injunction hearing to support this preference. Those who think there is no role for our state Constitution when government flexes this kind of muscle should be very afraid about what comes next.

We seem to relearn these lessons far too often. For instance, in *Buck v. Bell*, 274 U.S. 200, 205-06, 47 S. Ct. 584, 71 L. Ed. 1000 (1927), the Court upheld a Virginia law authorizing involuntary sterilization of the intellectually disabled. In doing so, the Court

remained silent about whether substantive due process protected those subject to forced government sterilization and justified it as a means to an appropriate end. 274 U.S. at 207 ("It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind."). Kansas courts shamefully fell in line. See *State, ex rel., v. Schaffer*, 126 Kan. 607, 270 P. 604 (1928) (upholding constitutionality of R.S. 1923, 76-149 through 76-155, authorizing sterilization of the "insane," epileptic, or "feeble-minded" as justified by "the interest of the higher general welfare"); cf. L. 1965, ch. 477, § 1 (repealing R.S. 1923, 76-149). Fortunately, an appropriate constitutional perspective eventually materialized. See *Skinner v. Oklahoma*, 316 U.S. 535, 541, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942) (holding Oklahoma Habitual Criminal Sterilization Act violated equal protection guarantee by applying strict scrutiny since the challenged law implicated a fundamental right; stating, "We are dealing here with legislation which involves one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race").

This is why we have a state constitution with a bill of rights instead of unrestrained rule by whatever legislatively represented majority exists in the moment. See Madison, Federalist No. 51, *The Structure of the Government Must Furnish the Proper Checks and Balances Between the Different Departments*, *in* Hamilton, Jay, and Madison, The Federalist Papers 382 (The Floating Press ed. 2011) (1787) ("In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself."); *Planned Parenthood*, 915 N.W.2d at 244 ("[T]he state's capacity to legislate pursuant to its own moral scruples is necessarily curbed by the constitution. The state may pick a side, but in doing so, it may not trespass upon the fundamental rights of the people."). And once we accept that there must be constraints on the government's power over its citizens, as we do in this country, courts have a singular

role in defining contours to the constitutional protections that ensure statutory or regulatory restrictions on our rights are commensurate with what is at stake. "[T]his court is the sole arbiter of the question whether an act of the legislature is invalid under the Constitution of Kansas." *Harris v. Shanahan*, 192 Kan. 183, 207, 387 P.2d 771 (1963).

Our court is called upon today to set those contours in a specific context, i.e., limiting the government's ability to control a woman's decisions concerning her pregnancy. This is where I take exception with the majority's unrefined strict scrutiny standard. It amounts to little more than name dropping. Let me explain my concern.

*The false dichotomy between the "strict scrutiny" vs. "undue burden" labels*

Federalism principles, which underlay our form of government, recognize that states are free to establish their own standards against which they will measure governmental restrictions on judicially enforceable, substantive rights arising from their state constitutions. See *Kansas v. Carr*, 577 U.S. ___, 136 S. Ct. 633, 648, 193 L. Ed. 2d 535 (2016) ("The Federal Constitution guarantees only a minimum slate of protections; States can and do provide individual rights above that constitutional floor."); *Oregon v. Hass*, 420 U.S. 714, 719, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975) ("[A] State is free *as a matter of its own law* to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards.").

My colleagues all agree, as do I, that a Kansas standard based on section 1 in the present context cannot be blindly bound to United States Supreme Court jurisprudence on abortion. Majority slip op. at 15-16, 67-70; slip op. at 185-86 (Stegall, J., dissenting). This is not an instance in which we simply go lockstep with federal caselaw. See, e.g., *State v. Daniel*, 291 Kan. 490, 498, 242 P.3d 1186 (2010) ("We interpret § 15 of the Kansas Constitution Bill of Rights to provide the same protection from unlawful

93

government searches and seizures as the Fourth Amendment to the federal Constitution."). As both the majority and dissent point out, section 1 of the Kansas Constitution Bill of Rights differs from any federal counterpart, so the measure for deciding when its protections can be invoked does not necessarily mirror federal caselaw.

But federal jurisprudence can inform how our court should fashion a state constitutional test. And there is more than 45 years of federal caselaw to draw from on this subject, so I would look to the evidence-based analytical framework from *Hellerstedt* to style our Kansas test. My *Hellerstedt*-based test sets a considerably high bar that sufficiently protects the substantive personal interests at risk from legislation such as this. At the same time, this *Hellerstedt* analysis acknowledges important state interests with abortion that must also be conceded, but are not recognized under federal strict scrutiny abortion jurisprudence.

The *Hellerstedt* model I suggest effectively secures the constitutional protections considered today in a manner commensurate with what is at stake. And for me, the articulation that follows is necessary because it avoids simply tossing around strict scrutiny nomenclature like "compelling state interest" or "narrowly tailored to further that compelling state interest" without giving those concepts contextual substance and then hoping for the best. Majority slip op. at 7, 65, 82-83, 85-87. Litigation such as this is factually intensive and often medically based so an abstract, textbook approach is counterproductive. This is where the majority decision leaves the district court in a lurch.

The majority rationalizes that federal "undue burden" jurisprudence "has proven difficult to understand and apply." Slip op. at 67. But so what? We are tasked with developing a state standard against which a Kansas court is to scrutinize S.B. 95, so why not learn from the federal standard and do what needs to be done now to help this litigation conclude? Instead, the majority masks the lack of strict scrutiny caselaw in

94

Kansas by citing a string of cases that only mention strict scrutiny in passing while applying a lesser standard to the facts in controversy. See, e.g., slip op. at 73 (citing *State ex rel. Schneider v. Liggett*, 223 Kan. 610, 618, 576 P.2d 221 [1978], as support for strict scrutiny when it actually applied rational basis standard). This necessarily raises the question how the district court can predict what might be viewed as "strict scrutiny" without proper direction from this court.

Said more pointedly, there is very little Kansas "tradition" to the constitutional analytical standard the majority characterizes as "traditional." Slip op. at 69. I can find only two strict scrutiny cases by this court applying that standard for state constitutional claims, and neither is particularly helpful in the context presented by this legislation. See *State v. Ryce*, 303 Kan. 899, 957, 368 P.3d 342 (2016) (because a fundamental right to be free from an unreasonable search was involved, the court employed strict scrutiny in evaluating the constitutionality of a statute criminalizing driver's revoking implied consent for DUI testing); *Jurado v. Popejoy Constr. Co.*, 253 Kan. 116, Syl. ¶ 5, 853 P.2d 669 (1993) (since a suspect classification—alienage—was implicated, the court used strict scrutiny in assessing the constitutionality of a statute limiting workers compensation death benefits of dependents who were nonresident aliens to the sum of $750). Indeed, the majority concedes "there are no Kansas cases applying strict scrutiny to natural rights." Slip op. at 70. I expect the trial court will have the same problem I am trying to figure out what "strict scrutiny" means for this case since this is only the third time in our court's caselaw that standard is to be applied.

Adding to this confusion, the majority announces:  "Of course, before a court considers whether a governmental action survives this [strict scrutiny] test, *it must be sure the action actually impairs the right*." (Emphasis added.) Slip op. at 75. But how does this differ from undue burden? See *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 877, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992) (plurality opinion)

("A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."); see also *Hellerstedt*, 136 S. Ct. at 2309 ("'[A] statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.'"). Is a government act that "actually impairs the right" something different? Is there not a process of weighing inherent in making that determination? The trial court is going to have to make sense of this nuance, and I wish it luck because I can't tell the difference.

Another trouble spot is reconciling "strict scrutiny" abortion caselaw with the majority's rationale and its instructions on remand. The majority correctly observes the United States Supreme Court applied strict scrutiny to abortion legislation in *Roe v. Wade*, 410 U.S. 113, 154-55, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973) (invalidating law forbidding abortion except to save mother's life), and its companion case, *Doe v. Bolton*, 410 U.S. 179, 93 S. Ct. 739, 35 L. Ed. 2d 201 (1973) (invalidating procedural conditions and limitations on abortion access to Georgia residents). Slip op. at 66. But the *Roe* Court identified the State's "'compelling' point" as beginning at a pregnancy's second trimester—and only as to "the State's important and legitimate interest *in the health of the mother*." (Emphasis added.) *Roe*, 410 U.S. at 163. Is the majority signaling a return to *Roe*? It's hard to tell.

Under *Roe*, it was not until fetal viability that the State had any "'compelling'" interest in potential life. *Roe*, 410 U.S. at 163 ("State regulation protective of fetal life after viability thus has both logical and biological justifications."). *Roe* also made clear the State has no "'compelling' point" in the first trimester, so "the attending physician, in consultation with [the] patient, is free to determine, without regulation by the State, that, in [the doctor's] medical judgment, the patient's pregnancy should be terminated." 410

96

U.S. at 163. The majority does not explain whether *Roe*'s trimester framework has any application in Kansas, even though it refers to it and says it is adopting a strict scrutiny standard. Slip op. at 66. More confusingly, the majority implies criticism of *Roe*'s trimester-based distinctions by directing the district court on remand to "take into account advances in science that have blurred the sharp trimester-based lines used in *Roe*'s strict scrutiny analysis." Slip op. at 86. But those distinctions are at the heart of federal strict scrutiny abortion jurisprudence, so what is the district court to do? The answer, it seems, will be for the trial court to make something up.

It also should be understood federal strict scrutiny cases in the abortion context tolerated no government interference into a woman's pregnancy before viability—except for maternal health reasons during the second trimester and unique circumstances relating to pregnant minors. *Casey*, 505 U.S. at 876 (plurality opinion) ("Before viability, *Roe* and subsequent cases treat all governmental attempts to influence a woman's decision on behalf of the potential life within her as unwarranted."); *Bellotti v. Baird*, 443 U.S. 622, 639-40, 99 S. Ct. 3035, 61 L. Ed. 2d 797 (1979) (plurality opinion) (considering whether the "special interest of the State in encouraging an unmarried pregnant minor to seek advice of her parents in making the important decision whether or not to bear a child" does not "unduly burden the right to seek an abortion"); cf. *Colautti v. Franklin*, 439 U.S. 379, 388, 99 S. Ct. 675, 58 L. Ed. 2d 596 (1979) ("Viability is reached when, in the judgment of the attending physician on the particular facts of the case before [the physician], there is a reasonable likelihood of the fetus' sustained survival outside the womb, with or without artificial support.").

My larger point is this: if Kansas is adopting a pre-*Casey* stance, then this legal dispute is all but over. S.B. 95 is not claimed by the State to have been enacted to promote maternal health—it is all about fetal protection and tellingly entitled, "the Kansas unborn child protection from dismemberment abortion act." K.S.A. 65-6741. And

97

its legislative history shows patient safety was never brought up as a supporting justification. So what is left for the district court to ferret out through trial if the State's only "compelling interest" in the second trimester can be promoting maternal health? The majority says it will not "guess at what the arguments and evidence might be in order to provide guidance on remand." Slip op. at 85. But no guesswork is required—it is squarely in this legislation's title and legislative record, so why not talk about it now?

Pre-*Casey* federal strict scrutiny jurisprudence will also have potentially unsettling ripple effects in other areas of Kansas law touching on abortion access. See, e.g., K.S.A. 65-6709 (requiring informed consent). Compare *Casey*, 505 U.S. at 882 (plurality opinion) (holding informed consent provisions requiring "truthful, nonmisleading information about the nature of the procedure, the attendant health risks and those of childbirth, and the 'probable gestational age' of the fetus" did not impose undue burden), with *Thornburgh v. American Coll. of Obst. & Gyn.*, 476 U.S. 747, 764, 106 S. Ct. 2169, 90 L. Ed. 2d 779 (1986) (holding informed consent provisions were facially unconstitutional for requiring patient to be informed of "'detrimental physical and psychological effects'" and "'particular medical risks'" of abortion, because it tended to "increase the patient's anxiety, and intrude upon the physician's . . . professional judgment"). The majority signals this consequence when citing to McDonald, *A Hellerstedt Tale: There and Back Again*?, 85 U. Cin. L. Rev. 979, 1005-06 (2018), regarding scrutiny of governmental persuasion regulations. Slip op. at 74. I simply do not understand why the majority would stop short in explaining what its ruling today means.

I am even more puzzled by the majority's suggestion that on remand "the State may certainly raise to the trial court *any interests it claims are compelling*, including those it mentioned at oral argument before this court, and show why S.B. 95 is narrowly tailored to those interests." (Emphasis added.) Slip op. at 83. How does this comport with strict scrutiny analysis? The interests mentioned by the State do not fit the pre-*Casey*

98

federal strict scrutiny standard except for patient safety. Interests such as promoting potential life before viability, protecting the dignity of life, and protecting medical ethics, are permissibly advanced under a federal undue burden analysis but not strict scrutiny. Compare *Casey*, 505 U.S. at 872 (plurality opinion) (noting rigid trimester framework "sometimes contradicted the State's permissible exercise of its powers" to further its interest in promoting fetal life), with *Roe*, 410 U.S. at 163 (state's interest in mother's health becomes compelling approximately at end of first trimester, and interest in potential life becomes compelling at viability). And this litany of interests does not square with the majority's declaration that "to justify S.B. 95, the State must establish a compelling interest—one that is 'not only extremely weighty, possibly urgent, but also rare—much rarer than merely legitimate interests and rarer too than important interests.'" Slip op. at 66 (quoting Fallon, *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1273 [2007]).

But if the majority is really open to such claims being considered "compelling" state interests, I fail to see how this remains a "strict scrutiny" standard and not equally as vulnerable to "leaving judges to subjectively gauge" what is a state interest as the majority complains now occurs with federal undue burden under *Casey*. Slip op. at 69. The majority decision is fraught with these mixed signals, which the trial court will need to decode before it can proceed.

I also doubt the trial court will find helpful the out-of-state cases listed by the majority as *applying* strict scrutiny in the abortion context. Slip op. at 71-72. From my reading, they are inapplicable to the majority's stated standard or inconsistent in their resolution under similar facts. This presents several concerns.

For instance, *Hope Clinic*, 991 N.E.2d 745, confuses things because it did not explicitly analyze the abortion issue under strict scrutiny. It noted Illinois employs a

limited lockstep approach when the state and federal constitutional language is nearly identical and departs from the federal construction only if there is a reason to do so. 991 N.E.2d at 757. *Hope Clinic* was decided in 2013, so it would have employed undue burden under Illinois caselaw. But without explanation, the *Hope Clinic* court discussed pre-*Casey* federal decisions to determine whether the challenged statute was constitutional. See 991 N.E.2d at 766-69. This may explain why the Iowa Supreme Court included *Hope Clinic* among the court decisions employing undue burden. See *Planned Parenthood*, 915 N.W.2d at 253. The inescapable conclusion is that *Hope Clinic* will not assist the trial court on remand.

Among other decisions identified by the majority, Alaska, California, and Tennessee courts recognized compelling interests beyond those accepted under *Roe*'s strict scrutiny jurisprudence. *State v. Planned Parenthood of Alaska*, 171 P.3d 577, 579 (Alaska 2007) ("We decide today that the State has an undeniably compelling interest in protecting the health of minors and in fostering family involvement in a minor's decisions regarding her pregnancy."); *American Academy of Pediatrics v. Lungren*, 16 Cal. 4th 307, 348, 66 Cal. Rptr. 2d 210, 940 P.2d 797 (1997) (plurality opinion) ("We agree that the state's interests in protecting the health of minors and in preserving and fostering the parent-child relationship are extremely important interests that rise to the level of 'compelling interests' for purposes of constitutional analysis."). Compare *Sundquist*, 38 S.W.3d at 17 ("In our view, the State has an interest in promoting the health and safety of all its citizens, and the State clearly has a compelling interest in maternal health from the beginning of pregnancy."), with *Roe*, 410 U.S. at 163 ("With respect to the State's important and legitimate interest in the health of the mother, the 'compelling' point, in the light of present medical knowledge, is at approximately the end of the first trimester."). But, once again, this just means the trial court will have to guess whether it can ignore the pre-*Casey* federal jurisprudence and expand the state "interests" that might be "compelling."

Another problem comes when considering particular statutory provisions because the state courts the majority lists have rendered conflicting rulings. For example, when a parental consent statute was challenged, the Florida court concluded there was no compelling state interest. *In re T.W.*, 551 So. 2d at 1195. But Alaska and California courts decided similar statutes sufficiently implicated a compelling state interest but were unconstitutional because they were not the least restrictive means of achieving it. *Planned Parenthood of Alaska*, 171 P.3d at 579; *American Academy of Pediatrics*, 16 Cal. 4th at 348, 356-57 (plurality opinion). And when laws prohibiting public funding for certain abortions were challenged, the Minnesota court held the prohibition unconstitutional, but the Florida court did not even view a funding limitation as implicating a woman's right to abortion. Compare *Women*, 542 N.W.2d at 27, 31-32 (noting statute funding childbirth-related medical services but prohibiting similar funding for medical services related to therapeutic abortion impacted a woman's right to decide to terminate her pregnancy), with *Renee B. v. Fl. Agency for Health Care*, 790 So. 2d 1036, 1041 (Fla. 2001) (acknowledging poverty makes it difficult for some women to exercise a constitutional right but the challenged regulation did not implicate a right to abortion because it did not impose any restriction to existing abortion access).

It is also worth noting that unlike other state courts that held implication of an abortion right triggers strict scrutiny, courts in California may not review every abortion case based on a privacy right under strict scrutiny. In *American Academy of Pediatrics*, 16 Cal. 4th at 329-32 (plurality opinion), the court held a balancing test is appropriate when intrusion is "so insignificant or de minimis"; only "significant" intrusion calls for strict scrutiny. 16 Cal. 4th at 331-32.

Arguably, *Armstrong*, 296 Mont. 361 (statute restricting performance of abortions to licensed physicians fails strict scrutiny), might come factually closer to our Kansas

question on Dilation and Evacuation procedures if the issue on remand becomes patient health. But I question its analytical value for this S.B. 95 challenge. Montana's Constitution has an explicit strict scrutiny test written into it, as well as a special privacy provision that "adheres to one of the most stringent protections of its citizens' right to privacy in the United States—exceeding even that provided by the federal constitution." 296 Mont. at 373-74. Under those circumstances, *Armstrong* held:

> "Simply put, except in the face of a medically-acknowledged, *bona fide* health risk, clearly and convincingly demonstrated, the legislature has no interest, much less a compelling one, to justify its interference with an individual's fundamental privacy right to obtain a particular lawful medical procedure from a health care provider that has been determined by the medical community to be competent to provide that service and who has been licensed to do so. To this end, it also logically and necessarily follows that legal standards for medical practice and procedure cannot be based on political ideology, but, rather, must be grounded in the methods and procedures of science and in the collective professional judgment, knowledge and experience of the medical community acting through the state's medical examining and licensing authorities." 296 Mont. at 385.

Our Kansas Constitution contains no similar explicit strict scrutiny standard provision, so *Armstrong*'s analytical relevance is suspect. And even so, if the suggestion is that our Kansas controversy can be judged by Montana's standards, I again have to wonder what is left for trial because the Kansas legislation has not been claimed by the State to be based on "medically-acknowledged, *bona fide* health risks." 296 Mont. at 385. So unless the majority wants to move beyond *Roe*, 410 U.S. at 163 (recognizing the state's compelling interests in maternal health only after the first trimester and in potential fetal life only after viability), and closer to *Casey*, 505 U.S. at 846; 505 U.S. at 882-83 (plurality opinion) (not only recognizing but considering the state's legitimate interests in maternal health and potential fetal life from the outset of pregnancy in assessing a challenged governmental action), there is no compelling state interest to begin the analysis. See *Women,* 542 N.W.2d at 32 (holding state interest in potential life does not

become compelling before viability, citing *Roe*; concluding the challenged statute was unconstitutional as it applied at all stages of pregnancy). But if protecting potential life is a "compelling" state interest in the majority's view, it should just say so.

Unlike *Roe* and the Montana decision, the recent Iowa Supreme Court case also cited by the majority conflicts because the Iowa court held there is a compelling state interest in promoting potential life and helping people make informed choices about abortion. *Planned Parenthood*, 915 N.W.2d at 241 (challenge to a mandatory, 72-hour waiting period requirement for all abortions). That court held the statute failed "strict scrutiny" because it was not narrowly tailored and did not further the state's claimed interest in promoting potential life. 915 N.W.2d at 243-44.

In my reading, the Iowa "strict scrutiny" inquiry is much like *Hellerstedt* in that it is based on credible trial evidence and employs an analytical process tailored to the interests at stake, which in Iowa include promoting potential life and making informed choices about abortion. The Iowa court based its determination on evidence showing waiting periods do not change women's decisions whether to have an abortion. See 915 N.W.2d at 239-40 ("A regulation must further the identified state interest that motivated the regulation not merely in theory, but in fact.").

Put another way, the amici American Association of Pro-Life Obstetricians & Gynecologists, American College of Pediatricians, and Catholic Medical Association lay out arguments they claim are evidence based concerning fetal pain. The State chose not to present such evidence at the temporary injunction hearing; but if it had, and a trier of fact agreed, would the majority hold this would have been a waste of time under its strict scrutiny standard? Said yet another way, if the State really can prove to the court's satisfaction fetal pain from this second-trimester procedure, would not the majority

concede that legislation narrowly tailored to address that fact could pass constitutional muster?

With such uncertainty front and center, this court has a duty to provide more detailed direction in a case as complex and divisive as this one. And we have done so before. See, e.g., *Gannon v. State*, 298 Kan. 1107, 1171, 319 P.3d 1196 (2014) (remanding to apply a newly clarified constitutional standard under Kansas Constitution's Article 6, Section 6[b]). More thorough guidance concerning a Kansas test that similarly spells out the constitutional standard at issue would help the trial court fulfill its responsibilities and expedite this controversy's final resolution.

Notably, the majority flirts with *Hellerstedt* when deciding it is unnecessary to return the temporary injunction question to the district court to apply strict scrutiny. Slip op. at 81-82 ("[E]ven though we would apply what we view as the more demanding strict scrutiny standard for the State to meet, doing so would not change the conclusions reached by the trial court."). But the majority does not delve deeply enough into *Hellerstedt*'s analytical process to give the district court any clue about what it should do next. Quite possibly, the majority wants to imply potential life may constitute a compelling state interest simply by returning the case for a trial. But it does not really make any commitment about that when it merely invites the State to advance "any interests it believes compelling." Slip op. at 85. Nor does it supply a test for the district court to distinguish "compelling" interests from lesser ones in the abortion context. Instead, the majority cites a content-based First Amendment case, a race-based affirmative action case, and a law review article to try and define a distinction, which simply underscores the lack of abortion-related strict scrutiny jurisprudence for the district court to consider. Slip op. at 72-73. The majority, quite simply, is mistaken when it says "the strict scrutiny standard provides considerable guidance to a trial court" for the controversy presented today. Slip op. at 87.

104

To better address these uncertainties, I detail below what I see as *Hellerstedt*-like parameters appropriate for a Kansas test. At the very least, the district court and parties will have this to ponder for trial purposes.

But before doing that, I need to mention concerns with the dissent's standard, which it characterizes as rational basis "with bite." Slip op. at 185 (Stegall, J., dissenting). It describes this process as looking for a reasonable relationship to the common welfare or otherwise being arbitrary, irrational, or discriminatory. And it approvingly quotes *Patel v. Dept. of Licensing and Regulation*, 469 S.W.3d 69, 98 (Tex. 2015) (Willett, J., concurring), in explaining that this methodology demands "'actual *rationality*, scrutinizing the law's actual *basis*, and applying an actual *test*.'" Slip op. at 185-86 (Stegall, J., dissenting). There are things about this I don't understand. Let me explain.

At oral argument, I asked the State's counsel a hypothetical: A woman is told she must have an abortion to save her life; does the Kansas Constitution allow her Legislature to forbid this and say she must die? Committed as he was to the State's initial position that section 1 confers no judicially enforceable protections, the State's lawyer noticeably fumbled his response. But what is the answer under the dissent's scrutiny? Is legislating away a woman's chance to avoid death from childbirth irrational? Or arbitrary? I certainly think so.

But under the dissent's rationale, if this life-or-death decision becomes a judicial call—instead of a legislative one—how is that not the creation of a "judicially privileged act of abortion" the dissent excoriates? Slip op. at 116 (Stegall, J., dissenting). Is this judicial search for rationality or arbitrariness not an exercise in determining court-favored outcomes? See slip op. at 185-86 (Stegall, J., dissenting). And if a pregnant woman's death is a bridge too far on this continuum, how about great bodily harm, rape, incest,

105

fetal anomalies, or other prospects for an unsafe birth? How about the many other profoundly personal reasons a pregnant woman takes into consideration with her doctor when facing a pregnancy's possible termination? See, e.g., *Planned Parenthood*, 915 N.W.2d at 214-15, 218. If courts are drawing lines in this high stakes exercise in democratic majority rule, must not the judicial scrutiny needed to draw them be commensurate with what is at stake? Or do we really want to equate childbirth with selling ice cream on public streets? See slip op. at 169 (Stegall, J., dissenting) (suggesting same test applies to all challenged legislative acts, and citing *Delight Wholesale Co. v. City of Overland Park*, 203 Kan. 99, Syl. ¶ 5, 453 P.2d 82 [1969]). For me, that question answers itself.

More disturbingly, consider how the dissent's standard perfectly aligns with this notorious passage from our American caselaw:

"In view of the general declarations of the legislature and the specific findings of the Court, obviously we cannot say as a matter of law that the grounds do not exist, and if they exist they justify the result. We have seen more than once that the public welfare may call upon the best citizen for their lives. It would be strange if it could not call upon those who already sap the strength of the State for these lesser sacrifices, often not felt to be such by those concerned, in order to prevent our being swamped with incompetence. It is better for all the world, if instead of waiting to execute degenerate offspring for crime, or to let them starve for their imbecility, society can prevent those who are manifestly unfit from continuing their kind. The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes. [Citation omitted.] Three generations of imbeciles are enough." *Buck*, 274 U.S. at 207.

The interests at stake for our citizens must dictate the degree of judicial scrutiny given when government seeks to intrude into those interests. See *Skinner*, 316 U.S. at 546 (Jackson, J., concurring) ("There are limits to the extent to which a legislatively represented majority may conduct biological experiments at the expense of the dignity

106

and personality and natural powers of a minority—even those who have been guilty of what the majority define as crimes."). The dissent, of course, has the benefit at this stage of simply proposing its new standard in the abstract. But it is a mystery how rational basis "with bite" would actually operate to judicially limit government power when the circumstances are as serious as the complications attendant to a woman's pregnancy.

*A* Hellerstedt-*based test*

As explained, my premise is that *Hellerstedt*'s approach can inform our analysis of S.B. 95 under section 1 of the Kansas Constitution Bill of Rights. I would articulate the Kansas test as follows: When a litigant claims a law unconstitutionally infringes on a pregnant woman's access to abortion, a court must determine whether that law imposes an undue burden on that access. I intentionally use the term "undue burden" because it signals the weighing *Hellerstedt* contemplates and the scrutiny these circumstances demand, which the majority begrudgingly concedes. Slip op. at 72 ("We agree with the concurring opinion that both the undue burden and strict scrutiny tests start with determining how governmental action burdens or infringes on a right."). And I emphasize this is a Kansas test that going forward should be developed by Kansas courts distinct and independent from any federal abortion standard. This is why the majority's criticisms about *Hellerstedt* providing a lower level of rigor and being difficult to apply miss the mark. See slip op. at 67-69, 72-74.

I would see the district court's analytical path as first needing to determine whether, and to what extent, a challenged legislative or administrative action burdens abortion access. Next, the court would need to determine to what extent that action directly promotes valid state interests. These findings must be based on evidence, including medical evidence, presented in judicial proceedings. Mere deference to legislative or administrative findings or stated goals would be insufficient.

107

From these independent judicial findings, the court would then be in a position to decide whether the challenged action unduly restricts abortion access when the burdens are viewed in light of the action's actual benefits to the state's valid interests. The burdens, however slight, must be sufficiently justified by the actual benefits. See Robertson, Whole Woman's Health v. Hellerstedt *and the Future of Abortion Regulation*, 7 UC Irvine L. Rev. 623, 631 (2017) ("If there was no actual benefit, then more than de minimis burdens, even if not a substantial obstacle, would be 'undue.' To hold otherwise would remove most judicial scrutiny of legislation in the abortion area and impair the dignity, not only of women, but of law itself.") (citing Greenhouse & Siegel, Casey *and the Clinic Closings: When "Protecting Health" Obstructs Choice*, 125 Yale L.J. 1428 [2016]).

The *Hellerstedt* Court described the analytical process this way when agreeing the district court in that case correctly applied the legal standard:

> "[The district court] did not simply substitute its own judgment for that of the legislature. It considered the evidence in the record—including expert evidence, presented in stipulations, depositions, and testimony. It then weighed the asserted benefits against the burdens." 136 S. Ct. at 2310.

The above is an evidence-based analysis that compares actual benefits and burdens to support or oppose the government action in controversy. And while I appreciate it does not employ the "strict scrutiny" terminology the majority seems to prefer, I am confident this inquiry captures the majority's proposition that the challenged state action must actually impair abortion access, and its concern that any impairment be appropriately tailored to promote that state interest. See slip op. at 75; see also *Hellerstedt*, 136 S. Ct. at 2309-10; 136 S. Ct. at 2326 (Thomas, J., dissenting) ("The majority's undue-burden test

looks far less like our post-*Casey* precedents and far more like the strict-scrutiny standard that *Casey* rejected, under which only the most compelling rationales justified restrictions on abortion."). It also remains mindful of the State's valid interests by recognizing greater regulatory latitude as the conflict with individual rights diminishes. See *Planned Parenthood*, 915 N.W.2d at 241 (recognizing the state's interests in protecting potential life beyond *Roe*'s trimester framework). Most importantly, this inquiry's real world application in a courtroom, based as it must be on evidence, will protect a pregnant woman's constitutional rights from legislative or administrative pretext.

Given this as my test, I explain next its use to determine whether the district court correctly granted the temporary injunction. That is, after all, the question in this appeal.

*The test's application*

It is legitimate to wonder whether remand is appropriate. See *Gannon*, 298 Kan. at 1171 (remanding to apply a newly clarified constitutional standard under Kansas Constitution's Article 6, Section 6[b]). The majority holds remand is unnecessary because S.B. 95 effectively eliminates D & E procedures when coupled with our state's existing partial-birth restriction in K.S.A. 65-6721, so the practical result is squarely prohibited by *Stenberg v. Carhart,* 530 U.S. 914, 120 S. Ct. 2597, 147 L. Ed. 2d 743 (2000). Slip op. at 81-82. The dissent would remand to apply rational basis with bite. Slip op. at 188.

I would hold remand is unnecessary based on the lopsided evidentiary record favoring plaintiffs so far in these proceedings. As a practical matter, the State made no evidence-based defense for this legislation, even though at times its arguments on appeal claim it did by pointing to incomplete quotes from a few medical journals.

As a defense strategy, the State's decision to rely on lawyer interpretation of medical journals—rather than using actual medical professionals—is at best curious given the pivotal role expert testimony typically plays in medically related litigation. See, e.g., *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 435, 228 P.3d 1048 (2010) (expert testimony generally required in medical malpractice cases to establish applicable standard of care and prove causation). In contrast, plaintiffs submitted sworn affidavits from medical doctors, who detailed:  (1) their training, qualifications, and experience upon which they based their testimony and opinions; (2) explanations regarding the relevant medical procedures and opinions about their relative safety and risks; (3) the doctors' professional judgments about the medical considerations concerning those procedures and the likely adverse impacts from S.B. 95; and (4) supportive medical research for their opinions.

Based on its hearing record, the district court expressly held the State did not dispute the facts plaintiffs outlined in supporting their temporary injunction request. Its order granting the temporary injunction found:

- The D & E procedure prohibited by the legislation is used for 95% of second trimester abortions.

- The State proposed three alternative procedures to D & E permitted by the legislation:  labor induction, induction of fetal demise using an injection, and induction of fetal demise using umbilical cord transection.

- Labor induction is used in approximately 2% of second-trimester abortion procedures. It requires an inpatient labor process in a hospital lasting between five-to-six hours and up to two or three days. Labor induction includes

increased risks of infection when compared to D & E and is medically inadvisable for some women.

- An injection of digoxin may be administered either by transabdominal or transvaginal injection. "Injections to induce demise using digoxin prior to D & E are not practiced prior to 18 weeks gestation, and the impact of subsequent doses of digoxin, required in cases [when] a first dose is not effective, is virtually unstudied. Research studies have shown increased risks of nausea, vomiting, extramural delivery, and hospitalization."

- "Umbilical cord transection prior to a D & E is not possible in every case. Requiring transection prior to a D & E increases procedure time, makes the procedure more complex, and increases risks of pain, infection, uterine perforation, and bleeding." Using transection to induce fetal demise has only been discussed in a single retrospective study, the authors of which note its main limitation is a "'potential lack of generalizability.'"

- "There is no established safety benefit to inducing demise prior to a D & E procedure."

*Standard of review*

Generally, appellate courts review a district court's grant or denial of injunctive relief for abuse of discretion. To issue a temporary injunction, five factors are necessary: (1) a substantial likelihood of success on the merits; (2) a reasonable probability of suffering irreparable future injury to the movant; (3) a lack of obtaining an adequate remedy at law; (4) the threat of suffering injury outweighs whatever damage the requested injunction may cause the opposing party; and (5) the injunction, if issued, will

111

not be adverse to the public interest. *Downtown Bar and Grill v. State*, 294 Kan. 188, 191, 273 P.3d 709 (2012). A court abuses its discretion when its action is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018).

*Discussion*

The State does not claim the district court made any error of fact. See majority slip op. at 13-14; *Hodes*, 52 Kan. App. 2d at 275. And those facts sufficiently establish that S.B. 95 unduly restricts abortion access. This leaves the State with nowhere to go on appeal except to argue as a matter of law that the Legislature is free to do whatever it wants. That strategy plainly fails across the board with this court as discussed. From my vantage point, under the applicable abuse of discretion standard, there is nothing to remand as far as the temporary injunction motion is concerned.

The State repeatedly avows in its briefing that it produced "evidence" about the legislation's alternative medical procedures. But it did no such thing. The State is referencing medical journals cited in its arguments opposing the temporary injunction. But these articles were never offered into evidence or for that matter even given to the trial court. And they are not part of our record on appeal. I had to search them out across multiple library resources, including locating some behind website paywalls, just to get a look. In my experience, it is a strange defense strategy for a litigant to play hide and seek with "evidence" characterized as supporting its position.

Nevertheless, the State's briefing about these articles supplied only partial quotes that were recited as prelude to its lawyers' arguments about what those medical passages meant. There is a long-standing admonition we tell our juries that comes to mind:  the arguments of counsel are not evidence. PIK Civ. 4th 102.04 (2010 Supp.). Plaintiffs, on

the other hand, offered sworn testimony expressing expert medical opinions. Their references to medical journals only bolstered the doctors' stated professional opinions. Plaintiffs did not attempt to use those articles by themselves to establish medically based facts—the doctors' sworn testimony did that. The State's approach was starkly different; and, as explained, that difference is significant. See *Puckett*, 290 Kan. at 435 (discussing the evidence's sufficiency).

Worse yet, the State's advocates deleted findings from those medical journals that flatly contradicted their arguments supporting S.B. 95. Consider this example, offered at least twice by the State in its fractured quotation from the article, Diedrich and Drey, Society of Family Planning, Induction of Fetal Demise Before Abortion, SFP Guideline 20101, 81 Contraception 462, 464 (2010). Note particularly the ellipses in the State's quoted material:

> "'It is difficult to determine whether or not a fetus has the ability to perceive pain. . . . By inducing fetal demise the issue of whether the fetus could experience pain during the abortion can be circumvented . . . , which is another reason feticide may be offered by some providers.'" Appellants' Brief, at 7; Defendants' Response Opposing Plaintiffs' Motion for Temporary Restraining Order and/or Temporary Injunction, at 24.

Now consider that same passage in its original published form, with the State-excised portion italicized:

> "It is difficult to determine whether or not a fetus has the ability to perceive pain, *which by its definition requires cortical interpretation of noxious stimuli. A multidisciplinary review of the medical evidence concluded that a fetus cannot experience pain until 29 weeks of gestation at the earliest, when thalamocortical connections are first present. In the past, withdrawal reflexes and the release of hormonal stress hormones have been indicated as evidence of fetal pain perception. This review shows evidence that both withdrawal reflexes and hormonal stress hormones can*

113

*be elicited by nonpainful stimuli and can occur without conscious cortical processing.*
*Therefore, the best indicator as to when a fetus has potentially the capacity to experience*
*pain is the development of the thalamocortical axons, which do not occur until at least 29*
*weeks of gestational duration; however, their functionality within the intrauterine*
*environment has not been determined. With the difficulty of establishing any clear way to*
*measure fetal pain and the lack of specific markers for fetal pain, any potential pain of*
*the means of inducing fetal demise cannot be assessed either.* By inducing fetal demise
the issue of whether the fetus could experience pain during the abortion can be
circumvented, which is another reason feticide may be offered by some providers."
(Emphasis added.)

Setting aside the stunning lack of candor with the court the State's machinations
exemplify, if we view these journals as "evidence," as the State argues we should, the
italicized passage only bolsters plaintiffs' expert testimony that S.B. 95 is unjustified
from a fetal pain perspective—at least until 29 weeks into the gestational process. No
wonder the State tried to hide it.

It is also unclear from a benefits/burdens perspective how S.B. 95 furthers any
state interest from a fetal pain standpoint. Existing law already restricts abortion on "a
pain-capable unborn child." See K.S.A. 65-6724(a). So under my suggested test, S.B. 95's
burdens are unjustified as shown by the evidence presented at the temporary injunction
hearing.

Given the current record on appeal, and applying what I see as the appropriate
Kansas test, I would hold the district court did not abuse its discretion in issuing the
temporary injunction against S.B. 95's enforcement pending trial on the merits.

114

*Conclusion*

All agree this court should interpret the Kansas Constitution in accordance with the framers' intent and the values expressed by its words. Both the majority and the dissent devote nearly 108 pages discussing historical lineage for those words. And it is a demanding read. I hope those reviewing my colleagues' history lessons will accept the exercise for what it obviously is—hard working judges trying to honestly answer the questions presented in good faith. But for me, an originalism search gets us only so far when divining meaning for words with such obvious open-ended qualities as "liberty" or "inalienable natural rights." The historical back-and-forth really just boils down to how much weight is given one selected fact over another.

I believe our framers had to understand this interpretative dynamic and picked those particular words because they require contemporary context. This means we must apply what "liberty" and "inalienable natural rights" mean in the real world today for a pregnant woman. In doing so, that necessarily demonstrates meaningful limitations on the government's ability to elbow its way into the decisions she must make concerning her pregnancy.

The district court did not abuse its discretion by temporarily enjoining S.B. 95's enforcement pending trial.

＊ ＊ ＊

STEGALL, J., dissenting:  This case is not only about abortion *policy*—the most divisive social issue of our day—it is more elementally about the *structure* of our republican form of government. Which is to say, this case is about the proper conditions for just rule. At bottom, this case is about finding and drawing the sometimes elusive line

115

between law and arbitrary exercises of power. Here we venture onto a battlefield as old as politics itself. And as we argue about the structure of government—and ultimately delineate the proper conditions for just rule—we must never forget that we are also actively engaged in ruling.

The structural idea that gave birth to Kansas as a political community, which has achieved consensus support across most of our history, is that the proper conditions for just rule are met via *participatory consent to secure and promote the common welfare*. Today, a majority of this court dramatically departs from this consensus. Today, we hoist our sail and navigate the ship-of-state out of its firm anchorage in the harbor-of-common-good and onto the uncertain waters of the sea-of-fundamental-values. Today we issue the most significant and far-reaching decision this court has ever made.

The majority's decision is so consequential because it fundamentally alters the structure of our government to magnify the power of the state—all while using that power to arbitrarily grant a regulatory reprieve to the judicially privileged act of abortion. In the process, the majority abandons the original public meaning of section 1 of the Kansas Constitution Bill of Rights and paints the interest in unborn life championed by millions of Kansans as rooted in an ugly prejudice. For these reasons, I dissent.

CLEARING THE UNDERBRUSH

Reading today's majority opinion is a follow-the-white-rabbit experience. One is left feeling like Alice, invited by the Queen to believe "'as many as six impossible things before breakfast.'" Carroll, Through the Looking-Glass 100 (1899). Indeed, the story told by the majority is a strange one. In it, all the luminaries of the western legal tradition—from Sir Edward Coke and William Blackstone to Edmund Burke and Thomas

116

Jefferson—would celebrate and enshrine a right to nearly unfettered abortion access. In this imagined world, the Liberty Bell rings every time a baby *in utero* loses her arm.

The experience of women in Kansas, however, is rendered as a dystopian *Handmaid's Tale* of oppression. According to the majority, the State of Kansas has commandeered the bodies and lives of "unwilling wom[e]n to carry out a long-term course of conduct" that will last for their entire "course of . . . life." Slip op. at 46. The enactment of laws such as S.B. 95 is described as the moral equivalent of legalized wife beating and spousal rape. Slip op. at 60. Abortion restrictions are framed as lingering vestiges of a discredited and bankrupt patriarchy, fit only for history's slag heap. The trope is as common as it is unjustified. See, e.g., *Jackson Women's Health Organization v. Currier*, 349 F. Supp. 3d 536, 540 n.22 (S.D. Miss. 2018) (claiming a Mississippi abortion regulation reflected "the Mississippi bent on controlling women and minorities . . . [t]he Mississippi that . . . barred women from serving on juries . . . [t]he Mississippi that . . . sterilized six out of ten black women in Sunflower County . . . [a]nd the Mississippi that . . . was the last State to ratify the 19th Amendment."), *appeal filed* December 17, 2018.

The majority claims "the prevailing views justifying" these long-since-discredited misogynistic practices were "manifested in a majority" of the drafters and ratifiers of the Kansas Constitution and of the Kansas legislators who criminalized abortion in 1862. Slip op. at 58, 61. The majority concludes that these "discriminatory" "biases" and "paternalistic attitude[s]" "were reflected in" the abortion policies enacted at the time. Slip op. at 58, 61. As if the point wasn't clear, the majority reminds the reader that these benighted individuals were "all men." Slip op. at 24.

Oddly, at other points, the majority makes the contrary claim that "history does not reflect" an "antiabortion sentiment" in Kansas' early days. Slip op. at 56. In fact, our

117

prejudiced early lawmakers "gave no consideration to the appropriateness of the abortion statutes." Slip op. at 56. Thus, "we cannot know what a majority of the legislators—much less the people in the Kansas Territory or the new state—thought about abortion." Slip op. at 57.

No matter. Whatever our founders thought or didn't think about abortion, we are certain they were bad. As a result, the majority concludes our founders' views on the Constitution they drafted and ratified and lived under for the first decades of the new State of Kansas must be "give[n] . . . little weight" and are "wholly unpersuasive" when it comes to the majority's enlightened 21st century constitutional interpretation. Slip op. at 51, 57. In the majority's telling, today's legislators are not much better. The policy embodied in S.B. 95—that living babies not be "torn limb from limb" (*Stenberg v. Carhart*, 530 U.S. 914, 958-59, 120 S. Ct. 2597, 147 L. Ed. 2d 743 [2000] [Kennedy, J., dissenting])—is likewise hopelessly "tethered to prejudices from two centuries ago." Slip op. at 61. That policy does not reflect true "Kansas constitutional value[s]." Slip op. at 61. Values this court is prepared to pronounce.

It is important to pause here and ask, what is really going on? For it is certainly true that sex-based discrimination and oppressive practices aimed at women are part of our history, as both a nation and a State. Such misogynistic practices, where they existed (or still exist), are truly heinous and deserving of scorn and moral condemnation, from this court as much as from society as a whole. The story of resistance to sanctioned abuses and second-class status is indeed a heroic one. A story in which Kansas and Kansas women played their own significant role. See 2 History of Woman Suffrage 229-68 (Stanton et al. eds., 1882) (documenting the trailblazing Kansas women's suffrage campaign of 1867); Caldwell, *The Woman Suffrage Campaign of 1912*, 12 The Kansas Historical Quarterly 300-18 (Aug. 1943) (recounting the victorious women's suffrage

118

campaign of 1912, where Kansas women won the right to vote 8 years before the national women's suffrage amendment).

But that story is not this one, as much as the majority wishes it were. The majority's framing of the issue before us solely as a battleground in a war on women is a ruse. Abortion restrictions are not relics of a patriarchal society—they are a longstanding feature of Kansas law. A ban on dismembering a living human being *in utero* is not inherently sexist and discriminatory. See *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 269, 113 S. Ct. 753, 122 L. Ed. 2d 34 (1993) (rejecting claim that "opposition to abortion reflects an animus against women in general").

There are women on both sides of this debate—one that involves complex considerations about the nature of life itself; the contours of a just and fair society; and competing interests, each of which may have a legitimate claim on society's attention. "From reading the majority opinion, one would scarcely be aware that many women . . . are pro-life and strongly support the same law the court concludes unconstitutionally discriminates against them." *Planned Parenthood v. Reynolds ex rel.*, 915 N.W.2d 206, 246 (Iowa 2018) (Mansfield, J., dissenting).

As the United States Supreme Court has said, equating "opposition to voluntary abortion" with "opposition to (or paternalism towards) women" is "irrational." *Bray*, 506 U.S. at 270. "Whatever one thinks of abortion, it cannot be denied that there are common and respectable reasons for opposing it, other than hatred of, or condescension toward (or indeed any view at all concerning), women as a class—as is evident from the fact that men and women are on both sides of the issue . . . ." 506 U.S. at 270. By claiming to speak for all women on such a divisive issue, it is actually a majority of this court who now reenact the old story of paternalism—a government stripping away the political agency of thousands of women simply because it claims to know better.

119

Today's opinion does not disclose the inconvenient fact that a majority of the 41 women serving in the Kansas Legislature at the time of passage voted *in favor of* S.B. 95. Sen. J. 2015, p. 141; House J. 2015, p. 547-48. The majority does not grapple with the problem of sex-selection abortions and the vicious misogyny inherent in that despicable practice. See Eberstadt, *The Global War Against Baby Girls*, 33 The New Atlantis 3, 3 (Fall 2011) ("Over the past three decades the world has come to witness an ominous and entirely new form of gender discrimination:  sex-selective feticide, implemented through the practice of surgical abortion with the assistance of . . . prenatal gender determination technology. All around the world, the victims of this new practice are overwhelmingly female—in fact, almost universally female."); *Gender-Biased Sex Selection*, United Nations Population Fund, https://www.unfpa.org/gender-biased-sex-selection (last visited April 26, 2019) ("Today, around 126 million women are believed to be 'missing' around the world—the result of son preference and gender-biased sex selection, a form of discrimination. . . . The rise in sex selection is alarming as it reflects the persistent low status of women and girls."); see also United Nations Population Fund, Programme of Action of the International Conference on Population and Development 34 (20th anniversary ed. 2014) (containing resolution adopted by 179 countries that urges governments worldwide "[t]o eliminate all forms of discrimination against the girl child and the root causes of son preference, which results in harmful and unethical practices regarding female infanticide and prenatal sex selection"). The majority does not mention the fact that the more "progressive" nations in our global community tend to restrict abortion access after the first trimester. See generally Acosta et al., *Abortion Legislation in Europe*, The Law Library of Congress, Global Legal Research Center (January 2015).

The majority cannot even bring itself to agree with the United States Supreme Court's statement in *Planned Parenthood of Southeastern PA v. Casey*, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992):

"Abortion is a unique act. It is an act fraught with consequences for others: for the woman who must live with the implications of her decision; for the persons who perform and assist in the procedure; for the spouse, family, and society which must confront the knowledge that these procedures exist, procedures some deem nothing short of an act of violence against innocent human life; and, depending on one's beliefs, for the life or potential life that is aborted." 505 U.S. at 852.

The very language chosen by the majority to describe the act prohibited by S.B. 95—"'instrumental disarticulation,'" "'collapse of fetal parts,'" "fetal demise," etc. (slip op. at 8-9)—is designed to "name things without calling up mental pictures of them." Orwell, *Politics and the English Language*, *in* 4 The Collected Essays, Journalism, and Letters of George Orwell 127, 136 (Orwell & Angus eds., 1968). In the majority's narrative, even the word abortion is set aside in favor of the anodyne decision to "continue a pregnancy"—a phrase occurring more times in the majority opinion than I can cite. Perhaps the majority finds the unsanitized facts "too brutal for most people to face." Orwell, at 136.

The majority doesn't recite the portion of S.B. 95 defining "dismemberment abortion" as:

"[W]ith the purpose of causing the death of an unborn child, knowingly dismembering a living unborn child and extracting such unborn child one piece at a time from the uterus through the use of clamps, grasping forceps, tongs, scissors or similar instruments that, through the convergence of two rigid levers, slice, crush or grasp a portion of the unborn child's body in order to cut or rip it off." K.S.A. 65-6742(b)(1); L. 2015, ch. 22, § 2.

As Justice Kennedy wrote in *Stenberg*, 530 U.S. at 957 (Kennedy, J., dissenting), the "majority views the procedures from the perspective of the abortionist, rather than from the perspective of a society shocked when confronted with a new method of ending

121

human life." Justice Kennedy went on to describe what actually happens during a D & E procedure—the very procedure at issue here. He did so "for the citizens who seek to know why laws on this subject have been enacted across the Nation." 530 U.S. at 957 (Kennedy, J., dissenting).

The procedure "requires the abortionist to use instruments to grasp a portion (such as a foot or hand) of a developed and living fetus and drag the grasped portion out of the uterus into the vagina." 530 U.S. at 958 (Kennedy, J., dissenting). Using the resistance "created by the opening between the uterus and vagina" the "grasped portion" is torn "away from the remainder of the body." 530 U.S. at 958 (Kennedy, J., dissenting). "For example, a leg might be ripped off the fetus as it is pulled through the cervix and out of the woman." *Gonzales v. Carhart*, 550 U.S. 124, 135, 127 S. Ct. 1610, 167 L. Ed. 2d 480 (2007). The baby then "bleeds to death as it is torn limb from limb." *Stenberg*, 530 U.S. at 958-59 (Kennedy, J., dissenting). The child "can survive for a time while its limbs are being torn off." 530 U.S. at 959 (Kennedy, J., dissenting). The heartbeat can continue even "with 'extensive parts of the fetus removed.'" 530 U.S. at 959 (Kennedy, J., dissenting). "At the conclusion of a D&E abortion . . . the abortionist is left with 'a tray full of pieces.'" 530 U.S. at 959 (Kennedy, J., dissenting).

Our Legislature heard similar testimony about the procedure—one even Justice Ruth Bader Ginsburg has called "'brutal'" and "'gruesome.'" *Gonzales*, 550 U.S. at 182 (Ginsburg, J., dissenting) (quoting *Stenberg*, 530 U.S. at 946 [Stevens, J., concurring]). Dr. Anthony Levatino, a board-certified obstetrician gynecologist, provided an eyewitness account of one such dismemberment abortion performed on a 21-week-old fetus:

> "Once you have grasped something inside, squeeze on the clamp to set the jaws and pull hard—really hard. You feel something let go and out pops a fully formed leg about 5

122

inches long. Reach in again and grasp whatever you can. Set the jaw and pull really hard once again and out pops an arm about the same length. Reach in again and again with that clamp and tear out the spine, intestines, heart and lungs." Hearing on S.B. 95 Before the Kansas Senate Public Health and Human Services Committee (Feb. 2, 2015) (testimony of Dr. Anthony Levatino).

None of these complexifying factors make it into the simplistic morality tale told by the majority. Why? Because by appropriating the rhetorical and moral force of the legitimate historical struggle against sex-based tyranny, the reader's attention is drawn away from the majority's jurisprudential sleight-of-hand. By the time the majority soars to new heights above the "paternalistic attitude" of the Wyandotte Convention on wings of "constitutional value[s]" leaving behind the accumulated "prejudices" of two centuries, the reader has completely forgotten the majority's earlier, boilerplate paean to the "''*intention* of the *makers* and *adopters*''" as the "''polestar''" of constitutional interpretation. Slip op. at 61, 17. Instead, the majority is in the judicial Wonderland of a "vibrating, flexing, and marching constitution" that is "often simply referred to as a 'living' constitution." *State v. Riffe*, 308 Kan. 103, 118, 418 P.3d 1278 (2018) (Stegall, J., concurring).

Invoking the spirit of this living constitutionalism (while avoiding its name), today's majority proceeds as follows. First, it contrives to find a "wide range of judicially enforceable [though unenumerated] rights" in section 1 of the Kansas Constitution Bill of Rights. Slip op. at 33. Then it divines a "natural right[]" to abortion. Slip op. at 62. And finally, it decides to review restrictions on that newly minted right according to one among varying levels of judicial "scrutiny" depending on its favored or disfavored classification. Slip op. at 64-75.

In the end, our court holds the right to an abortion is "fundamental" under the Kansas Constitution and restrictions on that right are subject to the highest, strictest level

of judicial review in a system of tiered scrutiny. Slip op. at Syl. ¶ 15. Despite claiming to interpret section 1 of the Kansas Constitution Bill of Rights independent of the United States Constitution, the majority imposes a legal rubric that is indistinguishable from the "substantive due process" guarantees the 20th century United States Supreme Court found in the Fourteenth Amendment. See generally Conkle, *Three Theories of Substantive Due Process*, 85 N.C. L. Rev. 63 (2006) (summarizing 20th century substantive due process jurisprudence); Massey, *The New Formalism:  Requiem for Tiered Scrutiny?*, 6 U. Pa. J. Const. L. 945 (2004) (tracing the development and "unwieldy" application of tiered scrutiny).

Perhaps it is apropos—though macabre—that while reviewing a prohibition against human dismemberment we have fashioned a 20th century jurisprudence of fundamental rights and tiered scrutiny into a procrustean bed upon which we now force the Kansas Constitution Bill of Rights to lie. Given this, the reader likely wonders, what *does* section 1 of the Kansas Constitution Bill of Rights properly mean? It is to this question that I now turn.

ORIGINAL PUBLIC MEANING

I have previously posed the question:  "Is the meaning of our Constitution fixed or flexible? A great deal turns on how judges answer this question." *Riffe*, 308 Kan. at 118 (Stegall, J., concurring). Today we see just how much can turn on the answer to this question. My commitment is to the fixed meaning of our constitutional text as it was originally understood by the people writing, reading, and ratifying that text.

> "Law's meaning must be fixed if it is to be the people's bulwark against arbitrary power manifest in the vicissitudes of time. This simple idea—the rule of law—has historically been the way our free society has vigorously insisted that we will not be

124

governed by the whims of the mere men and women who happen, at any given moment, to have their hands on governmental levers. '[W]here . . . is the king of America? . . . [I]n America *the law is king*. For as in absolute governments the king is law, so in free countries the law ought to be king; and there ought to be no other.' Paine, Common Sense 46 (1776)." 308 Kan. at 113 (Stegall, J., concurring).

Original public meaning jurisprudence seeks to find the "contemporaneously expressed understanding of ratified text." Barrett, *Originalism and Stare Decisis*, 92 Notre Dame L. Rev. 1921, 1924 (2017) (describing the two basic claims of originalism:  "First, the meaning of constitutional text is fixed at the time of its ratification. Second, the original meaning of the text controls because 'it and it alone is law.'"). Most states follow these same principles of constitutional interpretation—"by first positing the law's fixed meaning and then by looking to the public's common and ordinary understanding of the text at the time of its adoption to ascertain that meaning." *Riffe*, 308 Kan. at 115 (Stegall, J., concurring); see Christiansen, *Originalism:  The Primary Canon of State Constitutional Interpretation*, 15 Geo. J.L. & Pub. Pol'y 341, 344 (2017). Kansas, too, has mostly adhered to these ideas. See *Solomon v. State*, 303 Kan. 512, 523, 364 P.3d 536 (2015) ("'"In ascertaining the meaning of a constitutional provision courts consider the circumstances attending its adoption and what appears to have been the understanding of the people when they adopted it."'"); *State, ex rel., v. Highwood Service, Inc.*, 205 Kan. 821, 825-26, 473 P.2d 97 (1970) ("ascertaining the meaning of constitutional provisions" requires courts to consider the "understanding of the people at their adoption"); *State, ex rel., v. Fadely*, 180 Kan. 652, 659, 308 P.2d 537 (1957) ("the test is . . . the common understanding . . . of the people at the time they adopted the constitutional provision and the presumption is in favor of the natural and popular meaning in which the words are usually understood by the people who adopted them").

I have previously noted, as well, the need for judicial humility—"attendant as it is to the indeterminacy of language and the difficulties of the interpretive process," *Riffe*, 308 Kan. at 117 (Stegall, J., concurring)—as a third leg of the originalist stool:

> "Even with these principles of constitutional interpretation firmly in hand, the conscientious judge will understand that all texts, even those 'penned with the greatest technical skill' are 'more or less obscure . . . until their meaning be liquidated and ascertained by a series of particular discussions and adjudications.' James Madison, The Federalist No. 37, p. 229 (Modern Library ed. 1969). Madison went on to articulate what every judge involved in constitutional interpretation learns from experience—that the 'complexity of objects' served by the constitutional text and the 'imperfection of the human faculties' leads often to 'fresh embarrassment[s]' in any interpretive endeavor. The Federalist No. 37, p. 229. Even the commands of the 'Almighty himself,' Madison wryly notes, are 'rendered dim and doubtful by the cloudy medium through which [they are] communicated.' The Federalist No. 37, p. 230." 308 Kan. at 116-17 (Stegall, J., concurring).

One of the most powerful criticisms of originalist methods takes the form of the so-called "dead hand" problem. See, e.g., Polsby, *Introduction to Panel I: Originalism and the Dead Hand*, 19 Harv. J.L. & Pub. Pol'y 243, 243 (1996) ("Why should the thoughts and philosophies of those who have gone before us be considered authoritative in present day life?"). Often, it is claimed, originalist outcomes will—either wittingly or unwittingly—import the repugnant racist or sexist views some of our forebearers held into modern constitutional law. Modern judges, these critics suggest, should not be required to repeat the sins of the past. For example, one prominent critic of originalism (and "strong supporter of abortion rights," Segall, *Beware a Gay Rights Backlash*, Los Angeles Times [May 15, 2012], at A13) has candidly stated:

> "The hypothetical 'objective meaning' of much of the constitutional text at the time of ratification if looked at fairly runs directly though the racist and sexist values,

perspectives, and actions of the people living at the time. For example, there can be little debate that a woman's choice to terminate her pregnancy was not part of the original public meaning of the word liberty in the Fourteenth Amendment. But many, perhaps most, of the men who wrote, voted for, and understood what liberty meant in 1868, believed women didn't have the right to vote or have substantial legal identities separate from their husbands. Why should judges today be beholden to people living in such a sexist society?" Segall, Originalism as Faith 88-89 (2018).

These unacceptable results, it is argued, render originalism suspect at best and cruel at worst. As one erudite critic of originalism has put it, an austere originalism is unacceptable "because it is inconsistent with too much that is both settled and worthy in many areas, including free speech, religious liberty, racial discrimination, and sex discrimination." Sunstein, *Five Theses on Originalism*, 19 Harv. J.L. & Pub. Pol'y 311, 312 (1996). As such, strict originalist methods will result "in an unacceptably narrow set of liberties for the United States in the [modern era]." 19 Harv. J.L. & Pub. Pol'y at 312. Or more bluntly, as another scholar recently put it, "Originalism has a difficult relationship with race and gender." Mulligan, *Diverse Originalism*, 21 U. Pa. J. Const. L. 379, 379 (2018).

Thus, a straightforward critique of originalist methods claims that originalist jurists are bound to perpetuate the political disenfranchisement of minorities that prevailed during the founding era. Therefore, they claim originalism fails "to advance the interests or reach the preferred outcomes of women and people of color." 21 U. Pa. J. Const. L. at 383. Such difficulties lead naturally to the question of "whether originalism can address its relationship with race and gender while maintaining its commitment to the fixation principle—the principle that a constitutional provision's meaning was fixed at the time of its adoption." 21 U. Pa. J. Const. L. at 381. This question presents a serious challenge that ought to be taken seriously by committed originalists.

For example, the use of the word "men" in section 1 presents a kind of "dead hand" challenge to my preferred originalist approach to the Kansas Constitution. Did our founders mean to exclude women from the promises made in section 1? And if they did, how can we justify enforcing the original meaning of section 1? At oral argument, the State had some difficulty contending with this question, falling back on the notion that perhaps the use of the word "men" in section 1 was merely a "historical accident."

But substantial effort has been made to demonstrate that the unacceptable results critique—especially as it relates to issues concerning race and gender—is premised on the false assumption that originalism necessarily produces unjust outcomes. See generally McConnell, *Originalism and the Desegregation Decisions*, 81 Va. L. Rev. 947 (1995) (defending *Brown v. Board of Education*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 [1954], on originalist grounds); Upham, *Interracial Marriage and the Original Understanding of the Privileges or Immunities Clause*, 42 Hastings Const. L.Q. 213 (2015) (defending *Loving v. Virginia*, 388 U.S. 1, 87 S. Ct. 1817, 18 L. Ed. 2d 1010 [1967], on originalist grounds); Barnett, *Was Slavery Unconstitutional Before the Thirteenth Amendment?: Lysander Spooner's Theory of Interpretation*, 28 Pac. L.J. 977 (1997) (presenting an originalist argument that slavery was unconstitutional even before the adoption of the Thirteenth Amendment). In my view, these scholars, and others doing similar work, have the better argument.

In the same way, the historical case that those who drafted and ratified the Kansas Constitution understood section 1 to apply only to men is dubious. Even going all the way back to the Declaration itself, the use of the term "men" in the phrase "all men are created equal" was understood as a generic term for all humankind. See Van Patten, *The Enigma of the ERA*, 30 S.D. L. Rev. 8, 9 (1984) ("Did Jefferson mean 'men' in the specific sense or did he mean the word to be understood in the broader sense of 'people'? It was, of course, the style of the time to use the word 'men' in both senses. . . . It appears

. . . that the statement of equality in the Declaration is a statement about the natural equality of all people."). Contemporary dictionaries corroborate this understanding. An American Dictionary of the English Language published in 1841 defines "men" as, "Persons; people; mankind; in an indefinite sense." An American Dictionary of the English Language 525 (1841).

Accordingly, Justice Clarence Thomas has said:

> "What Jefferson meant, like John Locke before him, is that all men and women, all human beings, are equally created by God, endowed with the capacity to reason and with free will, thus sufficiently sharing in human nature as to render it unjust for any man to rule another without consent. This principle of equality is applicable to all men and women at all times, and applies as much to the greatest king as to the lowest laborer." Thomas, Associate Justice, U.S. Supreme Court, Remarks at the Dwight D. Opperman Lecture (Sept. 24, 1999): *Why Federalism Matters*, *in* 48 Drake L. Rev. 231, 232 (2000).

Even Susan B. Anthony described Jefferson's famous language as containing no "exclusion of any class" and pronouncing "the rights of all men, and 'consequently,' . . . 'of all women.'" 2 History of Woman Suffrage, at 631. If there was any lingering question about the generic use of the term "men" in section 1 referring to all people, it would be put to rest by Samuel A. Kingman's statement on the floor of the Wyandotte Constitutional Convention, addressing this *very question*: "Such rights as are natural are now enjoyed as fully by women as men." Proceedings and Debates of the Kansas Constitutional Convention (Drapier ed., 1859), *reprinted in* Kansas Constitutional Convention 169 (1920) (hereinafter Convention). Whatever else Kingman may have thought about a woman's role in society, he believed section 1 applied to women. So did the vast majority of those who adopted and ratified the Kansas Constitution. On this point, the majority and I agree.

129

The majority frames the rest of its section 1 analysis as an effort to finally deliver on the Constitution's promises to women—promises that now include a right to an abortion. Slip op. at 45 (claiming that "society's attitude regarding women at the time was not in step with the natural rights guarantee in section 1"). It is here, in my view, that the majority must by necessity embrace a living, evolving constitution instead of treating the "law as an ever-fixed mark." *Riffe*, 308 Kan. at 117 (Stegall, J., concurring). "As times change, the thinking goes, so too must our interpretation of the law." 308 Kan. at 117 (Stegall, J., concurring). As the meaning of the text evolves "to reflect vacillating social sensibilities, the Constitution becomes a kind of mood ring for the zeitgeist of the age" giving "judges the power to announce the new colors of the constitutional text whenever the kaleidoscope of history turns." 308 Kan. at 117-18 (Stegall, J., concurring).

I reject the view of our organic law adopted by the majority. Though admittedly, the majority can find support for its approach in our caselaw. See *State, ex rel., v. Hines*, 163 Kan. 300, 301, 182 P.2d 865 (1947) ("the constitution must be given flexibility so that it may vibrate in tune with the vicissitudes of time"); *Markham v. Cornell*, 136 Kan. 884, 891, 18 P.2d 158 (1933) (The constitution should "march abreast of the times," and the constitutional text "must yield to the pressure of changed social conditions, more enlightened ideals, advanced business organizations and the general march of progress."); *Postlethwaite v. Edson*, 102 Kan. 619, 643, 171 P. 769 (1918) (Porter, J., dissenting) ("constitutions march, aided by judicial interpretation").

"The brief of reason, liberty, and experience argues forcefully in favor of a fixed meaning. The opposing brief of hubris, progress, and good intentions holds forth the enticing fruit of 'flexibility.'" 308 Kan. at 118 (Stegall, J., concurring). But "we should resist the temptation" because the "problem with judges striving to pick up on vibrations emanating from a constitutional text as it yields to the march of progress is that the

process tends to produce results we 'just can't explain.' Brian Wilson, *Good Vibrations*, *on* SMiLE (Nonesuch Records 2004)." 308 Kan. at 118 (Stegall, J., concurring).

LIMITING THE POLICE POWER

Today's decision is a textbook case of unexplainable results. To be sure, the majority *attempts* a rational explanation. To no avail. The majority misunderstands and misuses history; bolsters its rejection of Kansas law with factually unsupported allegations of prejudice; ignores even its own claim to be pursuing the "drafters' intent" as the """polestar""" of constitutional interpretation (slip op. at 17); and in the end, can do no better than to fall back on federal substantive due process jurisprudence—complete with judicially favored rights and a byzantine system of tiered scrutiny. We thus vindicate Justice Sandra Day O'Connor's warning "that no legal rule or doctrine is safe from ad hoc nullification by this Court when an occasion for its application arises in a case involving state regulation of abortion." *Thornburgh v. American Coll. of Obst. & Gyn.*, 476 U.S. 747, 814, 106 S. Ct. 2169, 90 L. Ed. 2d 779 (1986) (O'Connor, J., dissenting).

This "major distortion in [our] constitutional jurisprudence" can at least be shown for what it is. 476 U.S. at 814 (O'Connor, J., dissenting). In this section, I will provide some historical corrections, investigate and describe the original public meaning of section 1 of the Kansas Constitution Bill of Rights as a limit on the police power of the state, and review the applicable judicial test for evaluating alleged violations of that limit.

1.     *From Locke to Jefferson*

The majority recognizes the influence of John Locke on the Declaration of Independence and thus, on section 1 of our Bill of Rights. Tracing the language of section 1 all the way back to Locke's Second Treatise, the majority discovers a line that says

131

"every Man has a *Property* in his own *Person*." Slip op. at 38; Locke, Two Treatises of Government, Bk. II, § 27 (Gryphon special ed. 1994) (1698). This lonely line then becomes the springboard to a fundamental—nay absolute—right to abortion. Connecting these dots is difficult, to say the least. But it begins with the premise that Locke's Treatise announced a 21st-century-style list of fundamental rights. The premise is not just wrong, it is utterly foreign to Locke.

That said, it is true that Locke is amenable to an interpretive gloss that emphasizes a voluntarist understanding of the "heart of liberty" and its "right to define" its own "concept of existence, of meaning, of the universe, and of the mystery of human life." *Casey*, 505 U.S. at 851. Call this the "voluntarist lens." This is the lens through which the majority reads Locke, and hence section 1:

> "At the heart of a natural rights philosophy is the principle that individuals should be free to make choices about how to conduct their own lives, or, in other words, to exercise personal autonomy. Few decisions impact our lives more than those about issues that affect one's physical health, family formation, and family life. We conclude that this right to personal autonomy is firmly embedded within section 1's natural rights guarantee and its included concepts of liberty and the pursuit of happiness." Slip op. at 44.

As one scholar has summarized, seeing the world through the voluntarist lens dictates that the purpose of the social compact is to "increase our personal liberty by eliminating customs and even laws that can be thought to limit individual freedom." Deneen, Why Liberalism Failed 49 (2018). This "ideal of liberty can be realized only through a powerful state" whose main role "becomes the active liberation of individuals from any limiting conditions." Deneen, at 49. In this sense, many of Locke's modern, voluntarist interpreters suggest the ultimate goal of the Lockean state is to disembed and disassociate the individual from the political community itself—freeing persons from any and every unchosen condition of life. The purpose of the state is not to secure and

132

promote a common good but is instead to relentlessly tear down all barriers to the choose-your-own-adventurism of a voluntarist paradise.

But as I will demonstrate, the dominant and accepted *jurisprudential* view of the Lockean natural rights tradition during the first century-and-a-half of our existence as a nation—and for our entire existence as a state—has focused on the idea of a limited central power chartered by consent to secure and promote a "commonwealth." Call this the "commonwealth lens." In this view, Locke's primary, overriding theoretical concern is sovereignty:  What is it, where does it come from, and what are the conditions for its just exercise?

By focusing on the proper conditions for just rule (the exercise of sovereignty) rather than on a voluntarist theory of "rights," this approach has striven, imperfectly to be sure, to protect *both* a sphere of individually retained, pre-political freedom (the negative liberty *from* tyranny) *and* a sphere of collectively held, political freedom to self-rule (the positive liberty *toward* citizenship). The latter is the kind of freedom that adheres to and arises out of the duties, obligations, privileges, and affections that flow from participation in a just and well-ordered political community.

Given these radically different lenses through which one may view the history and thinkers at issue, a short review of the Lockean "natural rights" tradition—a tradition far broader than Locke himself—animating the Declaration of Independence is in order. As mentioned, Locke was less interested in delineating "rights" than he was in describing the contours of republican self-government. He begins his Second Treatise by describing people in their pre-political state—that is, before they agree to associate in a political community. In that pre-political state—Locke's "State of Nature"—all people are in a "State of perfect Freedom to order their Actions, and dispose of their Possessions, and Persons as they think fit, within the bounds of the Law of Nature, without asking leave,

or depending upon the Will of any other Man." Two Treatises, Bk. II, § 4. This includes the "Freedom from Absolute, Arbitrary Power." Two Treatises, Bk. II, § 23. People in the State of Nature are governed by the Law of Nature: "That being all equal and independent, no one ought to harm another in his Life, Health, Liberty or Possessions . . . ." Two Treatises, Bk. II, § 6.

But Locke sees a problem. Individuals in the State of Nature are left to their own devices to enforce the Law of Nature themselves. Two Treatises, Bk. II, §§ 6, 13. Thus, the State of Nature is prone to "Confusion and Disorder" as the powerful naturally prey upon the weak and even the enforcement of legitimate interests will be tainted with partiality and revenge. Two Treatises, Bk. II, § 13. People remain in the State of Nature "till by their own Consents they make themselves Members of some Politick Society," one that promotes the common good and "the mutual Preservation of their Lives, Liberties and Estates." Two Treatises, Bk. II, §§ 15, 123.

The power of the "Politick Society" extends only so far as the people's consent. This is because governmental power originates from the "mutual Consent of those who make up the Community," which Locke calls the "Compact." Two Treatises, Bk. II, §§ 97, 171. In this compact, the people agree to give up some of their pre-political sovereignty to a central power—surrendering some natural rights—but only to the extent necessary to secure a common good. Two Treatises, Bk. II, §§ 131, 171. People in a social compact can be presumed to have consented to rational laws that promote or secure the common good:

> "[Y]et it being only with an intention in every one the better to preserve himself his Liberty and Property; (For no rational Creature can be supposed to change his condition with an intention to be worse) the power of the Society, or Legislative, constituted by them, can never be suppos'd to extend farther than the common good . . . ." Two Treatises, Bk. II, § 131.

134

For Locke, legislative acts beyond the scope of this consent are illegitimate. Put simply, the Lockean understanding of republican self-rule cannot tolerate arbitrary power. Two Treatises, Bk. II, § 23.

> "[W]henever the Legislators endeavor to take away, and destroy the Property of the People, or to reduce them to Slavery under Arbitrary Power, they put themselves into a state of War with the People, who are thereupon absolved from any farther Obedience . . . . Whensoever therefore the Legislative shall transgress this fundamental Rule of Society; and either by Ambition, Fear, Folly, or Corruption, endeavor to grasp themselves, or put into the hands of any other an Absolute Power over the Lives, Liberties, and Estates of the People: By this breach of Trust they forfeit the Power, the People had put into their hands for quite contrary ends . . . ." Two Treatises, Bk. II, § 222.

Locke also recognized the freedom that comes with a flourishing community, what he called a "Communion of Interest," which unites the parties to a social compact in "Care and Affection." Two Treatises, Bk. II, § 77-78 (describing the more basic "first [s]ociety" between spouses and their children). Bizarrely, the majority interprets this cozy picture of the most basic "commonwealth" in human society—a family—through a voluntarist lens as a justification for finding a fundamental right to abortion. See slip op. at 43-44.

The influential ideas in Locke's Second Treatise permeated the revolutionary moment of 1776. But of course Locke was just one in a long line of enlightenment "natural rights" political theorists that included, among others, the Spanish Jesuit Francisco Suárez and the Dutch jurist Hugo Grotius—all of whom influenced Thomas Jefferson and the other intellectuals behind the American break with Great Britain. It was "[a] central feature of Suárez' thought on rights and political theory," for example, "that ruling power was brought into being, not by patriarchy or divine right or the supposed

135

superiority of some person or class, but by the will and consent of free right-bearing individuals who entered into a compact with one another to form a political society." Tierney, The Idea of Natural Rights 311 (1997).

Tierney helpfully traces the history of this "developing tradition of thought" that sought to harmonize "state sovereignty" with "individual natural rights." Tierney, at 289. Thinkers like Grotius reasoned deeply about "the relationship between individuals and community within a civil society." Tierney, at 334. "In this way of thinking, the natural sociability of humans led to the formation of political societies with sovereign governments; but the sociability itself was related to the needs of individual persons." Tierney, at 289. Some theorists believed that "political society was created in the first place by the voluntary acts of free individuals and that some of the rights that existed in pre-political society were not and could not be yielded to a sovereign community or a sovereign ruler." Tierney, 289. Thus, they were "able to hold together, in coherent structures of thought, ideas that later thinkers would sometimes treat as polar opposites." Tierney, at 334. In the end, "modern constitutional thought evolved in the way it did partly because the practice of monarchial absolutism could not easily be reconciled with a theory of the state expressed in the language of natural rights." Tierney, at 289.

The concepts developed within this tradition functioned for the American revolutionaries not only as a justification for their declaration of independence, but also as the foundation of a new republican structure of government. As John Hancock explained in a letter to the colonies on July 6, 1776, the Declaration of Independence was "the ground and foundation of a future Government." Hancock, *Letter to the New York Convention July 6, 1776*, *in* 1 American Archives, Fifth Series: A Documentary History of the United States of America 33 (Force ed., 1848). "It was an act of original, inherent sovereignty by the people themselves, resulting from their right to change the form of

government, and to institute a new government, whenever necessary for their safety and happiness." 1 Story, Commentaries on the Constitution of the United States 198 (1833).

The Declaration of Independence was in good company. The Virginia Declaration of Rights of 1776—which some believe was Jefferson's model for the Declaration of Independence—was the first of many state constitutions to incorporate this structure:

"That all men are by nature equally free and independent and have certain inherent rights, of which, when they enter into a state of society, they cannot, by any compact, deprive or divest their posterity; namely, the enjoyment of life and liberty, with the means of acquiring and possessing property, and pursuing and obtaining happiness and safety." Va. Const. Bill of Rights, art. I, § 1.

See Calabresi & Vickery, *On Liberty and the Fourteenth Amendment: The Original Understanding of the Lockean Natural Rights Guarantees*, 93 Tex. L. Rev. 1299, 1313-19 (2015). About a year before he drafted the Virginia Declaration of Rights, George Mason explained this republican theory of government in greater depth:

"We came equals into this world, and equals shall we go out of it. All men are by nature born equally free and independent. To protect the weaker from the injuries and insults of the stronger were societies first formed; when men entered into compacts to give up some of their natural rights, that by union and mutual assistance they might secure the rest; but they gave up no more than the nature of the thing required. Every society, all government, and every kind of civil compact therefore, is or ought to be, calculated for the general good and safety of the community. Every power, every authority vested in particular men is, or ought to be, ultimately directed to this sole end; and whenever any power or authority whatever extends further, or is of longer duration than is in its nature necessary for these purposes, it may be called government, but it is in fact oppression." 1 The Papers of George Mason 1725-1792, at 229-30 (Rutland ed., 1970).

Given all this, it is difficult to credit the majority's co-opting of Locke for the idea that there is a fundamental, natural right to terminate a pregnancy in whatever manner one chooses.

But an aside:

After these forays into long-ago history, complete with jousting views of a political theory of natural rights that is separated from us by an ocean of both time and water, any reader who has persevered to this point is entitled to wonder—isn't the history of ideas more complicated than this? And how can European theorists who died long before America's founding tell us anything about whether the Kansas Constitution contains a right to abortion?

I do not wish to denigrate the proper role history can and should play in constitutional adjudication—after all, here I have offered an important historical corrective to the majority's misunderstanding of Locke. But I am sensitive to the words of Justice John Paul Stevens, who often warned that "[i]t is not the role of . . . judges to be amateur historians." *McDonald v. Chicago*, 561 U.S. 742, 910, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010) (Stevens, J., dissenting). Indeed, I agree with Chief Judge Posner's suggestion that "judges do not have either the leisure or the training to conduct *responsible* historical research or *competently* umpire historical controversies." *Velasquez v. Frapwell*, 160 F.3d 389, 393 (7th Cir. 1998), *vacated in part* 165 F.3d 593 (7th Cir. 1999). Though something else Justice Stevens said is likewise true:  "Some appellate judges are better historians than others." *Eastern Enterprises v. Apfel*, 524 U.S. 498, 550, 118 S. Ct. 2131, 141 L. Ed. 2d 451 (1998) (Stevens, J., dissenting).

In the end, I recognize that while the majority opinion illustrates the maxim that "bad history can make bad law," the cautious judge will understand that even "good history can sometimes do the same." Amar, *Our Forgotten Constitution: A Bicentennial Comment*, 97 Yale L.J. 281, 289 (1987). Thus, I will return to safer judicial ground—the legal principles being debated at the time of our State's founding and the widely understood public meaning of the language our founders chose to enshrine in section 1 of our state Constitution.

2.      *The Structure of the American State: Rights First, Then Government*

When George Washington wrote the cover letter from the Constitutional Convention to Congress, transmitting the proposed Constitution, he summarized the whole endeavor in starkly Lockean terms:

> "Individuals entering into society must give up a share of liberty to preserve the rest. The magnitude of the sacrifice must depend as well on situation and circumstance, as on the object to be obtained. It is at all times difficult to draw with precision the line between those rights which must be surrendered, and those which may be preserved . . . ." 1 Annals of Congress vii (Gales ed., 1834).

Washington's sentiment echoed through the ratification process as delegates explained the structure of the new government. For example, during the ratification convention in South Carolina, Robert Barnwell argued that "in the compacts which unite men into society, it always is necessary to give up a part of our natural rights to secure the remainder . . . ." *Debates, etc., in the Legislature, and in the Convention, of South Carolina*, *in* 3 The Debates, Resolutions, and other Proceedings, in Convention, on the Adoption of the Federal Constitution 327, 363-65 (Elliot ed., 1830). Or again, during the Massachusetts ratification debates, Samuel Nasson asserted: "When I give up any of my

natural rights, it is for the security of the rest." Debates and Proceedings in the Convention of the Commonwealth of Massachusetts in 1788, at 236 (1856).

According to James Madison, the European model of government called for "charters of liberty . . . granted by power," but America provided a new example of "charters of power granted by liberty." Madison, *Charters*, *in* 6 The Writings of James Madison 83 (Hunt ed., 1906).

It would be hard to improve on Madison's words, but for modern ears, Professor Randy Barnett at Georgetown has distilled the classical liberal tradition from Locke to Madison down to its root idea that "'first come rights, then comes government.'" Barnett, *We the People:  Each and Every One*, 123 Yale L.J. 2576, 2596 (2014); see also Barnett, *Are Enumerated Constitutional Rights the Only Rights We Have? The Case of Associational Freedom*, 10 Harv. J.L. & Pub. Pol'y 101, 103 (1987) ("[T]he authors of our Constitution were very much influenced by the Lockean philosophy of 'rights first—government second.'"). Indeed, there is ample evidence in the earliest United States Supreme Court caselaw that "rights first, then government" was the proper way to understand the structure of the American experiment in self-government.

For example, in *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 1 L. Ed. 440 (1793), by a vote of 4-1, the United States Supreme Court first held that a state was required to answer a civil suit in federal courts. Georgia argued that as a sovereign state, it was not subject to a foreign jurisdiction without consent. See 2 U.S. at 424. The Court's *Chisholm* decision—and Justice James Wilson's written opinion in particular—was the first systematic exploration of state sovereignty under the newly ratified Constitution.

Justice Wilson began with the comment that "the term *sovereign* is totally unknown" to "the [C]onstitution of the United States." 2 U.S. at 454. Citing William

Blackstone, Justice Wilson then summarized the commonly understood theory of sovereignty England operated under. "[I]n the case of the King, the sovereignty had a double operation. While it vested him . . . with jurisdiction over others, it excluded all others from jurisdiction over him. With regard to him, there was no superior power; and consequently . . . no right of jurisdiction." 2 U.S. at 458 (Wilson, J., opinion).

But Justice Wilson perceived "that another principle, very different in its nature and operations" was at work in the American understanding of republican government. 2 U.S. at 458. This principle held that "laws derived from the pure source of equality and justice must be founded on the *consent* of those whose obedience they require. The sovereign, when traced to his source, must be found in the man." 2 U.S. at 458 (Wilson, J., opinion). In the American republic, the "only reason . . . a free man is bound by human laws, is, that he binds himself." 2 U.S. at 456 (Wilson, J., opinion). And the same principle "upon which he becomes bound by the laws" makes him "amenable to the courts of justice." 2 U.S. at 456 (Wilson, J., opinion). Because Georgia's sovereignty as a state was derived from the sovereignty of the people, the "aggregate of free men, a collection of original sovereigns," could bind the State of Georgia in the same way. 2 U.S. at 456, 458 (Wilson, J., opinion). Interestingly, the "collection of original sovereigns" got together after *Chisholm* and expressly unbound the states from federal court jurisdiction by passing the Eleventh Amendment.

*3.      The Rise of "States' Rights":  Government First, Then Rights*

But as the 19th century progressed and the question of slavery moved inexorably to the center of American political and legal debates, a new, competing account of the proper scope of the state's general policing power rose to prominence. Often, the argument began with a soft concession that while the federal government may be a government of limited powers, the same is not true of state governments. Highly

summarized, these theorists "argued that rights were created by society, not by nature, and that the state or the legislature that spoke for it held the ultimate sovereign power to determine what rights would or would not be politically recognized." Sandefur, The Right to Earn a Living 84-85 (2010). Sometimes shorthanded as a defense of "states' rights," these judges, politicians, and legal theorists were perverting our original self-understanding of the American structure by espousing a "government first, then rights" view of things.

By the time the United States Supreme Court decided *City of New York v. Miln*, 36 U.S. (11 Pet.) 102, 139, 9 L. Ed. 648 (1837), this view—that the police power of the various states was absolute unless expressly constrained by some constitutional provision—was so widespread that the Court declared it to be "impregnable." "[A] state has the same undeniable and unlimited jurisdiction over all persons and things, within its territorial limits, as any foreign nation." 36 U.S. at 139. Thus, "it is not only the right, but the . . . duty of a state, to advance the safety, happiness and prosperity of its people . . . by any and every act of legislation" in any manner except where the "exercise [of power] is not surrendered or restrained" by a constitutional provision. 36 U.S. at 139.

Perhaps the most infamous legal expositor of the primacy of state sovereignty was Chief Justice Roger Taney, who would later apply the principle in his abominable *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 15 L. Ed. 691 (1857), *superseded by* U.S. Const. amend. XIV (1868), decision. Several years before that, however, he articulated an expansive commitment to government first, then rights. "But what are the police powers of a State?" he asked. *License Cases*, 46 U.S. (5 How.) 504, 583, 12 L. Ed. 256 (1847) (Taney, C.J., opinion), *overruled in part by Leisy v. Hardin*, 135 U.S. 100, 10 S. Ct. 681, 34 L. Ed. 128 (1890).

142

"They are nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominions. And whether a State passes a quarantine law, or a law to punish offences, or to establish courts of justice, or requiring certain instruments to be recorded, or to regulate commerce within its own limits, in every case it exercises the same power; that is to say, the power of sovereignty, the power to govern men and things within the limits of its dominion. It is by virtue of this power that it legislates . . . ." *License Cases*, 46 U.S. at 583 (Taney, C.J., opinion).

Thus, according to Taney, the "authority" of a state to make laws is "absolute . . . except in so far as it has been restricted" by a constitutional pronouncement. 46 U.S. at 583 (Taney, C.J., opinion). Moreover,

"when the validity of a State law . . . is drawn into question in a judicial tribunal, the authority to pass it cannot be made to depend upon the motives that may be supposed to have influenced the legislature, nor can the court inquire whether it was intended to guard the citizens of the State from pestilence and disease, or to make regulations of commerce for the interests and convenience of trade." 46 U.S. at 583 (Taney, C.J., opinion).

That is to say, states have near absolute power to legislate as they please subject only to judicial review for encroachment on a constitutionally protected right of the people. If no right or encroachment is found, courts must not question the real motives or intent of the Legislature.

This was a complete and total rejection of John Quincy Adams' widely read 1831 Fourth of July Oration. There, Adams had maintained that "the body politic is formed by a voluntary association of individuals; that it is a social compact, by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws, for the common good." Adams, An Oration Addressed to the Citizens of the Town of Quincy (July 4, 1831), *in* Adams Addresses 17 (1831). We know this, according to Adams, because the "Declaration of Independence was a social

143

compact, by which the whole people covenanted with each citizen of the United Colonies, and each citizen with the whole people . . . ." Adams, at 17.

Adams went on to explain that the "sovereignty" of the "States of this confederation . . . is not, and never was, a sovereignty as defined by Blackstone and the English lawyers, identical with unlimited power; that sovereignty, thus defined, is in direct contradiction to the Declaration of Independence, and incompatible with the nature of our institutions . . . ." Adams, at 35. Instead, the States are "but creatures of the people, and possess none but delegated powers . . . ." Adams, at 35-36. Finally, in dramatic fashion, Adams intoned that it was the "hallucination of State sovereignty" that became "identified with unlimited power" that had "blasted the Confederation from its birth." Adams, at 23. Figures like Adams and Taney stood irreconcilably at odds. For them, the absolute "police powers in the states" on the one hand, and the "Lockean theory of natural rights" on the other, were, as one scholar put it, "mutually contradictory." Forte, *Ideology and History*, 13 Ga. L. Rev. 1501, 1508 (1979).

In 1857, the California Supreme Court succinctly summarized the contending legal theories of state sovereignty:

"Whether there is any restriction upon legislative power, irrespective of the Constitution, is a question upon which ethical and political writers have differed. Many of the ancient writers have based this claim of omnipotence upon the doctrine of the absolute and sacred character of sovereignty, assuming that princes bear rule by divine right, and not by virtue of the expressed or tacit consent of the governed. Some contend that the very existence of government depends upon the supreme power being lodged in some branch of the government, from which there is no appeal, and, if laws are passed which are immoral, or violate the principles of natural justice, the subject is bound to obey them. Others contend that there are boundaries set to the exercise of the supreme sovereign power of the State, that it is limited in its exercise by the great and fundamental principles of the social compact, which is founded in consent, express or implied; that it shall be

144

called into existence for the great ends which that compact was designed to secure, and, hence, it cannot be converted into such an unlimited power, as to defeat the end which mankind had in view, when they entered into the social compact." *Billings v. Hall*, 7 Cal. 1, 10 (1857).

Following Chief Justice Taney's *Dred Scott* opinion, the great debate quickly moved from courtrooms and legal briefs to the political battleground. On that field, Chief Justice Taney's political counterpart was Senator Stephen Douglas, who championed the Kansas-Nebraska Act of 1854. In short, the Act repealed the Missouri Compromise; enacted a policy of "'popular sovereignty'" for the territories of Kansas and Nebraska; and thus permitted the expansion of slavery into the north. Farber, Lincoln's Constitution 8-10, 71 (2003).

But Douglas—more politically savvy than Chief Justice Taney—knew that slavery expansion had to be "freely" chosen if the Act would have any chance at success. Thus, in a deft display of tactical sophistication, Douglas framed the question in terms of self-government and popular sovereignty. See Adkins, *Lincoln's Constitution Revisited*, 36 N. Ky. L. Rev. 211, 225-26 (2009). If the people of Nebraska and Kansas wanted slavery, they could have it. Who could oppose self-government? After all, self-government was the rallying cry of the American Revolution itself.

But in truth, Douglas' understanding of "self-government" was no different from Taney's. Douglas believed "the doctrine of popular sovereignty" extended only to the constituting process itself, and not beyond. Jaffa, Crisis of the House Divided 347 (50th anniversary ed. 2009). That is, behind the Kansas-Nebraska Act was the doctrine that the pre-political sovereignty of the individual is *fully and completely* vested in the state in and during the constituting act. Therefore, state sovereignty is absolute so long as it is not expressly limited by constitutional command. From there, the sovereign state exercising

its "state's rights" may freely choose to dole some rights or privileges back to individuals or minority interests—or choose not to. Government first, then rights.

Then came Abraham Lincoln.

*4.     Lincoln's Fight to Renew the Declaration of Independence*

In 1854, in Peoria, Illinois, Lincoln delivered perhaps the most consequential speech in American history. It was at Peoria that Lincoln formed "the foundation of his politics and principles" and "developed the mature model that would guide his principal writings for the last decade of his life." Lehrman, Lincoln at Peoria xvi, xviii (2008). His mission was to make clear to the public the competing notions of "popular sovereignty" spawned by the pressing national need to resolve the tension between slavery and the language of the Declaration; the rise of states' rights absolutism; and the passage of the Kansas-Nebraska Act. Peoria was Lincoln's refutation of Douglas' account of state sovereignty.

To do so, Lincoln expressly took up the question of political chronology—do rights come from government, or does government follow rights? Lincoln framed this as a war between the "ancient faith" of the Declaration and a "new" understanding of so-called "self-government" that would enshrine slavery. Lincoln, Speech at Peoria, Illinois (October 16, 1854), *in* Lehrman, Lincoln at Peoria 289, 309 (2008). He lamented that with the passage of the Kansas-Nebraska Act "we have been giving up the OLD for the NEW faith." Lehrman, at 319.

It is no exaggeration to say that Lincoln became such a towering figure in American history because he was among the first to publicly recognize and forcefully repudiate the dangerous perversion of self-government pedaled by Chief Justice Taney,

146

Senator Douglas, and the slave power. Lincoln called it the "one great argument in the support of the repeal of the Missouri Compromise"—the argument of, quoting Douglas, "'the sacred right of government.'" Lehrman, at 308. Douglas had sarcastically chided, "'[Lincoln thinks] [t]he white people of Nebraska are good enough to govern themselves, *but they are not good enough to govern a few miserable negroes!!*'" Lehrman, at 309. As repulsive and evil as Douglas' language and assumptions were, Lincoln understood it was insufficient to respond with purely moral objections to slavery, valid as those objections certainly were. Lincoln had to repudiate Douglas' perversion of the idea of popular sovereignty and articulate a more compelling account of the structure of American government. Thus, he insisted he "hate[d]" the Kansas-Nebraska Act not just "because of the monstrous injustice of slavery itself" but also "because it deprives our republican example of its just influence in the world." Lehrman, at 297.

The simple genius of Lincoln's argument lay in his recognition that underlying Douglas' jibe was a fundamental commitment to Chief Justice Taney's idea that, once constituted, the all-powerful, sovereign state can determine what rights to grant (or not grant) to any within its jurisdiction excepting only those rights expressly reserved in the constitution itself. For Douglas, government came first, and only then could government provide rights through its organic or positive laws. Lincoln found his answer to this pernicious "new faith" in the Declaration of Independence. In Peoria, he quoted:

> "'We hold these truths to be self evident:  that all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty and the pursuit of happiness. That to secure these rights, governments are instituted among men, DERIVING THEIR JUST POWERS FROM THE CONSENT OF THE GOVERNED.'" Lehrman, at 309.

"I have quoted so much," Lincoln said, "merely to show that according to our ancient faith, the just powers of governments are derived from the consent of the

147

governed." Lehrman, at 309. Moreover, "[w]hen the white man governs himself," that is self-government; but when he "also governs *another* man, that is *more* than self-government—that is despotism." Lehrman, at 309.

Given how deeply Lincoln is imprinted on our minds, it would be easy to miss what is happening here. Lincoln found an antidote to Douglas' poisonous theory of self-government in the Declaration's language. He rejected the notion that government comes first. Instead, the Declaration asserts that individual sovereignty—the natural rights of pre-political people—predates the formation of any just government. For Lincoln, the problem was not only that Douglas excluded some people from the social compact—which both he and Chief Justice Taney clearly did. See *Dred Scott*, 60 U.S. at 410 (stating the words of the Declaration of Independence "would seem to embrace the whole human family" but "the enslaved African race were not intended to be included, and formed no part of the people who framed and adopted this declaration").

Lincoln understood the problem was deeper. He recognized that Chief Justice Taney and Senator Douglas were distorting the fundamental structure of republican government. For Lincoln, it was a distinction that made all the difference. Lincoln championed a government of limited power constituted when the people relinquished only a defined and limited measure of their pre-political sovereignty while retaining the rest. Douglas championed a government of nearly unlimited power constituted when the people relinquished all of their pre-political sovereignty excepting only a defined and limited measure expressly reserved. The former idea Lincoln celebrated as "the sheet anchor of American republicanism." Lehrman, at 309. The latter was to Lincoln the seedbed of tyranny and despotism. For Lincoln, the Declaration's principles and Douglas' distortion of "self-government" "can not stand together . . . and whoever holds to the one, must despise the other." Lehrman, at 319. Essentially, Lincoln accused Douglas of perpetrating a nasty bait-and-switch scheme—under the promise of "popular sovereignty"

148

Douglas had cleverly substituted tyrannical and arbitrary majority rule (despotism) for the structural guarantee of the proper conditions for just rule (republican self-rule).

Indeed, Lincoln drove the point home by demonstrating how Douglas and his supporters rejected the language of the Declaration. During the Senate debate on the Kansas-Nebraska Act, Senator John Pettit of Indiana, arguing in favor of the Act, had insisted that Jefferson's words in the Declaration were a "self-evident lie." 31 Appendix to the Congressional Globe for the First Session, Thirty-third Congress: Containing Speeches, Important State Papers, Etc. 214 (Rives ed., 1854). Referring to those who supported Douglas and the Kansas-Nebraska Act as "Nebraska men," "Nebraska Senators," and "Nebraska newspaper[s]," Lincoln inveighed:

> "When Pe[t]tit, in connection with his support of the Nebraska bill, called the Declaration of Independence 'a self-evident lie' he only did what consistency and candor require all other Nebraska men to do. Of the forty odd Nebraska Senators who sat present and heard him, no one rebuked him. Nor am I apprized that any Nebraska newspaper, or any Nebraska orator, in the whole nation, has ever yet rebuked him. . . . If it had been said in old Independence Hall, seventy-eight years ago, the very door-keeper would have throttled the man, and thrust him into the street.
>
> "Let no one be deceived. The spirit of seventy-six and the spirit of Nebraska, are utter antagonisms; and the former is being rapidly displaced by the latter." Lehrman, at 319-20.

See Lincoln, Seventh Joint Debate at Alton, Illinois (October 15, 1858), *in* The Lincoln-Douglas Debates 128, 135 (Sparks ed., 1918). Lincoln's visage was etched on Rushmore that day.

Douglas' crusade for "states' rights" owed much of its theoretical oomph to the South Carolina politician, political theorist, and vehement defender of slavery, John C.

149

Calhoun. In one famous speech, Calhoun traced the language of the Declaration back to Locke, only to repudiate Locke's ideas. He referred to Locke's idea that pre-political human beings possessed autonomy in their state of nature as a "hypothetical truism"—that is, because there is no actual state of nature, considering this hypothetical state is "of little or no practical value." Calhoun, Speech on the Oregon Bill, delivered in the Senate (June 27, 1848), *in* 4 The Works of John C. Calhoun 479, 509 (Crallé ed., 1883). From this, Calhoun accused Jefferson of larding up the Declaration with aspirational nonsense. As far as the celebrated first lines were concerned, Calhoun claimed "there is not a word of truth in" the whole proposition and they were "inserted in our Declaration of Independence without any necessity." Calhoun, at 507-08.

Other, more moderate opponents of the Republican Party did not go as far as Calhoun or Pettit in directly attacking the language of the Declaration. For example, during the 1856 presidential contest, Rufus Choate, a Whig congressman from Massachusetts, refused to join the Republican Party (as most Whigs had) and instead supported the Democrat James Buchanan. He explained his decision was based on his commitment to unionism—that is, he accused the Republican Party of using the "'glittering and sounding generalities of natural right which make up the Declaration of Independence'" to foment sectionalism and disunion. Choate, *Letter to the Maine Whig State Central Committee* (Aug. 9, 1856), *in* 1 The Works of Rufus Choate with a Memoir of His Life 212, 215 (Brown ed., 1862); see, e.g., *Cox Improving on Choate*, White Cloud Kansas Chief (Nov. 5, 1857), at 1 (describing Rufus Choate as "[t]hat once distinguished man" who "made his memory infamous, by stigmatizing the Declaration of Independence as a 'glittering generality'").

Despite these criticisms, Lincoln's use of the Declaration quickly caught on and was adopted in the newly formed Republican Party platform. *Republican National Convention, J.C. Fremont Nominated*, Fremont Journal (June 20, 1856), at 3;

*Osawatomie Platform*, The Commercial Gazette (June 4, 1859), at 2. Describing the platform, Republican Senator Henry Wilson (later Vice-President under President Grant) noted:

> "We do not believe, with Mr. Calhoun, the Declaration of Independence to be a 'rhetorical flourish.' We do not believe it to be what Mr. Pettit pronounced it—'a self-evident lie.' We do not believe it to be . . . mere 'glittering and sounding generalities of natural right.' We believe it to be a living truth . . . ." Appendix to the Congressional Globe:  Containing Speeches, Important State Papers, Laws, Etc., of Third Session, Thirty-fourth Congress 64 (Rives ed., 1857).

*5.*     *Bleeding Kansas:  Two Ideas in Conflict*

In 1859, President James Buchanan appointed Senator Pettit as the chief justice of the Supreme Court of the Territory of Kansas, where he served until statehood. 1 Courts and Lawyers of Indiana 257 (Monks, Esarey, and Shockley eds., 1916). In at least one case, Chief Justice Pettit discussed his understanding of state sovereignty and its relationship to organic law. *The Territory of Kansas agt. William S. Reyburn*, McCahon 134, 1 Kan. (Dassler) 551 (1860). In that case, Chief Justice Pettit considered whether Congress had the power to permit the territorial legislature of Kansas to "abrogate or impair the obligation of a contract." McCahon at 142. He announced his view that while the power to impair contracts was "immoral in itself, and abhorrent to every man's sense of natural justice," nevertheless, the "separate states" likely had that power initially because they were the "original sovereignties." McCahon at 142-43.

Here, Chief Justice Pettit adds theoretical flesh to the bone of his claim that the Declaration was a "self-evident lie." According to Chief Justice Pettit, the original sovereigns are not the people in their pre-political state but rather the states themselves. While Chief Justice Pettit did not articulate how he would have applied his notions of

151

sovereignty to the constituting of the states, it seems clear that he was willing to concede a virtually unlimited power in state sovereignty. Even the power to take action that was "immoral . . . and abhorrent" to every "sense of natural justice" was nearly limitless. McCahon at 143. Evidently, Chief Justice Pettit subscribed to what the California Supreme Court had described in 1857 as the "claim of [state] omnipotence" premised "upon the doctrine of the absolute and sacred character of sovereignty." *Billings*, 7 Cal. at 10. Though such sovereignty was tempered with Chief Justice Taney's understanding that the power of a state to make laws is "absolute . . . except in so far as it has been restricted" by a constitutional pronouncement. *License Cases*, 46 U.S. at 583.

Thus, the anti-Declaration rhetoric of absolute state sovereignty had moved to Kansas—the hottest spot in the nascent war between the old faith in *government by consent* and new faith in *consent by government*. But Pettit's claims were not limited to the territorial supreme court. They were regularly debated publicly in the territory before statehood. See, e.g., *The Democratic Creed*, The Kanzas News (Nov. 7, 1857), at 2 (stating, to mock the democratic platform, "I believe the Declaration of Independence to be 'a self-evident lie' and a 'issue of glittering generalities'"). As one pro-slavery newspaper put it:

> "Nor is it literally true, that 'life, liberty, and the pursuit of happiness are inalienable.' On the contrary life is taken, the pursuit of happiness is regulated, liberty is restrained from the hour of birth, to the day of death. If the abolitionists were right in their interpretation of this principle, our army should be disbanded, our navy dismantled, our prisons thrown up, our very laws blotted out; they are all practical refutations of their construction." *Negro-Slavery, No Evil*, Squatter Sovereign (Feb. 20, 1855), at 1.

The slave power had so internalized the "new faith" of Douglas' government-first perspective that the language of the Declaration began to make no sense at all. What about criminal laws? What about regulations? Doesn't virtually every law limit someone's

liberty or pursuit of happiness? If one completely rejects the Lockean social compact as a pre-constitutional event—which Douglas had done—then the Declaration did seem to "blot out" almost all positive laws enacted by the State.

Following the election of the proslavery "bogus legislature" in 1855, the free-staters elected their own legislature and began drafting what would become known as the Topeka Constitution. Etcheson, *The Goose Question: The Proslavery Party in Territorial Kansas and the "Crisis in Law and Order," in* Bleeding Kansas, Bleeding Missouri: The Long Civil War on the Border 47, 54 (Earle & Mutti-Burke eds., 2013). Its preamble stated: "[I]n order to secure to ourselves and our posterity the enjoyment of all the rights of life, liberty and property, and the free pursuit of happiness, do mutually agree with each other, to form ourselves into a free and independent State . . . ." Topeka Const. of 1855, Preamble. Section 1 of its Bill of Rights stated: "All men are by nature free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety." Topeka Const. Bill of Rights, art. I, § 1.

Ultimately, the United States Senate rejected Kansas' admission to the Union under the Topeka Constitution, suggesting it was not actually the product of popular sovereignty. Kansas's War: The Civil War in Documents 23 (Ponce ed., 2011) ("On July 3, 1856, the Republican-controlled House of Representatives voted to accept the Topeka Constitution and admit Kansas to the Union. The Senate, however, rejected Kansas's admission because the constitution was written by a minority of residents acting without proper authority."). The language of the Declaration was front and center of the fiery Senate debate. Senator Charles Sumner gave his sensationally vehement speech, "The Crime Against Kansas," accusing Congress of tyrannically depriving Kansans of their rights and forcing slavery upon them. He lambasted his colleagues, saying, "Are you for the protection of American citizens?—I show you how their dearest rights have been

cloven down, while a tyrannical usurpation has sought to install itself on their very necks!" Sumner, The Crime Against Kansas, Speech of Hon. Charles Sumner in the Senate of the United States May 19 and 20, 1856, at 5 (1856). He continued:

> "I plant [the case to admit Kansas] firmly on the fundamental principle of American Institutions, as embodied in the Declaration of Independence, by which Government is recognized as deriving its just powers only *from the consent of the governed*, who may alter or abolish it when it becomes destructive of their rights. In the debate on the Nebraska Bill, at the overthrow of the Prohibition of Slavery, the Declaration of Independence was denounced as a 'self-evident lie.' It is only by a similar audacity that the fundamental principle which sustains the proceedings in Kansas can be assailed. Nay, more: you must disown the Declaration of Independence . . . ." Sumner, at 79.

Here again, it is evident that while the future of slavery in America was at stake, so too was a particular understanding of self-government—an understanding grounded in the presumption that the power of government *flows from* a limited consent of the people to relinquish only a measure of their natural, pre-political rights. The abolitionists, following Lincoln's lead, insisted that the proslavery forces, motivated by their "depraved longing for a new slave State," were adding to their crimes by tossing overboard the old republican commitment to limited government—"all for the sake of political power." Sumner, at 5. And this new, government-first notion of "self-government" was threatening to establish a strong foothold in the Kansas territory.

6.     *Constituting Kansas*

These happenings weren't history to either the people of the Kansas territory or to the men who convened in Wyandotte in 1859 to draft a new constitution establishing the hoped-for State of Kansas. These were current events. The Lincoln-Douglas debates were widely discussed in the Kansas frontier newspapers. See, e.g., *The Last of it—Joint*

154

*Debate*, The Kansas News (Nov. 13, 1858), at 2. The concepts were actively debated in community forums, dueling editorials, and by blistering political invective. See *Only the Beginning of the Battle*, The Kansas News (Nov. 27, 1858), at 3 (describing Douglas' Illinois campaign and calling on Republicans to fight for "life, liberty and the pursuit of happiness"); *Men Who Do and a Man Who Don't Care Whether Slavery is Voted Up or Down*, White Cloud Kansas Chief (September 20, 1860), at 1 (contrasting Douglas' view with the guarantees of the Declaration of Independence); *The Administration of Abraham Lincoln*, The Commercial Gazette (Oct. 13, 1860), at 2 (predicting Lincoln would win the presidential election and restore "the principles promulgated in the Declaration of Independence," including that "governments are instituted among men deriving their just powers from the consent of the governed").

By the late 1850s, the public conversation in Kansas was so thoroughly steeped in these competing ideas that certain phrases and slogans became flags that could be hoisted to immediately declare which side one was on. The organizational meetings in the town of Hyatt, Kansas, are illustrative. In 1857, free-state advocates—self-declared "citizens of the United States, inhabitants of Kansas and settlers of the town of Hyatt"—invoked the Lockean language of the Declaration of Independence to establish their own social compact. Town Organization of Hyatt, Kansas, Kansas Historical Society; see *People's Movement at Hyatt*, The Kanzas News (June 20, 1857), at 2. They asserted:  "As the only 'divine right' of governing, emanates from the people, it follows that the sovereignty of the individual is first, the sovereignty of communities next, the sovereignty of associated communities or States, third, and the sovereignty of a union of States is last and least." Town Organization of Hyatt. Moreover, they were organizing the town of Hyatt because the "citizens of the town of Hyatt, being without any government of an operative character, and without officers or organization, are necessarily thrown back upon that individual sovereignty . . . ." Town Organization of Hyatt. Put another way, these original

155

sovereigns sought to purchase a miniature commonwealth of their own at the cost of relinquishing a limited measure of their pre-political sovereignty.

By 1859, free-staters had gained the upper hand. At the new constitutional convention in Wyandotte that summer, it was clear the language of the Declaration was to play a starring role in the new Kansas Constitution. As first introduced, section 1 of the Bill of Rights read:

> "'All men are by nature equally free and independent, and have certain inalienable rights, among which are those of enjoying and defending their lives and liberties, acquiring, possessing and protecting property, and of seeking and obtaining happiness and safety, and the right of all men to the control of their persons, exists prior to law and is inalienable.'" Convention, at 271.

Explaining its rationale, the committee on the Preamble and Bill of Rights claimed that the Declaration—and this language in particular—was where "people [first] cut loose from a narrow conception of humanity, and entered upon that broad field of human liberty." Convention, at 184. The language was described in explicitly *structural* terms—as "the timbers of the building" and "the superstructure upon which the edifice of State must be erected." Convention, at 185. The importance of understanding section 1 as a *structural* clause cannot be missed. The delegates to Wyandotte understood the language of section 1 to be creating a government of *structurally limited* powers. To emphasize this, the committee explained:  "This bill of rights starts out on the old maxim that the world is governed too much—that there is too much proscriptive law." Convention, at 185. Section 1 guaranteed that "[t]he people are here allowed to do the nearest what they like." Convention, at 185. The only way this could be true is if the language of section 1 was publicly understood to *limit power* rather than to *grant rights*.

156

The older European idea of liberty flowing from the power of the state was then lifted up as an example Kansas had soundly rejected:

> "It is said in French history, at a certain time, that no people could assemble at the theatre, or on the street, or anywhere, without having soldiers attending them; passports were required of their citizens of mornings under police regulations—pretending thus to secure liberty to the people. Even the government sent its messengers to the markets to see that the meat was in proper condition; and sent them to the stores to see that weights and measures were properly regulated. . . . [The people] could not cut a canal or build a railroad without looking up to their ruler for both the mode and means. With our democracy, the rulers should look to the people." Convention, at 185.

Finally, to emphasize that section 1 was understood to be a restriction on the police power of the state, the Bill of Rights was introduced with the claim that "'[t]he tyranny of the Legislature is really the danger most to be feared.'" Convention, at 186.

When the floor was opened to debate the proposed Bill of Rights, the use of the Declaration's language in section 1 caused immediate confusion and skepticism. Was the language of the Declaration true? If it wasn't true, why put it in the new constitution? In the words of one delegate, "I know, sir, that there is, at the present time . . . a great disposition to look upon the Declaration of Independence as a string of 'glittering generalities.'" Convention, at 280. Would section 1—whether by its "control of their persons" clause or by its "lives and liberties" clause—mean that the state could not enforce criminal statutes?

For example, one delegate objected that "the language of this section is an enunciation of the higher law principle" and that, specifically, the "'control of a man's person'" provision was wrong. Convention, at 272. "[F]or if this doctrine is correct, you cannot make a man amenable to any criminal law." Convention, at 272. Another delegate

157

worried that "if there is any necessity for making qualifications . . . it might be best to place them also in connection with the right to life and liberty." Convention, at 280. Yet another delegate roundly rejected the proposed language of section 1, saying:  "[T]he effect of this provision is to declare, that no person can forfeit his right to liberty under any circumstances." Convention, at 274. He went on:  "Adopt this declaration here, and at once you abolish the criminal law, and open all your jails. I am opposed to the declaration . . . because I believe the declaration is not true in itself." Convention, at 274.

The hotly contested issue of the Declaration's truth was evident throughout the Wyandotte debates. Some were confused about the true meaning of the "unalienable rights" language of the Declaration, while others still committed to a government-first view of states' rights expressed outright hostility to the idea. It was not until George Lillie—a lawyer who had served on the Preamble and Bill of Rights Committee—rose to instruct his fellow delegates in the majestic meaning of section 1 that the confusion and opposition subsided. His brief speech is a brilliant summation of the Lockean commitment—charters of power granted by liberty rather than charters of liberty granted by power—animating both the Declaration of Independence and section 1:

> "Mr. President, . . . I think this debate has taken rather an extraordinary range. It occurs to me, sir, that this is a question of natural rights, and not at all connected with artificial rights and civil disability. It is a declaration that all men are created free and equal and possessed of certain inalienable rights, such as we all concede, as set forth in the Declaration of our national independence—from which I suppose no gentleman at this hour will deliberately dissent. These are natural rights; but by this section we say that they existed prior to the formation of any government; that they are coextensive with the existence of man, and so were before the formation of civil government. When, by the multiplication of men, it became necessary to have civil government, individuals gave up part of their natural rights to secure for themselves the blessings of civil liberty, and among them were restraints upon the liberty and life of the person. Hence it became necessary that laws should be enacted to protect the weak. These natural rights were

158

given up for the protection of the weak. Thus, every man in the State has acknowledged that he has given away part of his natural rights. . . . I consider this question as contemplating only natural rights, and not acquired rights . . . ." Convention, at 280.

Lillie understood—first come rights, then government. Lillie would go on to serve as a Kansas legislator, a district attorney, and a judge. *Bar Resolutions*, The Eureka Herald (Nov. 29, 1883), at 4. His extraordinary convention floor speech, though mostly lost to history, deserves to be remembered as one of the greatest in the history of our state.

Soon after Lillie's address, Samuel A. Kingman offered the language forever enshrined as section 1 of our Bill of Rights: "'All men are possessed of equal and inalienable natural rights, among which are those of life, liberty and the pursuit of happiness.'" Convention, at 283. Kingman asserted that these words "are fixed in the minds of the American people" and "part of our political creed, from which no man can extricate himself" being the "political Bible of every citizen of the United States." Convention, at 283.

7.    *The Original Public Meaning of Section 1*

The delegates at Wyandotte who voted to approve Kingman's language understood what they were doing. The citizens of Kansas who ratified the language understood its meaning. They knew they were establishing a *structural constraint on the power of the government*. They were not, in section 1, conferring "civil" rights on the people—that came in later provisions of the Bill of Rights. Rather, they were *giving up* only so much of their pre-political sovereignty as was necessary to establish a civil government—to quite literally, constitute a new state. They, in their pre-political state, represented absolute *liberty* granting a limited charter of *power* to the state.

As Kansas was bleeding its way into the Union, the warring parties were thus relitigating one of the most fundamental and perennial debates of western political systems—which come first, rights or governments? Do our individual freedoms flow from the constitution and the power of the State, or does the constitution and the power of the State flow from our freedom as individuals? This debate echoes anew through the diametrically opposed views of our Constitution my colleagues and I have announced today.

Tellingly, today's majority shares its government-first assumptions with many courts that have considered challenges to state abortion restrictions under state constitutions. After all, most modern jurisprudence on abortion regulation shares the majority's underlying assumption that the scope of the state's police power is unlimited unless expressly constrained by a constitutional provision. This explains the fierce contest to locate a specific "right to abortion" somewhere in the organic law—whether it be federal or state.

Consider the California Second District Court of Appeal's decision in *People v. Gallardo*, 243 P.2d 532 (Cal. Dist. Ct. App. 1952), *vacated* 41 Cal. 2d 57, 257 P.2d 29 (1953). In *Gallardo*, the California court considered whether the state's criminalization of abortion violated the "'natural law'" right to "the care of one's corporeal tenement." 243 P.2d at 535. But, the court said, "The realm of statecraft acknowledges no such thing as 'natural law.'" 243 P.2d at 535. "[M]any men," the court mocked, have become "persuade[d] . . . to believe" that "the principles embodied in the Bill of Rights are so allied to the happiness and freedom of people" that they must be "the direct gift of the Deity." 243 P.2d at 535. To which the California court emphatically responded, "Not so." 243 P.2d at 535. Rather, rights come from "[t]he state." 243 P.2d at 535.

The *Gallardo* court then rhapsodized about the state as "the paramount creation of man." 243 P.2d at 535. "Either through a monarch, a dictator or a legislature" the state has "the absolute control of society except to the extent abridged by its organic law." 243 P.2d at 536. Because the California court had not yet achieved the judicial creativity and flexibility of today's majority, it could find nothing in its organic law establishing a woman's right to an abortion, so the state was free to regulate in any manner it saw fit. See 243 P.2d at 537.

Even though the *Gallardo* court and today's majority desire different outcomes, both share a government-first understanding of the constitution arising from the belief that in the act of constituting a state, the people only retained a small chunk of expressly defined sovereignty for themselves, which was carved out of an otherwise universal grant of power to the state. This starting point naturally leads present-day political actors— including judges—to view the constitution primarily as a rights-granting document. This rights-oriented understanding of the constitution only magnifies the State and its near-limitless power. For the *Gallardo* court, the legislature was the "monarch" with near "absolute control" to dole rights out to the people as it saw fit. 243 P.2d at 536. For today's majority, the State's power is equally broad—and the Kansas Supreme Court has a similar absolute control to creatively find and grant specific, fundamental rights, mentioned nowhere in the Constitution, as a kind of benevolent judicial preferment.

So even though results have varied dramatically, this basic assumption— government first, then rights—has become the standard framing in cases adjudicating constitutional rights. If a right cannot be "found" in some constitutional clause (or even a penumbra), then the state is free to act as it sees fit—however arbitrary its action may be. The pressure this puts on judges to be more creative and ambitious in their "search" for "fundamental rights" is largely to blame for the erosion of rigorous—and constrained— constitutional interpretation.

161

At least in Kansas, it does not have to be this way. Our rights-first founding was accomplished when, in the act of constituting Kansas, our founders retained for themselves all pre-political individual sovereignty *except* that which was relinquished as necessary to secure the political community being formed. When political actors and judges start from this understanding, the constitution becomes primarily a power-limiting document. This power-oriented understanding of the constitution magnifies the people's natural, pre-political rights. This is how our founders understood the political charter they wrote and ratified. In particular, section 1 of the Kansas Constitution Bill of Rights was intended to settle this question for the newly formed State of Kansas. In Kansas, rights come first—then government.

The winning side of the long and labored debates over Kansas' political birth believed that rights bearing, pre-political persons compacted together to give a measure of their sovereignty—no more than necessary—to their agents in the newly formed State. Those agents, in turn, were to exercise that limited measure of sovereignty to promote and secure the common good. In this way, our founders reaffirmed the republican genius of the American founding that a government of limited powers, delegated by the consent of naturally sovereign individuals to secure a common welfare (literally a commonwealth), is a better guarantee—the only real guarantee—of the full range of natural pre-political rights than is a government of unlimited power which doles certain favored rights back out to citizens. See, e.g., Charles, *Restoring "Life, Liberty, and the Pursuit of Happiness" in our Constitutional Jurisprudence: An Exercise in Legal History*, 20 Wm. & Mary Bill Rts. J. 457, 481-83 (2011) ("[T]he Declaration's preamble . . . embodies the belief and ideal that a Republic, based solely on the equitable consent of the people, will best preserve 'life, liberty, and the pursuit of happiness.'").

162

Today's proponents of a government-first view of the Kansas Constitution cannot, of course, call the language of the Declaration or section 1 a lie. But even so, the clear, original meaning of section 1 cannot be squared with their commitments. In a government-first world, a plain reading of the words simply makes no sense—if not quite a lie, they become "glittering generalities" at best. Some of our predecessors have taken that latter route. See *Schaake v. Dolley*, 85 Kan. 598, 601-02, 118 P. 80 (1911) (purporting to eschew the term "'glittering generality'" as a description of section 1, but nevertheless holding that it cannot "furnish a basis for the judicial determination of specific controversies" and is more of a "'guide[] to the legislative judgment'" than a "'limitation of power'").

The majority chooses to avoid each of these distasteful concessions by instead—in a display of staggering judicial creativity and ambition—choosing to distort the original public meaning of section 1 in order to make it "fit" both a government-first perspective *and* a "fundamental right" to abortion. Beginning with the assumption that government has all the power—and given the desired result—the majority reads section 1 as a grant of unlimited power to judges to declare which "fundamental rights" the State cannot encroach upon. In so doing, the majority has repudiated not only the original meaning and spirit of Wyandotte, but also the consistent interpretation of that language by our predecessors.

8.     *Early Police Power Jurisprudence*

As I have made clear, *sequence* is of central importance in this long-running debate about the just exercise of government power. Construing Professor Barnett's "first come rights, then comes government" formulation as a *prioritization* of rights over government (even if that might, sometimes be the result) would be a misunderstanding. Properly understood, the claim is about political *chronology*. It answers the fundamental

"which came first?" chicken-and-egg problem of modern, western political theory. Does the State come first and, only then, provide protections to individual rights, or are people possessed of absolute pre-political sovereignty which they delegate—in part—to a state to secure the general welfare of the political community?

The answer given by the Declaration of Independence and section 1 of the Kansas Constitution Bill of Rights is that the people are sovereign, and the government rests on their limited delegation of power. The question then becomes:  How do we know how much pre-political sovereignty the people delegated to the State and how much they retained? This question is paramount because the scope of pre-political sovereignty retained is the only proper "measure of whether government is acting" within the just and lawful scope of its general police powers. Barnett, *The Proper Scope of the Police Power*, 79 Notre Dame L. Rev. 429, 451 (2004).

Put the same question a little differently and you get something like this:  If the only foundation on which the State may enact just laws is the voluntary consent of the governed—the "giving up" of sovereignty exercised to a central power—how do we know whether the people have "consented" in any particular instance? It turns out, this is the precise question courts have busied themselves answering over the course of a long tradition of police power jurisprudence.

In Washington's words, the "difficult" task of drawing "the line between those rights which must be surrendered, and those which may be preserved" must always "depend . . . on situation and circumstance, as [well as] on the object to be obtained." 1 Annals of Congress vii (Gales ed., 1834). Justice Samuel Chase undertook one of the earliest efforts to draw this line in *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 1 L. Ed. 648 (1798).

In *Calder*, Justice Chase first rejected the idea that the power of the state is absolute unless expressly limited by constitutional command: "I cannot subscribe to the omnipotence of a state legislature, or that it is absolute and without control; although its authority should not be expressly restrained by the constitution . . . ." 3 U.S. at 387-88. Next, Justice Chase tackled the Washingtonian question at hand—where exactly is the line limiting the just and proper exercise of a state legislature's police power? Heeding Washington's admonition to pay attention to the "object to be obtained," Justice Chase began with the proposition that the "purposes for which men enter into society will determine the nature and terms of the social compact; and as they are the foundation of the legislative power, they will decide what are the proper objects of it." 3 U.S. at 388. Thus, the "nature, and ends of legislative power will limit the exercise of it." 3 U.S. at 388. Generally, those ends are "to establish justice, to promote the general welfare, to secure the blessings of liberty, and to protect . . . persons and property from violence." 3 U.S. at 388.

Justice Chase then turned to Washington's other admonition—to scrutinize the particular "situation and circumstance" before deciding the precise boundary of the police power. Generally speaking, Justice Chase claimed that "[a]n *act* of the legislature (for I cannot call it a law), contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority." (Emphasis added.) 3 U.S. at 388. But legislative bodies make laws to address specific concerns and courts judge particular cases. How is a court to apply "great first principles" to a specific law or in a specific case?

To answer this, Justice Chase listed specific laws that would exceed the legitimate police power, including: punishing "a citizen for an innocent action"; permitting a man to be "judge in his own cause"; and taking "property from A. and giv[ing] it to B." 3 U.S. at 388. What did all these examples have in common? Justice Chase answered this with

an early version of what would become, over time, the developed and accepted judicial standard applied to questions involving the proper scope of state police power: "[I]t is against all reason and justice, for a people to intrust a legislature with *such* powers; and therefore, it cannot be presumed that they have done it." (Emphasis added.) 3 U.S. at 388. For Justice Chase, claiming a state legislature possessed any powers beyond those reasonably presumed to have been delegated by the people was "a political heresy, altogether inadmissible in our free republican governments." 3 U.S. at 388-89.

The proper bounds of state police power was a common subject of discussion in constitutional treatises published after the Civil War. One of the most influential was Thomas Cooley's A Treatise on the Constitutional Limitations first published in 1868. There, Cooley made the commonplace observation that "[p]olice regulations cannot be purely arbitrary nor purely for the promotion of private interests. It must appear that the general welfare is to be in some degree promoted." 2 Cooley, A Treatise on the Constitutional Limitations 1227 n.2 (8th ed. 1927). "[A] large discretion is necessarily vested in the legislature, to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests." Cooley, at 1231. Thus, "courts will not interfere" with legislative choices—or question the legislature's "wisdom or expediency"—unless "the regulations adopted are arbitrary, oppressive, or unreasonable." Cooley, at 1228; see Sutherland, Notes on the Constitution of the United States 732-33 (1904) (stating any exercise of police power "must be reasonable and extend only to such laws as are enacted in good faith for the promotion of the public good"; the police power cannot be used for the benefit or "oppression of a particular class" or to pass "unduly oppressive" or "arbitrary" laws.).

The view that there were "substantive limit[s] upon the police power of the states" was "consistent" across the constitutional commentators of the era. Larsen, *Nationalism and States' Rights in Commentaries on the Constitution after the Civil War*, 3 Am. J. of

166

Legal Hist. 360, 368 (1959). "All of them expressed a fear of a tyranny of the majority" and were concerned with "protecting the vested rights [that is, pre-political rights] of all persons . . . from legislative attacks upon their liberty *under the guise* of the police power." 3 Am. J. of Legal Hist., at 368.

9.      *Early Kansas Supreme Court Interpretations of Section 1*

The earliest justices on this court felt the same way. For decades after statehood, this court interpreted sections 1 and 2 of the Kansas Constitution Bill of Rights as imposing a structural limit on the police power of the state. In fact, we consistently held, in no uncertain terms, that section 1 is a police power provision. In *The State v. Wilson*, 101 Kan. 789, 168 P. 679 (1917), this court considered whether a trading stamp tax was an unconstitutional exercise of the police power. The court stated unequivocally:  "The provisions of our own constitution which are violated by the act in question, if the suppression of trading stamps is beyond the police power of the state, are the declarations of the first two sections of our bill of rights . . . ." 101 Kan. at 795. Decades later, we affirmed the same truth, citing *Wilson* (among other cases) in support. See *Tri-State Hotel Co. v. Londerholm*, 195 Kan. 748, 759, 408 P.2d 877 (1965) ("The provisions of our Constitution which are violated by the Act, if it is beyond the police power of the state as the plaintiffs contend, are Sections 1 and 2 of our Bill of Rights.").

As *Wilson* explained, the "judicial question" posed by section 1 is does the act under scrutiny have "a real relation to the public good? Does it tend to remove or diminish a practice that is injurious, obnoxious or inconvenient to the public?" 101 Kan. at 799; *Carolene Products Co. v. Mohler*, 152 Kan. 2, 6-7, 102 P.2d 1044 (1940); see *Tri-State Hotel*, 195 Kan. at 763 (asking whether the classification bore "a real, logical and substantial relation to the public welfare?"). Applying this test, the *Wilson* court held the

167

trading stamp tax was a legitimate exercise of the police power because it reasonably prevented "evil consequences" to the public. 101 Kan. at 800.

In a long and settled line of cases, the Kansas Supreme Court applied these same tests to a variety of challenged legislative acts. See *Brick Co. v. Perry*, 69 Kan. 297, 299, 76 P. 848 (1904) (holding law that prohibited firing an employee for belonging to a labor organization was not a valid "police regulation" because it did "not affect the public welfare, health, safety or morals of the community, or prevent the commission of any offense or other manifest evil"); *In re Williams*, 79 Kan. 212, 221, 98 P. 777 (1908) (upholding regulation of the sale of explosive powder because "'the police power can not be put forward as an excuse for oppressive and unjust legislation'" but "'it may be lawfully resorted to for the purpose of preserving the public health, safety or morals, or the abatement of public nuisances'"); *Wilson*, 101 Kan. at 799-800 (upholding trading stamp tax as a valid exercise of the police power because it had a "real relation to the public good" and reasonably prevented "evil consequences to the public"); *State v. Haining*, 131 Kan. 853, 854-55, 293 P. 952 (1930) (upholding Sunday closing law as a valid exercise of the police power); *Capital Gas & Electric Co. v. Boynton*, 137 Kan. 717, 728, 730, 22 P.2d 958 (1933) (holding law that prohibited public utility companies from selling appliances violated the police power because it "create[d] a monopoly," did not promote the public welfare, and was "unreasonable, arbitrary, unjust and oppressive"); *State v. Payne*, 183 Kan. 396, 405, 327 P.2d 1071 (1958) (affirming conviction for evading alcoholic liquor tax because alcoholic liquor was "'fraught with such contagious peril to society'" and thus subject to police power regulation); *Gilbert v. Mathews*, 186 Kan. 672, 686, 352 P.2d 58 (1960) (holding law requiring itinerant merchants to obtain licenses to conduct public auctions violated the police power because it "places arbitrary and unreasonable limitations, regulations and impositions on the conduct of a lawful business, and is designed to be so oppressive and unreasonable that it prohibits the conduct of such lawful business"); *Tri-State Hotel*, 195 Kan. at 761, 764

(upholding separate liquor licensing laws for nonprofit and for-profit clubs because alcohol consumption was "attendant with danger to the state" and the distinction between the clubs bore "a real, logical and substantial relation to the public welfare in regulating the consumption of alcoholic liquor in the state"); *Laird & Company v. Cheney*, 196 Kan. 675, 686, 414 P.2d 18 (1966) (following *Tri-State* to hold that liquor price-fixing law did not violate the police power because "the method used is reasonable and not arbitrary and . . . there is a real and substantial relation to a proper legislative purpose"); *Delight Wholesale Co. v. City of Overland Park*, 203 Kan. 99, Syl. ¶ 5, 453 P.2d 82 (1969) (holding ordinance that prohibited selling ice cream from vehicles on city streets violated the police power because "such enterprises may be controlled by reasonable regulations" but "the absolute prohibition of such legitimate enterprises is arbitrary and unreasonable"); *City of Junction City v. Mevis*, 226 Kan. 526, Syl. ¶ 1, 601 P.2d 1145 (1979) (affirming the dismissal of conviction for firearm possession under overbroad ordinance that criminalized innocent conduct because "[a] city cannot enact unreasonable and oppressive legislation under the guise of the police power").

The majority tries to force cases like *Wilson* and *Tri-State Hotel* into its "fundamental rights" framework. See slip op. at 14-15, 32-33. But this is a critical misunderstanding of not only political philosophy, but also of the history of police power jurisprudence in this country and in Kansas. Section 1, as originally understood and historically interpreted by this court, was not a fount of judicially found "fundamental" or "natural" rights. Instead, it guaranteed Kansans their first rights of republican self-rule. Namely, the right to participatory consent to government for the benefit of the common welfare, on the one hand, and the right to otherwise be free from arbitrary, irrational, or discriminatory regulation that bears no reasonable relationship to that same common welfare, on the other. Two decisions in particular—*Williams* and *Gilbert*—show how the judicial test should be applied.

In *Williams*, the petitioner was convicted for selling black powder in an unlawful manner. On appeal, Williams argued the act regulating the sale of black powder violated the police power under section 1 and the Fourteenth Amendment because it singled out the coal industry for special oversight. 79 Kan. at 213-14. Our police power analysis focused on two questions: (1) whether the purpose of the act was valid, and (2) whether the means used reasonably furthered that purpose.

First, we determined the purpose of the act was "to provide for safety in the operation of coal-mines." 79 Kan. at 216. Then we explained that the distinction between coal mines and other mines would be valid if the means used reasonably furthered that purpose:

> "That a law operates only upon a class does not make it invalid, if the classification is reasonable. If the classification is arbitrary or fictitious, it is objectionable, but where it is based upon such differences in situation as to be reasonable in view of the purpose to be accomplished, and tends fairly to accomplish that purpose, it must be upheld. (*Rambo v. Larrabee*, 67 Kan. 634, 73 Pac. 915.) It is sufficient if the classification is based upon some reasonable ground—some differences which bear a just and proper relation to the attempted classification, and is not a mere arbitrary selection. (*Magoun v. Illinois Trust & Savings Bank*, 170 U.S. 283, 18 Sup. Ct. 594, 42 L. Ed. 1037.)

> "The coal mining industry of the state is of great and growing importance, about 12,000 men being employed in this occupation in this state. The hazards incident to this work are matters of common knowledge, and proper regulations to secure the safety of employees, so far as possible, is a matter appealing strongly to the wisdom and conscience of the legislature. Regulations to promote this beneficent end are not void because they do not relate to other industries, where, if the peril is as great, the conditions at least are different and may properly call for different regulations." 79 Kan. at 217.

Distilling the test further, the court summarized: "Speaking generally, laws may be enacted to promote the health and safety of the people, and will be upheld when they have a necessary or reasonable relation to the accomplishment of such ends." 79 Kan. at 217. In the end, the court upheld the act as a legitimate exercise of the police power under both constitutional provisions because its purpose—to promote the safety of a dangerous industry—was valid and the means used to achieve that purpose were reasonable. 79 Kan. at 216-20; see *The State v. Reaser*, 93 Kan. 628, 629-30, 145 P. 838 (1915) (following *Williams* to hold that a mining regulation was a valid exercise of the police power).

Later in *Gilbert*, we considered whether a law requiring itinerant merchants (but not local ones) to obtain licenses to conduct public auctions violated section 1's limitation on the state's police power. This public auction law was full of red tape and fees, and hindered itinerant merchants from participating in the trade. The key question was whether the law was a reasonable regulation or a protectionist roadblock.

The *Gilbert* court explained that the police power is first limited by the *purpose* of the law in question; it extends only to "the protection of the public health, safety and morals" and "the preservation and promotion of the public welfare." 186 Kan. at 676-77. This is because the police power

> "'springs from the obligation of the State to protect its citizens and provide for the safety and good order of society. Under it there is no unrestricted authority to accomplish whatever the public may presently desire. It is the governmental power of self protection, and permits reasonable regulation of rights and property in particulars essential to the preservation of the community from injury.'" 186 Kan. at 677 (quoting *Panhandle Co. v. Highway Comm'n.*, 294 U.S. 613, 622, 55 S. Ct. 563, 79 L. Ed. 1090 [1935]).

But the *Gilbert* court refused to be a rubber stamp. Instead, it questioned the real purpose behind the public auction law and cautioned courts to watch out for the proverbial wolf of arbitrary special interest legislation masquerading as a harmless sheep of public welfare regulation. 186 Kan. at 677-79; see *State, ex rel., v. Sage Stores Co.*, 157 Kan. 404, 427, 141 P.2d 655 (1943) (Wedell, J., dissenting) (explaining when the "principle purpose" behind an exercise of the police power is to advantage "a particular class[,] . . . courts will look behind even the declared intent of legislatures, and relieve citizens against oppressive acts where the primary purpose is not to the protection of the public health, safety, or morals"). The court held the public auction law was not a valid exercise of the police power because it was "purposely designed to completely eliminate the sale of new merchandise at public auctions by itinerant vendors." *Gilbert*, 186 Kan. at 679. As the court explained:

> "While the police power is wide in its scope and gives the legislature broad power to enact laws to promote the health, morals, security and welfare of the people, and further, that a large discretion is vested in it to determine for itself what is deleterious to health, morals or is inimical to public welfare, it cannot under the guise of the police power enact unequal, unreasonable and oppressive legislation or that which is in violation of the fundamental law." 186 Kan. at 677.

*Delight Wholesale*, 203 Kan. 99, Syl. ¶ 4; *Junction City*, 226 Kan. at 535.

The *Gilbert* court also declared that "[t]he reasonableness of restrictions imposed by the legislature by the exercise of the police power is a judicial matter." 186 Kan. at 678; see *Delight Wholesale*, 203 Kan. at 104-05 ("'the reasonableness of the enactment is a question for courts to determine in the exercise of sound judicial discretion'"); *Sage Stores*, 157 Kan. at 421-22 (Wedell, J., dissenting) (stating the determination of the reasonableness of police power legislation "is the ultimate province, responsibility and duty of courts"). The court described the judicial inquiry this way:

172

"The controlling principle is that if legislative action is arbitrary and has no reasonable relation to a purpose which it is competent for the government to effect, the legislature transcends the limits of its power in interfering with the rights of persons affected by the legislation, but if there is reasonable relation to an object within governmental authority, the exercise of the legislative discretion is not subject to judicial review." *Gilbert*, 186 Kan. at 678.

See *Tri-State*, 195 Kan. at 760 (citing *Gilbert* for the rule: "If the classification provided is arbitrary, as the plaintiffs contend, and has no reasonable relation to objects sought to be attained, the legislature transcended the limits of its power in interfering with the rights of persons affected by the Act.").

Applying this test, the *Gilbert* court held the licensing regulations were "poorly and awkwardly drawn," "oppressive and unreasonable," and "discriminatory and confiscatory." 186 Kan. at 683, 686. Furthermore, the law "place[d] arbitrary and unreasonable limitations, regulations and impositions on the conduct of a lawful business" and was "designed to be so oppressive and unreasonable that it prohibit[ed] the conduct of such lawful business." 186 Kan. at 686.

The consistency of these judicial concepts across time is remarkable and unassailable. Perhaps the most influential Kansan to espouse the structural principles of the Declaration and section 1 was Kansas Supreme Court Justice—and later United States Supreme Court Justice—David Brewer.

10.     *Justice David Brewer: Defending Republican Self-Government*

Justice Brewer came from a solidly abolitionist New England family of "'old stock.'" Brodhead, David J. Brewer: The Life of a Supreme Court Justice, 1837-1910, at

173

1 (1994). His father, Josiah, edited antislavery periodicals. Brodhead, at 3. While studying law, Justice Brewer began to consider the Kansas struggle as emblematic of the national crisis over slavery. He inveighed against the Kansas-Nebraska Act and the administration of President Franklin Pierce. He wrote that "'the crackling flames which rose from burning Lawrence and the pillar of fire and cloud of smoke that have rested on the plains of that lovely Territory [must] be the everlasting witness' to the 'failure and curse' of Pierce's administration." Brodhead, at 5.

After graduating, in September 1859, mere months after the Wyandotte Convention, the young lawyer relocated to Kansas to join the free-state movement. He arrived in Leavenworth with 65 cents in his pocket and a head full of ideas about the future of republican self-government. Brodhead, at 7. Ideas inspired by the Declaration of Independence, the Lincoln-Douglas debates, and the constituting of his adopted home state of Kansas. Ideas which he would spend a lifetime espousing as a political philosopher; evangelizing for as a public speaker; and enforcing as a jurist on the supreme courts of Kansas, which he joined in 1871, and of the United States, which he joined in 1889.

Curiously, the majority credits Justice Brewer with the idea that section 1 provided the people with enforceable "individual rights." Slip op at. 29-30. But Justice Brewer never espoused the majority's view that section 1 provides fundamental rights to limit an otherwise absolute legislative power. On the contrary, he enunciated a theory of delegated powers and retained pre-political sovereignty, echoing the likes of Justice Chase. During his tenure on the Kansas Supreme Court, Justice Brewer was the most consistent and insistent defender of the Declaration's principles of republican self-government, as set forth in sections 1 and 2 of the Kansas Constitution Bill of Rights. For example, in an early forceful dissent challenging legislation that fueled the growing railroad power, Justice Brewer asked:  "[U]pon what, let me inquire, must such

174

legislative action rest for support?" *The State, ex rel., v. Nemaha County*, 7 Kan. 542, 554 (1871) (Brewer, J., dissenting). His answer:

> "All power resides with the people. The ultimate sovereignty is with them. The constitution is the instrument by which some portion of that power is granted to different departments of the government. Power is not inherent in the government, from which some portion is withdrawn by the constitution. The object of the constitution of a free government is to grant, not to withdraw, power. This is the primal distinction between the constitutions of the old monarchical governments of Europe, and those of this country. The former indicate the amount of power which the people have been enabled to withdraw from the government; ours the amount of power the people have granted to the government. . . . The constitution creates legislature, courts, and executive. It defines their limits, grants their powers. It should always be construed as a grant. The habit of regarding the legislature *as inherently omnipotent*, and looking to see what express restrictions the constitution has placed upon its action, is dangerous, and tends to error." 7 Kan. at 554-55 (Brewer, J., dissenting).

For Justice Brewer, sections 1 and 2 of the Kansas Constitution Bill of Rights planted Kansas firmly in this fertile social compact soil. He declared these provisions were not a bunch of "'glittering generalities'"; instead, they imposed the "conditions upon which legislative power is granted" and through which the exercise of such power must be vetted. 7 Kan. at 555-56 (Brewer, J., dissenting); see *Atchison Street Rly. Co. v. Mo. Pac. Rly. Co.*, 31 Kan. 660, Syl. ¶ 1, 3 P. 284 (1884) ("The bill of rights is something more than a mere collection of glittering generalities: . . . all are binding on legislatures and courts, and no act of the legislature can be upheld which conflicts with their provisions, or trenches upon the political truths which they affirm.").

> "'[A]s expressed in the Bill of Rights, "all political power is inherent in the people." In extended communities, for obvious reasons, the direct exercise of this power becomes impracticable, and this has led to an institution of a subordinate agency called the

175

government, entrusted for the time being with the exercise of such sovereign power, and such only, as is clearly expressed in the instrument of delegation—the constitution. . . . Hence this court has held that it is always legitimate to insist that a legislative enactment, drawn in question, is invalid, either *because it does not fall within the general grant of power* to that body, or because it is prohibited by some provision of the constitution: and if the former is made to appear, it is as clearly void as though expressly prohibited.'" *Nemaha*, 7 Kan. at 556-57 (Brewer, J., dissenting) (quoting *Cass v. Dillon*, 2 Ohio St. 607, 628 [1853] [Ranney, J., dissenting]).

For Justice Brewer, sections 1 and 2, drawn as they were in the language of the Declaration, imposed a structural limitation on the "general grant of power" that had been "entrusted for the time being" to the state. Special interest legislation "whose apparent object and manifest result is to add wealth to the few by taking it from the many, or to give by law to one man that which another has gained by labor" fell outside that grant of power. 7 Kan. at 556 (Brewer, J., dissenting).

In other words, Justice Brewer understood sections 1 and 2 as announcing a Madisonian charter of limited power granted by liberty. All pre-political power belongs to the people; they grant some of this power to the government for the security and furtherance of the common good; and the government cannot act outside this granted power. Thus, courts must inspect legislation to prevent arbitrary, irrational, and discriminatory acts that are not reasonably related to the common welfare. Otherwise, the state becomes "inherently omnipotent" to create or deny rights as it sees fit. 7 Kan. at 555 (Brewer, J., dissenting); see *Fong Yue Ting v. United States*, 149 U.S. 698, 737, 13 S. Ct. 1016, 37 L. Ed. 905 (1893) (Brewer, J., dissenting) ("This doctrine of powers inherent in sovereignty is one both indefinite and dangerous. Where are the limits to such powers to be found, and by whom are they to be pronounced? . . . The governments of other nations have elastic powers—ours is fixed and bounded by a written constitution.").

Because ours is a charter of limited power granted by liberty, Brewer's question (echoing Washington and Justice Chase before him) was "'[*w*]*hat have* [the people] *authorized to be done*?'" *Nemaha*, 7 Kan. at 557 (Brewer, J., dissenting). Justice Brewer began exploring this question on the Kansas Supreme Court and would continue to do so the rest of his career. The basic answer to Justice Brewer's question was this: the people have authorized the State to take any reasonable measure which promotes the common good. Arbitrary, irrational, or discriminatory regulations, however, have not been authorized.

So, by way of example, in *Intoxicating-Liquor Cases*, 25 Kan. 751 (1881), Justice Brewer, writing for the court, construed a ban on intoxicating liquor narrowly, holding it prohibited the use of such liquor as a beverage but not for medicinal, culinary, or sanitary purposes. But he also commented that a broad construction of the statute—one that would prohibit the use of all intoxicating liquors without reasonable exceptions—would violate the guarantees of section 1:

> "[T]he writer of this opinion does not hesitate to say that such a construction, if imperatively demanded by the language used, would carry the statute beyond the power of the legislature. I do not think the legislature can prohibit the sale or use of any article whose sale or use involves no danger to the general public. The habits, the occupation, the food, the drink, the life of the individual, are matters of his own choice and determination, and can be abridged or changed by the majority speaking through the legislature only when the public safety, the public health, or the public protection requires it. I do not think the legislature has the power to prohibit the raising or sale of corn, though out of it whisky may be obtained. No more do I believe that the legislature has the power to prohibit the sale of cologne, though alcohol be in it. The constitutional guaranty of 'life, liberty, and the pursuit of happiness,' is not limited by the temporary caprice of a present majority, and can be limited only by the absolute necessities of the public."
> 25 Kan. at 765-66.

I could be wrong, but I doubt even my colleagues in the majority could find in section 1 a "fundamental right" to sell cologne. So why does Brewer mention it as an activity section 1 may protect? Because Brewer understood that section 1 has never been about "fundamental rights."

Justice Brewer may have been influenced by his uncle, United States Supreme Court Justice Stephen Field, who authored the influential dissent in the Court's *Slaughterhouse* cases. *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36, 83-111, 21 L. Ed. 394 (1872) (Field, J., dissenting). There, the Supreme Court upheld Louisiana's grant of a monopoly to one slaughterhouse corporation. 83 U.S. at 83. The question raised by the *Slaughter-House Cases* was whether the Fourteenth Amendment—and the Privileges and Immunities Clause in particular—imposed any limits on a state's exercise of its police powers. In dissent, Justice Field wrote:

> "It is contended in justification for the act in question that it was adopted in the interest of the city, to promote its cleanliness and protect its health, and was the legitimate exercise of what is termed the police power of the State. That power undoubtedly extends to all regulations affecting the health, good order, morals, peace, and safety of society, and is exercised on a great variety of subjects, and in almost numberless ways. . . . But under the pretence of prescribing a police regulation the State cannot be permitted to encroach upon any of the just rights of the citizen, which the Constitution intended to secure against abridgment." 83 U.S. at 87 (Field, J., dissenting).

But what, precisely, were those "just rights" described as the "privileges and immunities" of the American citizen? To find an answer, Justice Field looked to a famous passage in *Corfield v. Coryell*, 6 F. Cas. 546, 551-52 (C.C.E.D. Pa. 1823) (No. 3,230), authored by George Washington's nephew, Justice Bushrod Washington. In Corfield, Justice Washington considered the privileges and immunities to which "[t]he Citizens of

178

each State shall be entitled" under U.S. Const. art. IV, § 2, cl. 1, concluding that they could all be

> "comprehended under the following general heads:  Protection by the government; the enjoyment of life and liberty, with the right to acquire and possess property of every kind, and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole." 6 F. Cas. at 551-52.

"This appears to me," said Justice Field, "to be a sound construction of the clause in question." *Slaughter-House Cases*, 83 U.S. at 97 (Field, J., dissenting). I doubt the similarity of this language to the language of section 1—as a structural limitation on the police power of the state—was lost on Justice Brewer.

Familial speculation aside, Justice Brewer arrived at the United States Supreme Court on the heels of the Court's decision in *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S. Ct. 1064, 30 L. Ed. 220 (1886), a watershed police power case that overturned an ordinance that discriminated against Chinese nationals by excluding them from the laundromat business in San Francisco. *Yick Wo* made clear this arbitrary law—which gave a local board unfettered power to decide the fate of Chinese-owned laundromats—not only violated the Fourteenth Amendment but also undermined the foundation of government itself. As the Court explained, the people did not authorize the government to use "purely personal and arbitrary power":

> "When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power. Sovereignty itself is, of course, not subject to law, for it is the author and source of law; but in our system, while sovereign powers are delegated to the agencies of government, sovereignty itself remains

with the people, by whom and for whom all government exists and acts. And the law is the definition and limitation of power." 118 U.S. at 369-70.

The Court also analogized the laundromat law to slavery because it deprived Chinese nationals of "the means of living . . . at the mere will of another," citing the Declaration's guarantees of "life, liberty, and the pursuit of happiness" in support. 118 U.S. at 370. Thus, a government of delegated powers has no authority to sabotage the lawful business of a disfavored group. See Brewer, The Liberty of Each Individual, Address at H.C. Bowen's residence, Roseland Park, (July 4, 1893), *in* N.Y. Times, *Mr. Bowen's Celebration: Judge Brewer's Plea for Individual-Liberty as Against Combinations* (July 5, 1893) (warning about the "'growing disposition to sacrifice the individual to the mass, to make the liberty of the one something which may be ruthlessly trampled into the dust because of some supposed benefit to the many'").

During his time on the Court, Justice Brewer relied on *Yick Wo* to advance a rights-first theory of government, using language from the Declaration of Independence to describe the boundary of the police power. For example, in *Gulf, Colorado & Santa Fe R'y v. Ellis*, 165 U.S. 150, 17 S. Ct. 255, 41 L. Ed. 666 (1897), the Court considered whether a law imposing a special penalty on railroad companies for failing to pay certain debts violated the police power. The problem was that "[t]he act single[d] out a certain class of debtors and punishe[d] them when, for like delinquencies, it punishe[d] no others," not even other types of corporations. 165 U.S. at 153, 157. The Court simply asked, why was *this* industry singled out for a special penalty? The answer: for no good reason.

Justice Brewer, writing for the majority, debunked the myth that the penalty would protect the public from the "peculiarly dangerous nature" of railroad corporations. 165 U.S. at 158. He conceded that a law requiring railroad tracks to be fenced, for example,

would be a reasonable exercise of the police power to promote the public safety. But, he explained, "[t]he hazardous business of railroading carries with it no special necessity for the prompt payment of debts." 165 U.S. at 158. Indeed, the Court recognized that the public safety rationale was a red herring and held the statute was enacted to arbitrarily punish railroad corporations. 165 U.S. at 159. Justice Brewer used *Yick Wo* and the Declaration to drive the point home that arbitrary laws are beyond the scope of the police power:

> "But arbitrary selection can never be justified by calling it classification. The equal protection demanded by the Fourteenth Amendment forbids this. No language is more worthy of frequent and thoughtful consideration than these words of Mr. Justice Matthews, speaking for this court, in *Yick Wo v. Hopkins*, 118 U.S. 356, 369: 'When we consider the nature and the theory of our institutions of government, the principles upon which they are supposed to rest, and review the history of their development, we are constrained to conclude that they do not mean to leave room for the play and action of purely personal and arbitrary power.' The first official action of this nation declared the foundation of government in these words: 'We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable rights, that among these are life, liberty and the pursuit of happiness.' While such declaration of principles may not have the force of organic law, or be made the basis of judicial decision as to the limits of right and duty, . . . yet the latter is but the body and the letter of which the former is the thought and the spirit, and it is always safe to read the letter of the Constitution in the spirit of the Declaration of Independence. No duty rests more imperatively upon the courts than the enforcement of those constitutional provisions intended to secure that equality of rights which is the foundation of free government." 165 U.S. at 159-60.

Of course, the language of the Declaration does not carry "the force of organic law" in the federal Constitution as it does in Kansas. But in determining the original public meaning of section 1, it is compelling that Justice Brewer—who championed section 1 of the Kansas Constitution Bill of Rights as an enforceable restriction on the

181

police power—also invoked the same language of the Declaration to check the police power at the federal level. See *Budd v. New York*, 143 U.S. 517, 550, 12 S. Ct. 468, 36 L. Ed. 247 (1892) (Brewer, J., dissenting) (invoking the "unalienable rights" of "'life, liberty and the pursuit of happiness'" to argue that a grain storage price-fixing law violated the police power). And it is also compelling that the Supreme Court adopted a delegated powers theory of government to guide its police power inquiry. See *Cotting v. Kansas City Stock Yards Co., etc.*, 183 U.S. 79, 84, 22 S. Ct. 30, 46 L. Ed. 92 (1901) (following *Yick Wo*'s theory of government to reign in the police power:  "It has been wisely and aptly said that this is a government of laws and not of men; that there is no arbitrary power located in any individual or body of individuals; but that all in authority are guided and limited by those provisions which the people have, through the organic law, declared shall be the measure and scope of all control exercised over them."). Indeed, the Court's delegated powers approach in *Yick Wo* and its progeny bears a striking resemblance to Justice Brewer's dissent in *Nemaha*.

In *Gulf*, Justice Brewer also set forth a police power test that finds kinship in Kansas caselaw:  "[I]n all cases it must appear not only that a classification has been made, but also that it is one based upon some reasonable ground—some difference which bears a just and proper relation to the attempted classification—and is not a mere arbitrary selection." 165 U.S. at 165-66. Indeed, Justice Brewer exhorted courts to guard against even one step outside the bounds of the police power, insisting, "'[i]t is the duty of courts to be watchful for the constitutional rights of the citizens[,] and against any stealthy encroachments thereon. Their motto should be *obsta principiis* [withstand beginnings].'" 165 U.S. at 154 (quoting *Boyd v. United States*, 116 U.S. 616, 635, 6 S. Ct. 524, 29 L. Ed. 746 [1886]); *Fong Yue Ting*, 149 U.S. at 744 (Brewer, J., dissenting).

Justice Brewer later carried this warning from the bench to the podium. In a series of speeches, he cautioned that left unchecked, the police power would grow "until it

182

threatens to become an omniverous governmental mouth, swallowing individual rights and immunities." Brewer, U.S. Sup. Ct. Justice, Address to the Virginia State Bar Association:  Two Periods in the History of the Supreme Court 23 (August 1906); see Brewer, U.S. Sup. Ct. Justice, Address to the Kansas Bar Association:  Some Thoughts about Kansas (January 16, 1895), *in* Twelfth Annual Meeting of the Bar Association of the State of Kansas 61, 68-69 (1895) (hereinafter *Thoughts*) ("It seems often as though the function of the policeman was not that of protection against crime, but that of regulation and watch over the daily life of each individual."). He described the police power as "that power by which the State provides for the public health, and the public morals, and promotes the general welfare" but has tragically become "the refuge of timid judges to escape the obligations of denouncing a wrong, in a case in which some supposed general and public good is the object of legislation." Brewer, U.S. Sup. Ct. Justice, Address to the Graduating Class at Yale Law School:  Protection of Private Property from Public Attack (June 23, 1891) 10 (Hoggson and Robinson eds., 1891).

Justice Brewer even indulged a willingness to apply the principle of participatory consent outside strictly jurisprudential pursuits. Speaking to the Kansas Bar Association in 1895, Brewer warned that even private interests—the accumulation of capital into "combinations"—can exercise arbitrary power over people's lives. *Thoughts*, at 69. Brewer's warning came at a period of great unrest in Kansas, during the populist resistance to economic control by far-away, mostly out-of-state forces over the lives of ordinary Kansans (farmers in particular). "Has Kansas fulfilled her mission? Has her intense enthusiasm for liberty spent its force?" he rhetorically asked. *Thoughts*, at 67. He worried that even in the private sphere, liberty was threatened:

> "The corporation is not content to carry on its work without interfering with that of the
> individual, but it aims by virtue of its accumulated power to destroy all competition and

monopolize the entire business. The voice of the combination and trust to the individual is, 'Be swallowed up and live, or fight and die.'" *Thoughts*, at 69.

Thus, Justice Brewer sympathized with the "[h]elpless" laborer who, "in a contest with such accumulated power," organizes seeking "to maintain his rights against the combination of capital." *Thoughts*, at 69. But in this struggle, Justice Brewer lamented, the organization itself "becomes equally despotic over the individual laborer" determining "when he shall work and when not, the wages he must receive, and the various other conditions of employment." *Thoughts*, at 69. Given this, "[n]ever has there been a time when the inspiring thought written into the Declaration of Independence, of inalienable rights, rights which each individual has to life, liberty, and the pursuit of happiness, was in greater peril than at the present moment." *Thoughts*, at 67.

These ideas also echo through disciplines besides law. For example, explaining his objection to what Brewer called the "combination" of capital, the economic theorist Karl Polanyi clarified: "It is not degrading to work under orders: any collective work requires its coordination through orders." Polanyi et al., Economy and Society: Selected Writings 17 (2018). Instead, "[w]hat is degrading is the fact that under the given conditions the power to command, to which the workers are subjected, is an alien power, although it should be the workers' own since, from the social point of view, it rests on . . . their own labour . . . ." Polanyi, at 17.

The question, to appropriate Polanyi's felicitous phrasing, is whether, "under the given conditions," the "power to command . . . is an alien power" or is the people's own power, delegated by consent. That is the crucial distinction, and it makes all the difference. It doesn't matter how many "rights" an alien power confers upon those under its dominion; the degradation is the same. Treating human beings as mere profit and choice maximizing machines disembeds them from the political community itself,

184

rendering the "power to command" an "alien" rule. This "un-freedom"—as Polanyi termed it—stands in the "voluntarist" tradition described above. And there is a stark contrast between the voluntarist unfreedom and the true liberty that flourishes under the conditions of just rule, based on participatory consent for the promotion and security of the commonwealth.

Either section 1 is a fount of judicially discovered and preferred "fundamental" rights or it is a blanket guarantee to all Kansans of the *first* rights of republican self-government: the right to participatory consent to government for the benefit of the common welfare, on the one hand, and the right to otherwise be free from arbitrary, irrational, or discriminatory regulation that bears no reasonable relationship to the common welfare, on the other. Section 1 cannot be both. The former road alienates the people from the exercise of power and disembeds them from the political community. But this is the way the majority has decided to go.

*11.    Rational Basis with Bite*

If section 1 does not protect "fundamental" rights with the shield of "strict scrutiny" judicial review, is it necessarily a mere paper law—a glittering generality? No. Contrary to modern notions of "rational basis" review, the judicial inquiry demanded by section 1 would look to the actual legislative record rather than to hypothetical reasons or any possible imagined rationale. The test has occasionally been described as "rational basis with bite." Note, *Rational Basis With Bite:  Intermediate Scrutiny by Any Other Name*, 62 Ind. L.J. 779, 779-80 (1987) (coining the phrase).

As one judge recently put it, "this test is rational basis with bite, demanding actual *rationality*, scrutinizing the law's actual *basis*, and applying an actual *test*." *Patel v. Dept. of Licensing and Regulation*, 469 S.W.3d 69, 98 (Tex. 2015) (Willett, J., concurring). On

the one hand, it does not load "the dice—relentlessly—in government's favor," resulting in a "pass/fail" test that the "government never fails." 469 S.W.3d at 99 (Willett, J., concurring). On the other hand, it remains a deferential test—one that recognizes our Constitution vests the legislative branch of government with the institutional competence to consider competing interests and policy options, resulting in democratic judgment about the common welfare of all Kansans.

In sum, section 1 demands this "rational basis with bite" judicial inquiry. In order to be a constitutional exercise of power, *every* act of our Legislature must be rationally related to the furtherance or protection of the commonwealth. The lodestar of this test is, "'*what have* [the people] *authorized to be done*?'" *Nemaha*, 7 Kan. at 557 (Brewer, J., dissenting). The people have not authorized the State to act in arbitrary, irrational, or discriminatory ways. Applying the necessary deference, a court must examine the *actual* legislative record to determine the *real* purpose behind any law in question before it can conclude the law is within the limited constitutional grant of power possessed by the State.

Again, Justice Brewer provides guidance. "While good faith and a knowledge of existing conditions on the part of a legislature is to be presumed," courts reviewing an exercise of police power should never "carry that presumption to the extent of always holding that there must be some undisclosed and unknown reason for subjecting certain individuals or corporations to hostile and discriminating legislation" because to do so would "make the protecting clauses . . . a mere rope of sand, in no manner restraining state action." *Gulf*, 165 U.S. at 154.

Here I pause to observe that the majority's characterization of the judicial test I have set forth—the test section 1 demands *every* exercise of the State's police powers must satisfy—bears no resemblance to anything I have written here. The majority claims

186

I am "dismissive" of the rights of citizens. Slip op. at 34. The majority reads the limitations on the State's police power I describe as setting "too low a bar" and "allowing the State to . . . intrude into all decisions about childbearing" and "our families." Slip op. at 74-75. The original public meaning of section 1 is described as leaving citizens "naked and defenseless" against abusive state power. Slip op. at 83. The majority suggests my approach grants "unrestrained" power to the State, "unfettered by constitutional constraints," which has "no practical limits" and allows the government to "intrude with impunity" against the individual. Slip op. at 84. And finally, with an Atwoodian flourish, I stand accused of maintaining "that upon becoming pregnant, women relinquish virtually all rights of personal sovereignty in favor of the Legislature's determination of what is in the common good." Slip op. at 50. All of which leads to the preposterous "presumption" that I would find "no constitutional conflicts" with state-mandated mass sterilization. See slip op. at 84 (describing a hypothetical law where all males are forcibly sterilized at the age of 18 in order to limit population density). Meanwhile, continuing the theme, the concurring opinion suggests I am "perfectly align[ed]" with the infamous Holmesian judgment that "'[t]hree generations of imbeciles are enough.'" Slip op. at 106 (Biles, J., concurring).

I am agog. I must know—*what* have my colleagues been reading? It cannot be anything I have written. In any case, I assure the reader this description of my view is a fabrication so flimsy it makes run-of-the-mill straw men appear as fairy tale knights by comparison.

IS S.B. 95 A LEGITIMATE EXERCISE OF POLICE POWER?

So, is S.B. 95 a legitimate exercise of state police power? If the original meaning of section 1—and this court's prior mode of consistently applying section 1 as a police power provision—had carried the day here, I would be content to wait to answer that

187

question. In the meantime, I would remand this case to the district court to apply the correct legal standard. See, e.g., *State v. Garcia*, 295 Kan. 53, 54, 283 P.3d 165 (2012) (reversing and remanding to ensure the district court applied the correct legal standard). On remand, the question for the parties to litigate, and the district court to resolve, would be whether S.B. 95 bears a reasonable relationship to the common welfare or is otherwise arbitrary, irrational, or discriminatory.

Unfortunately, history, reason, and original meaning have not carried the day. Hence, because the proper "rational basis with bite" test will otherwise go unapplied in today's context, I offer some thoughts on the general considerations a court *might* entertain if such a test was applied, with the caveat that sufficient facts have not been developed in the record to arrive at any definitive conclusions.

The overriding question is whether the legislative act is reasonably related to the furtherance or protection of the common welfare. The Legislature has wide latitude to define for itself the substantive content of the common good, circumscribed by the traditional police power limit that a law cannot be arbitrary, irrational, or involve a class-based form of discrimination. Of course, protecting unborn life and requiring humane abortion procedures when that life is taken can promote the common good. Even the Supreme Court has recognized the state's so-called "life interest." See *Gonzales*, 550 U.S. at 157-58 (affirming the government's valid objectives in "protecting the life of the fetus," showing "profound respect for the life within the woman," and "'protecting the integrity and ethics of the medical profession'").

The stated goal of S.B. 95 is to protect Kansas unborn children from dismemberment abortion, or being "cut" "one piece at a time from the uterus." K.S.A. 65-6742(b)(1); K.S.A. 65-6741. It is certainly reasonable to say the State could have a valid purpose in banning this brutal method of killing an unborn child. See *Stenberg*, 530 U.S.

188

at 961 (Kennedy, J., dissenting) ("States also have an interest in forbidding medical procedures which, in the State's reasonable determination, might cause the medical profession or society as a whole to become insensitive, even disdainful, to life, including life in the human fetus."); 530 U.S. at 953 (Scalia, J., dissenting) ("The method of killing a human child . . . proscribed by this statute is so horrible that the most clinical description of it evokes a shudder of revulsion."). Shockingly, the majority hardly even *considers* the State's legitimate interest in protecting unborn life as a means of promoting and furthering the common welfare of our state.

This failure is glaring when contrasted with the State of Kansas' longstanding policy of protecting the unborn—even outside the abortion context. For instance, Kansas criminalizes homicides of the unborn; refuses to execute pregnant convicts; permits wrongful death actions for the unborn; gives no effect to a living will when the patient is pregnant; and provides for the representation of the unborn in trust and probate proceedings. See K.S.A. 2018 Supp. 21-5419(c) (homicides of unborn children); K.S.A. 22-4009 (prohibition against execution of a pregnant convict); K.S.A. 2018 Supp. 60-1901(b) (action for wrongful death of unborn child); K.S.A. 65-28,103 (living will has no effect during pregnancy); K.S.A. 59-2205 (representation of unborn in a probate proceeding); K.S.A. 59-2254 (representation of unborn in a trust accounting); K.S.A. 58a-305 (appointment of representative for unborn individual under Kansas Uniform Trust Code).

If, however, the legislative record reveals evidence of a discriminatory intent or some other arbitrary or irrational purpose behind the law, a court must actively consider the possibility that the act was not *actually* intended to further the common welfare and legitimate state interest in unborn life and humane medical practices. But such considerations are neither possible nor appropriate at this stage of litigation, where a preliminary injunction has been granted, and in the context of a dissenting opinion. This

189

brief recitation is sufficient to limn the outlines of the kind of judicial review that the original public meaning of section 1 requires and our predecessors actually performed many times.

## LOSING OUR COMMONWEALTH

Many Kansans—a significant majority of them if one extrapolates from the votes of their political representatives—will feel aggrieved by the decision this court renders today. They will not be pacified by claims that the result was achieved by a fair, impartial, and "democratic vote by [seven] lawyers." *Stenberg*, 530 U.S. at 955 (Scalia, J., dissenting). It's important to ask, why? Is it because, as the majority suggests, a significant majority of Kansans continue to be informed by centuries-old prejudices? Given the flourishing and broadly equal society Kansans have fashioned, this explanation seems unlikely at best. Or is it because Kansans will feel, even if only intuitively, that an important right of self-government has been stolen away from them under a cloud of impenetrable legal jargon?

As explained at length above, section 1—properly understood—expresses a truth widely known and accepted at the time of Kansas' constitutional moment:  pre-political individual sovereigns possess a natural and inalienable right to do "what they like." Convention, at 185. But that was only half the story. Just as important, Kansans understood the Declaration's language anticipated that such pre-political people desired to be more—they desired to be citizens. Such people came together and formed political communities by relinquishing however much of that individual sovereignty was necessary to obtain a "state"—that is, a common welfare secured for all.

Thus, the newly constituted State of Kansas exercised limited police power *in the name of* the pre-constitutional person who, by his or her implied consent, had agreed to

190

be bound to police regulations so long as they were not irrational, arbitrary, or discriminatory, and were reasonably related to the furtherance of the common welfare. At our founding, Kansans understood the "old truth" embodied in section 1 to mean that every person would give up "enough control over his original rights to permit government to maintain an organized, stable, peaceful pattern of human relations." Rossiter, Seedtime of the Republic:  The Origin of the American Tradition of Political Liberty 442 (1953).

Kansans were just as interested in achieving an organized, stable, peaceful commonwealth as they were in retaining individual sovereignty. The liberty proclaimed in both the Declaration and in section 1 was not just the negative liberty of the pre-political individual, but also the "'positive liberty'" of newly created "citizens of a self-governing society to participate and act for the public good and to use their government to seek, in Aristotle's words, 'not merely life alone, but the good life.'" Ketcham, Framed For Posterity:  The Enduring Philosophy of the Constitution 40 (McWilliams & Banning eds., 1993).

It is the right to self-government properly understood—and the constituent political community it establishes—which today's majority has taken from Kansans. Put another way, the "practice of constitutional revision by an unelected committee of [seven], always accompanied (as it is today) by extravagant praise of liberty, robs the People of the most important liberty they asserted in the Declaration of Independence and won in the Revolution of 1776:  the freedom to govern themselves." *Obergefell v. Hodges*, 576 U.S.__, 135 S. Ct. 2584, 2627, 192 L. Ed. 2d 609 (2015) (Scalia, J., dissenting). Likewise, if "'the people . . . should ever think of making judges supreme arbiters in political controversies . . . they will dethrone themselves and lose one of their own invaluable birthrights; building up in this way—slowly, but surely—a new sovereign power in the republic . . . .'" *In re Gunn, Petitioner*, 50 Kan. 155, 229, 32 P. 948 (1893)

191

(Allen, J., dissenting) (quoting *Luther v. Borden et al.*, 48 U.S. (7 How.) 1, 52-53, 12 L. Ed. 581 [1849] [Woodbury, J., dissenting]); see *Janus v. State, County, and Municipal Employees,* 585 U.S. ___, 138 S. Ct. 2448, 2502, 201 L. Ed. 2d 924 (2018) (Kagan, J., dissenting) (warning about "black-robed rulers overriding citizens' choices").

As one dissenting Tennessee Supreme Court Justice explained, calling abortion a fundamental right denies the people the opportunity to rule themselves and weigh difficult competing interests:

> "Undoubtedly, the issue of abortion is one of the most controversial and fiercely debated political issues of our time, and any resolution of this issue can only be achieved through deliberative, thoughtful, and public dialogue. Nevertheless, with its decision today, the Court has elevated one extreme of this debate to a constitutional level and has made any meaningful compromise on this issue all but impossible. The Court has done so simply by proclaiming that the right to obtain an abortion is 'fundamental' under the Tennessee Constitution, and that as such, our Constitution effectively removes from the General Assembly any power to reach a reasonable compromise that considers all of the important interests involved." *Planned Parenthood v. Sundquist*, 38 S.W.3d 1, 25 (Tenn. 2000) (Barker, J., dissenting in part and concurring in part).

Long ago, in Federalist 71, Alexander Hamilton described the importance of this kind of thoughtful, public resolution of difficult and fiercely debated issues. He wrote that the "republican principle demands that the deliberate sense of the community should govern the conduct of those to whom they intrust the management of their affairs . . . ." Hamilton, The Federalist No. 71, *The Same View Continued in Regard to the Duration of the Office*, *in* Madison, Hamilton, and Jay, The Federalist Papers 409 (Kramnick ed., 1987). "In the particular type of deliberative democracy fashioned by the American framers, the citizenry would reason, or deliberate, *through* their representatives . . . ." Bessette, The Mild Voice of Reason:  Deliberative Democracy & American National

Government 1 (1994). The framers conceived the republican "political process as an effort to select and implement public values. The process is primarily one of collective self-determination [in which] . . . [t]he role of the representative . . . is not to choose among preselected values but instead to select values through public deliberation and debate." Sunstein, *Naked Preferences and the Constitution*, 84 Colum. L. Rev. 1689, 1694-95 (1984).

The first Kansans understood the language of section 1 not only as an inherent limitation on the police power of the state, but also as legitimizing the political community itself, along with its "deliberative sense" of how to further the common welfare of all Kansans. "Kansas" was the community being "constituted" after all. See, e.g., Topeka Const. of 1855, Preamble ("[I]n order to secure to ourselves and our posterity the enjoyment of all the rights of life, liberty and property, and the free pursuit of happiness, do mutually agree with each other, to form ourselves into a free and independent State . . . .").

This deliberative sense is the only thing legitimizing law itself. "Law is more than just another opinion . . . . Law is the principal institution through which a society can assert its values." Bickel, The Morality of Consent 5 (1975). The people's deliberative sense, when confined to the pursuit of the common welfare, creates a pragmatic and flexible counterweight to the absolute sovereignty of the Lockean pre-constitutional person. As one scholar put it, "eighteenth century values of natural rights never totally supplanted the seventeenth century American belief in a community held together by substantive values reflected in moral legislation." Forte, 13 Ga. L. Rev. at 1507.

Such balance is the hallmark of our historic understanding of what makes a republican form of government. When pursued unilaterally, each version of "liberty" had proven inherently unstable. But when placed in creative equipoise, the two traditions

193

achieved their most lasting expression in the Declaration and the explosion of republican governments it spawned. Thus, the natural rights theorists that so influenced the American founding "emphasized both individual rights and the common good as complementary rather than conflicting aspects of the human condition." Tierney, at 334.

A more down-to-earth way to say the same thing—the Constitution announces and defines boundaries, not values. Or, if one must use the language and discourse of values, one might say those boundaries *are the values* the Constitution announces. And it is the courts' job to patrol boundaries, not to decide whether any particular enactment is consistent with "fundamental" or "substantive" values. See slip op. at 7, 77. One of the most cogent and penetrating critics of the judicial pursuit of fundamental constitutional values was the longtime Harvard legal philosopher and constitutional theorist John Hart Ely.

Ely was no originalist, and he supported legal abortion access as a matter of policy. He took the view that "certain of our Constitution's critical phrases cannot intelligibly be given shape without a substantial injection of content from some source beyond the documentary language." Ely, *Foreword:  On Discovering Fundamental Values*, 92 Harv. L. Rev. 5, 5 (1978). But this cannot mean "that all bets are off" and judges are "free to make the Constitution mean whatever [they] please." 92 Harv. L. Rev. at 5. As Ely explained, the "jurisprudence that defines the Court's role as one of protecting those values the Court regards as truly fundamental" began in earnest with *Roe v. Wade*, 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1973). 92 Harv. L. Rev. at 15. Such a jurisprudence conceives of the role of appellate judges as "identifying and enforcing upon the political branches those values that are, according to one formula or another, truly important or fundamental" because "the political process [cannot] be trusted with such judgments." 92 Harv. L. Rev. at 10, 12. Specifically, "the democratic process is incapable of dealing responsibly with the excruciating clash of values abortion

194

entails." 92 Harv. L. Rev. at 11. Thus, "a woman's right to choose an abortion is simply so important, so fundamental, that we cannot permit it to be legislatively inhibited." 92 Harv. L. Rev. at 11.

Today's majority certainly follows this well-trod rationale. And in truth, many people have grown accustomed to thinking about the American judiciary in precisely this fashion. The idea is buttressed by "the prevailing academic line . . . that the Court should give content to the Constitution's open-ended provisions by identifying and enforcing upon the political branches America's fundamental values." 92 Harv. L. Rev. at 15. The glaring problem, as Ely devastatingly describes, is that when judges are engaged in this process of values discovery, what the judge is "likely really to be 'discovering,' whether or not he is fully aware of it, are his own values." 92 Harv. L. Rev. at 16. And in that process of self-discovery, there "*will* be a systematic bias in judicial choice of fundamental values, unsurprisingly in favor of the values of the upper middle, professional class from which most lawyers and judges . . . are drawn." 92 Harv. L. Rev. at 37. This undeniable truth seems "so flagrantly elitist and undemocratic it should be dismissed forthwith." 92 Harv. L. Rev. at 38. Ely concludes with Robert Dahl's wry observation that "'almost the only people who seem to be convinced of the advantages of being ruled by philosopher-kings are . . . a few philosophers.'" 92 Harv. L. Rev. at 39 (quoting Dahl, Democracy in the United States 24 [3d ed. 1967]). And by way of addendum one might add—a majority of Kansas Supreme Court justices.

So how *should* we understand the proper role of judges in our republican system of government? Ely again supplies a useful metaphor:  "The approach to constitutional adjudication recommended here is akin to what might be called an 'antitrust' as opposed to a 'regulatory' orientation to economic affairs—rather than dictate substantive results it intervenes only when the 'market,' in our case the political market, is systematically malfunctioning." Ely, Democracy and Distrust:  A Theory of Judicial Review 102-03

195

(1980). Just so. While I have set forth a more originalist understanding of the proper constitutional boundaries imposed on the exercise of state power by the Kansas Constitution, and Ely preferred an approach grounded more in notions of procedural participation and fairness, the end results are not too far apart.

Both Ely and I fall on the side of judges as "keeper[s] of the covenant" instead of "Platonic guardians." Pacelle Jr. et al., *Keepers of the Covenant or Platonic Guardians? Decision Making on the U.S. Supreme Court*, 35 American Politics Research 718 (2007); see also *Plyler v. Doe*, 457 U.S. 202, 242, 102 S. Ct. 2382, 72 L. Ed. 2d 786 (1982) (Burger, C.J., dissenting) ("The Constitution does not constitute us as 'Platonic Guardians' nor does it vest in this Court the authority to strike down laws because they do not meet our standards of desirable social policy, 'wisdom,' or 'common sense.'"). It is the judicial maintenance of this constitutional synthesis—between boundaries that may not be crossed by the state for any reason, on the one hand, and a wide field to permissibly pursue the common good through the deliberative sense of the political community, on the other—that properly balances (and thus preserves) *both* the people's political liberty of self-government and their pre-political liberty "to do the nearest what they like—the nearest what they think and act." Convention, at 185.

Thus, among the casualties of today's decision is the deliberative sense of our particular political community—constituted in 1861 as "Kansas"—concerning what best serves the common welfare of its people. Without that deliberative sense, the ground under the political community erodes. Which is to say, the "constituting" of Kansas is itself effaced and diminished. Our unity as a particular "people" is undermined. As one leading political philosopher of the 20th century put it, "[h]uman society is . . . . illuminated with meaning from within" through "an elaborate symbolism" by "the human beings who continuously create and bear it as the mode and condition of their self-

realization." Voegelin, Representation and Existence, *in* 5 The Collected Works of Eric Voegelin 109 (2000).

Those symbols—in our case, the paramount symbol of the Declaration of Independence and section 1—are so important because they reveal "the internal structure" of the political community—"the relations between its members and groups of members." Voegelin, at 109. In simpler terms, constitutions both create and express the self-understanding of a particular political community. "[T]he members of a society experience" the "symbolization" inherent in constituting acts as "more than an accident or a convenience; they experience it as of their human essence." Voegelin, at 109.

The loss of this self-reflective, deliberative sense of ourselves is felt keenly by citizens who perceive, even if dimly, that something of their political "essence" is being eliminated. Practically speaking, "by foreclosing all democratic outlet for the deep passions this issue arouses, by banishing the issue from the political forum that gives all participants, even the losers, the satisfaction of a fair hearing and an honest fight," this court "merely prolongs and intensifies the anguish" felt by all sides of this existential argument. *Casey*, 505 U.S. at 1002 (Scalia, J., dissenting).

Nothing in this suggests that the deliberative sense of the political community cannot or does not, from time to time, exceed its legitimate bounds. Of course it can, and often does. When it does, it is the role of the judicial branch to police the policeman, to curtail those abuses, to put the political community back inside its "constituted" bounds. When judges carry out this policing function by considering the deliberative sense of the political community on its own terms—that is, by considering its reasonable relationship to the common good—we affirm the legitimacy of the political community exercising its lawmaking function. This remains true even when determining the police power was exceeded in a particular instance. But today's majority eschews the more modest,

restrained role of constitutional covenant keeper in favor of the unrestrained Platonic guardian of constitutional "values."

CONCLUSION

If any state has a historical claim to a seat of honor on any dais celebrating the triumph of the principles of the Declaration of Independence in the decades surrounding the Civil War, it is our beloved home of Kansas. More than any other state, ours was birthed in the crucible of pitched battle between two opposed and irreconcilable ideas— *government by consent* or *consent by government*.

Given the opportunity to seize this birthright anew, our court has decided—"all for the sake of political power," in Senator Sumner's words—to reach instead for the thin gruel of an all-powerful state restrained only by the caprice of judicially discovered "fundamental" rights. Sumner, 5. Section 1 was always intended to introduce a charter of limited power, not a charter of limited rights. As it turns out, there is an important difference between the two. Again, in Madison's striking words, it is the difference between "charters of power granted by liberty" and "charters of liberty . . . granted by power." Madison, at 83.

We have turned our constitutional structure on its head. Instead of a general limit on the police power of the state which constrains *every* exercise of that power, section 1 is now a "guarantee" of limited, preferred rights granted by the arbitrary power of a majority of judges on this court. Of course, this leaves in place the equally dangerous arbitrary power of the Legislature to act with impunity in any area not already occupied by this court.

At the outset, I noted that this case isn't just about the policy of abortion, it is more basically about the structure of our government. While true, this description fails to account for a strange but persistent symbiosis between the two. Abortion has become the judicially preferred policy tail wagging the structure of government dog. For the majority, the settled and carefully calibrated republican structure of our government must give way, at every turn, to the favored policy. But in my considered judgment, *constitutional structure* is the very thing securing and guaranteeing the *full range* of human liberty. History and reason suggest that those who, in the name of liberty, tear down that edifice will wind up out in the political elements, unsheltered and exposed to the cold wind of every arbitrary power.

I dissent.